**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **IN RE: TYLENOL®** §<br>**(ACETAMINOPHEN) MARKETING,** §<br>**SALES PRACTICES AND PRODUCTS** §<br>**LIABILITY LITIGATION** §<br> §<br> §<br>***THIS DOCUMENT RELATES TO ALL*** §<br>***CASES*** § | **MDL NO. 2436**<br><br>**2:13-md-02436**<br><br>**HON. LAWRENCE F. STENGEL** |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO STAY PROCEEDINGS**
**PENDING ENTRY OF MDL 2436 CASE MANAGEMENT ORDERS**
**AND PLAINTIFFS' COUNSELS' JOINT CROSS-APPLICATION FOR THE**
**CREATION OF, AND THEIR APPOINTMENT TO, A**
**PLAINTIFFS' STEERING COMMITTEE**

The undersigned Plaintiffs' counsel ("Movants") do not oppose the motion to stay filed by Defendants. However, any stay imposed should be very short and the prior deadlines for the Defendants' to respond to written discovery served by Movants should be maintained. Movants believe that appropriate Case Management Orders can be promptly entered, and that to facilitate the prompt commencement of this already active litigation, Movants incorporate within their non-opposition to the Motion to Stay their *Joint-Application for the Creation of, and their Appointment to, a Plaintiffs' Steering Committee* ("PSC"). Movants seek their appointment to various leadership roles to act on behalf of Plaintiffs in this complex over-the-counter pharmaceutical litigation. Movants also respectfully request an expedited case management conference with the Court to address their request for the creation of and their appointment to a PSC so that there will no unnecessarily delay in the litigation of this case.

1

As is typical with most complex pharmaceutical litigations, this case presents several significant factual and legal issues in which Plaintiffs must prevail against a number of well-financed and ably defended pharmaceutical companies, including the primary defendants McNeil-PPC, Inc.[1] and its parent corporation Johnson & Johnson, Inc. (collectively "McNeil" or the "McNeil Defendants"). As such, the early appointment of experienced Plaintiff counsel who are well-versed in pharmaceutical mass tort litigation in general, and in the science of acetaminophen induced liver toxicity in particular (which is the subject matter of the cases *sub judice*), will serve the best interests of all Plaintiffs in this multidistrict proceeding. Movants collectively represent over 95% of the Plaintiffs whose cases have been transferred to this Honorable Court or are pending in the state courts in Pennsylvania and New Jersey.

Prior to the creation of this MDL, Movants had been actively litigating TYLENOL® liver failure cases as a cohesive group in state court in New Jersey and the Philadelphia Court of Common Pleas ("Pennsylvania litigation"). Commencing in or about late 2012, McNeil began removing cases from the Pennsylvania litigation to this Court on the basis of diversity of citizenship. As the number of cases assigned to this Court increased, and cases were filed in other federal courts around the country, Movants collectively sought centralization and consolidation to this Court under 28 U.S.C. §1407, over McNeil's objection. Although the MDL was only recently established on April 1, 2013, Movants had been litigating the cases for a substantial period of time and had done so in a coordinated and organized fashion, conducting the litigation as though a "mini-MDL" existed prior to the formal establishment of this MDL.

---

[1] Defendants have represented that McNeil Consumer Healthcare in an unincorporated division of McNeil-PPC, Inc., and hence purportedly not separately amenable to suit. However, the Complaints in these cases name McNeil Consumer Healthcare as a separate defendant.

Now with the formal creation of an MDL, Movants respectfully request the Court to establish a formal PSC and that they be appointed to it.

The attorneys and firms who have demonstrated substantial monetary commitments and time to this litigation before the case was transferred to this Court, and even before the Motion for Consolidation and Interested Party Briefs were filed and oral arguments were conducted before the Panel, are those with the greatest interest and commitment to this litigation. As stated above, Movants have been litigating TYLENOL® cases as a cohesive group in Pennsylvania and New Jersey state courts and thus already have considerable time and resources invested in the cases and have developed substantial expertise in the science and law involving TYLENOL® cases. Appointing Movants will maintain continuity and serve to advance the goal of efficiency by allowing experienced attorneys familiar with the case to continue litigating the case and avoid reinventing the wheel. It will also enhance strategic coherence in the litigation and promote coordination with the ongoing litigation in New Jersey state court.[2]

In addition, Movants understand that the successful pursuit of any pharmaceutical mass tort requires not only zealous advocacy, but also professionalism, cooperation and courtesy. As experienced Plaintiffs' counsel, the Movants understand their obligation to this Court and to the Defendants to act in a manner which promotes the "just, speedy and inexpensive determination" of this consolidated proceeding, to avoid needless controversy and confrontation, and to always place the Plaintiffs' best interests at the forefront.

Movants therefore respectfully request that the Court appoint the proposed PSC and leadership as soon as practicable as set forth in the *Memorandum in Support of Plaintiffs'*

---

[2] It is not expected that many cases will remain in the Pennsylvania litigation, in that the Defendants have consistently removed the cases pending in the Philadelphia Court of Common Pleas to this Court and it is expected the Defendants will continue to do so. Thus, it is expected that the only two venues where virtually all of the cases will be litigated will be in this MDL and in state court in New Jersey.

*Counsels' Joint Application for the Creation of and their Appointment to the Plaintiffs' Steering Committee*, filed simultaneously herewith.

Respectfully submitted,

_____/s/_____

Arnold Levin, Esquire
Laurence S. Berman, Esquire
Fred S. Longer, Esquire
Michael M. Weinkowitz, Esquire
LEVIN FISHBEIN SEDRAN & BERMAN
510 Walnut St., Suite 500
Philadelphia, PA 19106
215-592-1500
215-592-4663 (facsimile)
ALevin@lfsblaw.com
LBerman@lfsblaw.com
FLonger@lfsblaw.com
MWeinkowitz@lfsblaw.com

R. Clay Milling, Esquire
HENRY SPIEGEL MILLING LLP
Atlanta Plaza, Suite 2450
950 East Paces Ferry Road, N.E.
Atlanta, GA 30326
(404) 832-8000
(404) 832-8050 (facsimile)
RCM@HSM-LAW.COM

Chris Seeger, Esquire
David Buchanan, Esquire
SEEGER WEISS, LLP
77 Water Street
New York, NY 10005
(212) 584-0700
(212) 584-0799 (facsimile)
CSeeger@seegerweiss.com

James F. Green, Esquire
Chris Tisi, Esquire
Michelle Parfitt, Esquire
ASHCRAFT & GEREL, LLP
SUITE 400
2000 "L" St., N.W.

4

Washington, D.C.20036
(202) 783-6400
(202) 416-6392 (facsimile)
jgreen@ashcraftlaw.com

Leonard Davis, Esquire
Russ Herman, Esquire
Steve Herman, Esquire
HERMAN, HERMAN, KATZ & COTLAR LLP
820 O'Keefe Avenue
New Orleans, Louisiana 70113
(504) 581-4892
(504) 561-6024 (facsimile)
LDavis@HHKC.com

Gil Gainer, Esquire
TOLIVER & GAINER
942 Green St SW
Conyers, GA 30012
(770) 929-3100
(770) 785-7879 (facsimile)
Gainer@tiloverandgainer.com

Dianne Nast, Esquire
NASTLAW
1101 Market Street
Suite 2801
Philadelphia, Pennsylvania19107
(215) 923-9300
(215) 923-9302 (facsimile)
DNast@nastlaw.com

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **IN RE: TYLENOL (ACETAMINOPHEN) MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION** | § § § § | **MDL NO. 2436**<br><br>**2:13-md-02436** |
| ***THIS DOCUMENT RELATES TO ALL CASES*** | § § § § | **HON. LAWRENCE F. STENGEL** |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO STAY PROCEEDINGS PENDING ENTRY OF MDL 2436 CASE MANAGEMENT ORDERS AND PLAINTIFFS' COUNSELS' JOINT APPLICATION FOR THE CREATION OF, AND THEIR APPOINTMENT TO, A PLAINTIFFS' STEERING COMMITTEE**

## I.  INTRODUCTION

The undersigned Plaintiffs' counsel ("Movants") do not oppose the motion to stay filed by Defendants. However, any stay imposed should be very short and the prior deadlines for the Defendants' to respond to written discovery served by Movants should be maintained.  Movants believe that appropriate Case Management Orders can be promptly entered, and that to facilitate the prompt commencement of this already active litigation, Movants incorporate within their non-opposition to the Motion to Stay their *Joint-Application for the Creation of, and their Appointment to, a Plaintiffs' Steering Committee* ("PSC"). Movants seek their appointment to various leadership roles to act on behalf of Plaintiffs in this complex over-the-counter pharmaceutical litigation. Movants also respectfully request an expedited case management conference with the Court to address their request for the creation of and their appointment to a PSC so that there will no unnecessarily delay in the litigation of this case.

1

The Plaintiffs have all alleged serious personal injury and in some tragic instances wrongful death due to their ingestion of the branded, non-prescription over-the-counter ("OTC") analgesic TYLENOL® products that contain acetaminophen. Each of the Plaintiffs ingested at least one type of acetaminophen containing OTC TYLENOL® manufactured by the primary defendants McNeil-PPC, Inc.[3] and its parent corporation Johnson & Johnson, Inc. ("McNeil") which is alleged to have caused their acute liver failure.[4] Plaintiffs allege, *inter alia,* that McNeil designed, manufactured, sold and placed into the stream of commerce defective acetaminophen containing OTC TYLENOL® products and in doing so concealed the margin of risk of liver toxicity / liver failure associated with the ingestion of TYLENOL® products.

The litigation presents several significant factual and legal issues in which Plaintiffs must prevail against a number of well-financed and ably defended pharmaceutical companies including the McNeil. As such, the early appointment of experienced Plaintiff counsel who are well-versed in pharmaceutical mass tort litigation in general and in the science of acetaminophen induced liver toxicity in particular which is the subject of the cases *sub judice,* will serve the best interests of all Plaintiffs in this multidistrict proceeding.

Prior to the creation of this MDL, Movants had been actively litigating TYLENOL® liver failure cases as a cohesive group in state court in New Jersey and the Philadelphia Court of

---

[3] Defendants have represented that McNeil Consumer Healthcare in an unincorporated division of McNeil-PPC, Inc., and hence purportedly not separately amenable to suit. However, the Complaints in these cases name McNeil Consumer Healthcare as a separate Defendant.

[4] There are a number of other acetaminophen OTC manufacturer's also named by Plaintiffs where the Plaintiff ingested a non-McNeil product at or near the time of injury. Some cases have named defendants whose prescription generic acetaminophen containing product was ingested. As for these latter defendants, most have been dismissed without prejudice and with a tolling agreement pending a decision by the United States Supreme Court in *Mutual Pharmaceutical Company, Inc. v. Karen L. Bartlett,* Docket No. 12-142, which was argued during the present Term. However, *all* cases in this MDL assert claims against the McNeil Defendants regardless of whether other Defendants are also named.

Common Pleas ("Pennsylvania litigation"). Commencing in or about late 2012, McNeil began removing cases from the Pennsylvania litigation to this Court on the basis of diversity of citizenship. As the number of cases assigned to this Court increased, and cases were filed in other federal courts around the country, Movants collectively sought centralization and consolidation to this Court under 28 U.S.C. §1407, over McNeil's objection. Although the MDL was only recently established on April 1, 2013, Movants had been litigating the cases for a substantial period of time and had done so in a coordinated and organized fashion, conducting the litigation as though a "mini-MDL" existed prior to the formal establishment of the MDL.[5] Now with the formal creation of an MDL Movants respectfully request the Court to establish a formal PSC and that they be appointed to it.

The constitution and make-up of the PSC is subject to the Court's approval. As set forth herein the proposed PSC includes lawyers with the appropriate attributes and skills needed to litigate this case. All have agreed to the proposed structure and to work cooperatively together on behalf of their clients and all Plaintiffs in this litigation. The proposed PSC includes attorneys with extensive leadership experience in the area of pharmaceutical mass torts. They have the highest ethical standing, outstanding courtroom achievements, superior academic backgrounds and proven records of success.

---

[5] Currently, in the New Jersey state court litigation there are fifteen (15) TYLENOL® liver failure cases pending before the Honorable Carole Higbee. The first of those cases was filed in 2010 and pre-trial discovery has been advancing in that case for the last few years as well as in the more recently filed cases in New Jersey (hereinafter referred to as the "New Jersey litigation"). Movants have been actively litigating those cases in tandem with their litigation of the cases now pending before this Court in this MDL. Thus, the Movants are well-versed in the science of acetaminophen induced liver toxicity, though some of the Movants are attorneys who have been litigating TYLENOL® liver toxicity cases against McNeil even longer, since 2007.

## II.  EARLY ACTION TO ORGANIZE THE LITIGATION IS ESSENTIAL TO PROTECT THE INTERESTS OF THE PARTIES AND EASE THE BURDEN ON THE COURT

Courts have broad discretion and authority to manage this Multidistrict litigation as noted

by Judge DuBuois in *In re Linerboard Antitrust Litigation*, 292 F.Supp.2d 644, 643 (E.D.Pa.

2003):

> "[A] district court needs to have broad discretion in coordinating and administering multi-district litigation." *In re Showa Denko K.K. L-Tryptophan Prods. Liab. Litig.*, 953 F.2d 162, 165 (4th Cir.1992)(citing *In re San Juan Dupont Plaza Hotel Fire Litig.*, 859 F.2d 1007, 1019 (1st Cir.1988)). "In multi-party, multi-case litigation, the district court's success is largely dependent on its ability to uncomplicate matters." *In re Recticel Foam Corp.* (*In re San Juan Dupont Plaza Hotel Fire Litig.*), 859 F.2d 1000, 1004 (1st Cir.1988). "The multiplicity of suits requires that the district court be allowed to combine procedures, appoint lead counsel, recognize steering committees of lawyers, limit and manage discovery, etc. to minimize expense to all litigants and to provide judicial efficiency." *In re Showa Denko*, 953 F.2d at 165 (citing *Manual for Complex Litigation* (Second) §§ 33.22, 33.25 (1985)(suggesting mechanism to organize counsel and discovery in mass tort litigation)). The district court's ultimate goal in multidistrict litigation is to "... promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a).

The *Manual for Complex Litigation* (Fourth) recognizes that an early effort by the Court

to structure and organize complex litigation best serves the interests of all parties. *Manual* at

§10.11. In implementing this important early involvement, the *Manual for Complex Litigation*

(Fourth) notes, "[t]he attorneys -who will be more familiar than the judge with the facts and

issues in the case - should play a significant part in developing the litigation plan and should

have primary responsibility for its execution." *Id.* at §10.13. Obviously, the first order of

business in overseeing coordinated litigation is the appointment of counsel to act on behalf of

other counsel and their clients. Once that order is in place, many other tasks may be addressed

immediately by the appointed counsel. Through prompt appointment of designated counsel,

Plaintiffs' counsel can assist the Court and the Defendants in managing resources and avoiding unnecessary disputes.[6] Moreover, prompt appointment will allow the parties to continue to litigate and alleviate the need for the stay that Defendants have requested. As is discussed at length below, the group of attorneys in the proposed PSC are from experienced law firms who are already familiar with the scientific and medical issues because they have been actively involved in litigating TYLENOL® cases for several years.

III. **THE BENEFITS OF A PSC AND DESIGNATION OF LEAD AND LIASION COUNSEL BEFORE THE INITIAL CASE MANAGEMENT CONFERENCE**

For an effective initial case management conference to be successfully conducted, Lead Counsel should be appointed[7] to coordinate a number of preliminary administrative matters that are best addressed *in advance* of the conference. These matters may include: (a) a proposed agenda for the conference; (b) a broad description of the claims; (c) the procedural status of the litigation, including the status of motions and state-court related litigation; (d) a preliminary estimate of the number of cases that may become part of the MDL; (e) the content of a proposed Case Management Order addressing issues such as establishment of a document repository; (f) submission of a list of all counsel of record and their contact information; (g) the use of medical releases and fact sheets; (h) suggestions on the content of potential preservation and protective orders; and (i) whether the appointment of a Special Master is appropriate for any functions pursuant to Fed.R.Civ.P. 53(1) (A&C).

---

[6] Indeed, even prior to the formation of this MDL, Movants negotiated with Defendants a Protective Order (Case Management Order No. 1) and an Order Regarding the Method of Discovery (Case Management Order No. 2) that this Court then entered. Movants continue to negotiate with Defendants' counsel over the terms of a Privilege Order and a Plaintiff Fact Sheet to be utilized in lieu of traditional interrogatory discovery.

[7] Although early appointment of leadership for both Plaintiffs and Defendants is important, Movants shall only address in this *Application* the appointment of Plaintiffs' leadership, leaving to Defendants their efforts to organize themselves.

Early appointment of leadership is beneficial to ensure orderly communication among involved parties, including those Plaintiffs' firms that have not yet entered an appearance in the MDL. As noted in the *Manual for Complex Litigation, Fourth*, "[t]he [initial] conference is not a perfunctory exercise, and its success depends on establishing effective communication and coordination among counsel and between counsel and the court." *See Manual for Complex Litigation,* (Fourth), §11.211. Pursuant to §11.12 of the *Manual for Complex Litigation,* (Fourth), this Court has authority, even *sua sponte*, to initiate special procedures at the outset of the case pending the initial conference including appointing liaison counsel. *See also, Manual for Complex Litigation,* (Fourth), §10.221 (outlining the responsibilities of liaison counsel).  Indeed it is not unprecedented in MDL litigations in the Eastern District of Pennsylvania for the Court to appoint MDL leadership early. For instance, in both *In re Orthopedic Bone Screw Products Liability Litigation*, MDL 1014 (E.D. Pa.) and *In re Diet Drugs*, MDL 1203 (E.D. Pa.), the Honorable Louis Bechtle appointed leadership, including Arnold Levin, Senior Partner at Movant Levin, Fishbein, Sedran & Berrman, shortly after transfer by the Panel. Movants are aware that the Honorable Cynthia Rufe in both *In re: Avandia Marketing, Sales Practices and Products Liability Litigation,* MDL No. 1871 (E.D. Pa.) and *In re: Zoloft (Sertraline Hydrochloride) Products Liability Litigation*, MDL No. 2342 (E.D. Pa.)[8] appointed the PSC in both MDLs after the initial status conference, following a hearing and submission of individual applications. However, early appointment is justified here because Movants have been actively litigating TYLENOL liver failure cases as a cohesive group in state court prior to the formation of this MDL and represent virtually all of the cases filed to date  This was not the case in

---

[8] Mr. Levin was a appointed by Judge Rufe to the Zoloft MDL PSC.

Avandia and Zoloft. In this case the applicants would be the undersigned Movants since they are the Plaintiffs' counsel actively pursuing these cases.

Elsewhere, the Honorable Judge Eldon Fallon of the Eastern District of Louisiana recognized the importance of early appointment of Liaison Counsel in the *In re Vioxx Product Liability Litigation*. In that pharmaceutical products liability MDL, Judge Fallon entered an order the day after the Panel Transfer Order was issued, directing plaintiffs' counsel to confer and seek consensus on the selection of a candidate for the position of liaison counsel (subject to court approval). *See In re: Vioxx Product Liability Litigation*, MDL No. 1657 (J.P.M.L. Feb. 16, 2005) and Pretrial Order No. 1 (E.D. La., Feb. 17, 2005). *See also In Re: Oral Sodium Phosphate Solution-Based Prods. Liab. Litig.*, MDL No. 2066, Pretrial Order No. 1, (N.D. Ohio, Jul. 16, 2009)(appointed of interim liaison counsel as the court's first order of business prior to the initial conference).

IV.     **BASIS FOR PROPOSED PSC AND LEADERSHIP**

There are a number of factors that the Court may evaluate and consider in determining who should be appointed lead counsel or a member of the PSC. A discussion follows.

### A.     Number of known and represented clients from each firm

The number of clients a firm has (whether under investigation or filed) is a highly relevant factor. Ultimately, lawyers with the most clients likely have the most at stake, and therefore have a significant interest in ensuring a fair and successful outcome for the litigation as a whole. While the principle of common benefit reimbursements can be utilized to incentivize lawyers with fewer cases to commit time and expenses, it is lawyers with the bulk of clients and cases who should drive the litigation. Thus far, Movants represent virtually all of the Plaintiffs

who have cases are pending in both the state and federal courts. They have a substantial stake in the litigation.

## B.    Time involved in the litigation

The attorneys and firms who have demonstrated commitment to this litigation before the case was transferred to this Court (and even before the motion for consolidation and Interested Party Briefs were filed and oral arguments were conducted before the Panel) are those with the greatest interest and those who have committed to this litigation. As stated above, Movants have been litigating TYLENOL® cases as a cohesive group in Pennsylvania and New Jersey state court for almost three years (the first New Jersey state court case was filed in 2010) and thus already have considerable time and resources invested. They have been active in this Court since the first case was removed to this Court in late 2012. Appointing Movants will maintain continuity and serve to advance the goal of efficiency by allowing experienced attorneys familiar with the case to avoid reinventing the wheel. It will also enhance strategic coherence in the litigation and promote coordination with the state court.

## C.    Interest in the litigation to perform meaningful work

While the numbers of known and represented clients is an important factor in determining which attorneys and law firms have the greatest stake in the litigation (as noted above), another important quality to consider is whether those attorneys show a genuine impassioned interest in the litigation as a whole. Those with less than a fiery interest in doing the work necessary to ensure the success of the litigation should not be allowed to lead it. Therefore, in terms of personal case-load and vested interest, it is not only size that matters, but the quality of commitment to fighting for the clients of all involved. Movants have demonstrated

8

this commitment well before the formation of the MDL and will continue as a cohesive group, if appointed by this Court.

**D.**     <u>Support for the Eastern District of Pennsylvania in their MDL Application</u>

Although this factor is admittedly not dispositive, since support for 28 U.S.C. §1407 centralization and consolidation before another court can be prompted by a multitude of reasons that are not prejudicial to this Court, this factor merits some consideration. All of the Movants actively participated in the motions and arguments before the Panel by filing pleadings supporting this Court as the jurisdiction to be assigned this MDL. Such consistent commitment to the case is a recognized qualification for selecting firms to act as leaders in the litigation. *See In re Cardinal Health Inc.,* 225 F.R.D. 552, 556 (S.D. Ohio 2005).

**E.**     <u>Past experience in pharmaceutical mass torts litigation</u>

When evaluating requirements for the PSC members, one can hardly dispute that an attorney or law firm must have had some involvement in the inner workings of pharmaceutical mass tort litigation in order to effectively serve as a leader of one. While one cannot suggest that every PSC should be repeatedly comprised of the same "cast of characters" and a new perspective is always an impetus to progress, one cannot overlook the fact that it is imperative for every member to be able to base his/her beliefs on some foundation of relevant and practical experience in this highly complex field of law. Each decision required of the PSC at every stage of this litigation will affect the next, and must be thoroughly contemplated with an eye to the expected outcomes and repercussions it will bring. Such foresight can only be borne of hindsight. Therefore, experience should weigh heavily in determining who among all those interested was more or less qualified to shoulder that weight, aided by what they had learned in past complex pharmaceutical mass tort litigations. Movant's credentials set forth below demonstrates their

9

extensive past experience in litigating pharmaceutical and complex mass tort cases. *See infra* at Section V.

**F.**     **Past success in pharmaceutical mass torts and complex mass tort cases**

This factor goes hand-in-hand with past experience, as detailed above.  Great experience can come from not only prior successes, but also failed attempts.  However, the value of such experience is proven by later success.[9] In that way, one must not only look at an attorney's or law firm's experience, but also at how they learned from it and put it to use in their future endeavors. It is important to the success of this litigation to have the benefit of the wisdom of those who have succeeded in this type of litigation, and therefore know the best course to take when presented with various options. Often a decision which may seem to be the most obvious has unforeseen or unconsidered consequences, which has been proven time and time again in complex litigation. This proposed PSC aims to avoid as many of those pitfalls as possible by including those attorneys and firms who have proven their abilities in this area and are devoted to ensuring the same level of success in this litigation.

**G.**     **Current commitments in other mass tort and/or complex litigations**

Even if an attorney or law firm has met every proposed guidepost (and any others which this Court may deem appropriate), one must take into account whether the proposed attorney is already committed to other litigations that are in early stages, which would hinder his/her ability to fully commit their attention to this case. Each of the moving counsel represent that they have the time and resources to commit to this case aside from their responsibilities in other cases.

---

[9] Success is not simply measured by jury verdicts and table-pounding, but rather, success is and should be measured by the ability to bring closure to litigation. The team comprised herein has all the crucial elements to help make this a successful litigation.

### H.    Unique and special talent or ability that would benefit this litigation

As in any group setting, a team is only as powerful as its component parts. One can rely on that axiomatic principle in concluding that if every member has the same strengths and weaknesses, then the whole will ultimately be weaker. In that way, successful PSCs contain attorneys and firms who are talented in many different areas of knowledge and practice, including medical science, depositions, technology, legal and medical research, brief and legal writing, epidemiology, pharmacology, regulatory and marketing issues, organization, expert reports, *Daubert* motions, and other areas. Each of the members of the proposed PSC, both individual attorneys and sponsoring firms, has a unique quality or area of expertise to bring to the table in order to make this PSC as well-rounded and strong as possible.

### I.    Proven ability to work collectively with parallel state court venues

In recent pharmaceutical MDLs, it has become regular practice to work jointly with the counsel of parallel state court actions.  A high level of cooperation between the MDL PSC and the attorneys who are leading the parallel state court cases has proven to be an integral component in moving towards an effective resolution of all litigations involved.  The best interests of the PSC often align with those of the state counsel, and collaboration can be somewhat effortless. However, where interests or even timelines may not coincide, a certain level of diplomacy and compromise is essential to success in both venues.  In addition, the MDL court and state courts often work jointly on issues affecting all parties, and all counsel must support and coordinate with each other in order to fulfill the requirements of the courts. It is absolutely necessary and critical that the PSC members be more than willing and able to work side-by-side with those involved in the state court venues in order to reach the same level of success and the proposed PSC is designed to accomplish this objective. For this case, the moving

counsel are cooperatively working in the parallel state court litigation pending in New Jersey and therefore this criteria is easily met.

**J.     Liquidity of firm for financial commitments**

Consideration of the adequacy of the resources of counsel is appropriate and necessary when appointing leadership in complex litigation. *See Manual for Complex Litigation* at §10.221. An attorney or a law firm must have the financial means to serve on the PSC. Each member of the PSC must be prepared to bear and sustain a substantial financial burden. Indeed Movants have already expended considerable financial resources in Pennsylvania and the New Jersey litigation. It can be estimated that this litigation will cost no small sum, and will require continuous financial support from all PSC members, both in cash contributions and held costs. Thus, despite any other qualifications, if an attorney or law firm cannot handle the financial strain of this MDL, they would not be able to serve equally and efficiently as a member of the PSC. The moving counsel have already expended substantial sums of money in this case in connection with managing the large document repository but more importantly are prepared to continue to fund the case as required. (*See* Movants' Sworn Declarations attached as Exhibit "A").

**K.     Commitment to excellent work in this case**

A PSC sets the tone for the level of devotion and work product of everyone involved, from the members of the subcommittees to those serving peripheral roles. Therefore, it is absolutely imperative that every member of the PSC be completely bound to the goal of producing the finest—and nothing short of excellent—work in every aspect of this case in order to properly serve and represent the clients. Movants represent with utmost certainty that each

and every one of the proposed attorneys and respective law firms in this proposed PSC have pledged themselves and their resources to doing just that.

### L.    Reputation of the lawyer and sponsoring law firm on a national level and by judiciary, if available

A PSC essentially acts as one collaborative law firm prosecuting a general case in many ways on behalf of all lawyers and all individual plaintiffs against a large corporation defended by some of the most skilled law firms. To this end, one must ensure that the PSC, its members, and their respective firms adhere to the highest levels of ethical standards both in their dealings on this case and in any matters that could potentially come to bear or reflect on this PSC, and therefore reflect on this litigation and this Court. Thus, the PSC and leadership not only have demonstrated the highest ethical standards but must have the appearance of appearance of the same. Movants meet this requirement.

## V.    MOVANTS ARE WELL-QUALIFIED COUNSEL WITH SPECIFIC EXPERIENCE IN ACETAMINOPHEN LIVER TOXICITY LITIGATION IN ADDITION TO EXTENSIVE EXPERIENCE IN LEADERSHIP ROLES IN OTHER PHARMACEUTICAL AND MEDICAL DEVICE MASS TORT MULTI-DISTRICT LITIGATIONS

Courts recognize that experience in the legal issues involved in the litigation is the "most persuasive" factor in appointing counsel for plaintiffs. *See In re: Terazosin Hydrochloride*, 220 F.R.D. 672, 702 (S.D. Fla. 2004); *In re Cardinal Health Inc.,* 225 F.R.D. 552 (S.D. Ohio 2005). Clearly the attorneys proposed herein have a wealth of relevant experience.

Without exception, each of the proposed leadership firms has direct and extensive experience in pharmaceutical mass tort litigation. Movants include counsel who acted as lead counsel, liaison counsel, executive committee or steering committee members in a significant number of multidistrict litigations and a host of other major litigations.

13

Besides their extensive experience in successfully representing Plaintiffs in a myriad of other pharmaceutical and medical device mass torts, Movants have spent significant time and resources developing expertise specific to the issues in this litigation.  In particular, Movants herein include attorneys who have litigated liver toxicity cases against McNeil for at close to a decade and most recently in the Pennsylvania and New Jersey litigation where a substantial amount of preliminary pre-trial work has been undertaken by Movants which will assist in the "just, speedy and inexpensive determination" of this action. In the Pennsylvania and New Jersey litigations, Movants have already:

- developed and served document requests, interrogatories and request for admissions which McNeil answered;

- negotiated numerous  pre-trial orders including a Protective Order which was the basis for the Protective Order (Case Management Order No. 1) entered by this Court on February 28, 2013 in the approximately 21 related cases assigned to this Court before transfer by the Judicial Panel on Multidistrict Litigation ("Panel")(hereinafter "related actions");[10]

- organized the approximately 1 million electronic documents produced by McNeil in a rolling production which is on-going in New Jersey;[11]

---

[10] As the Court will recall, Movants also negotiated an ESI Order that this Court entered (Case Management Order No. 2).

[11] Relating to the New Jersey production, Movants recently filed a motion to compel against McNeil after they determined that McNeil had withheld an 1800+ page index relating to the organization and management of its documents located in a depository at its Fort Washington, Pennsylvania Headquarters and raising issues relating to the manner and quality of McNeil's document production. Judge Higbee granted that motion and ordered McNeil (at its own cost) to re-scan and reproduce its entire Tylenol document depository located in Fort Washington. This re-scanning and reproduction project has caused substantial prejudice to the Plaintiffs and such a delay that Judge Higbee has postponed expert discovery and upcoming trial dates in the early cases selected for trial.  McNeil has only recently started re-producing the rescanned documents and it is anticipated that Plaintiffs will need substantial time to re-organize and analyze the rolling-production before being in a position to complete fact and expert discovery.

Additionally, notwithstanding Plaintiffs good-faith request for McNeil to produce documents related to all acetaminophen containing Tylenol products it manufactures, McNeil has refused. The Panel's Order creating this MDL recognized that the case involves various forms and types of Tylenol but nevertheless

14

- produced to McNeil's new counsel documents in Movants' possession previously produced to Plaintiffs in earlier TYLENOL® litigations including deposition and trial transcripts;

- retained Crivella-West, a leading on-line document management company to establish a secure on-line document depository accessible remotely over the internet:

- retained world-renowned experts in hepatology, pharmacology, epidemiology, regulatory affairs, and other relevant fields;

- participated in numerous Case Management Conferences before the Court;

- briefed and argued various motions; and,

- noticed and engaged in taking the depositions of McNeil corporate witnesses and third-parties.

As the Court knows, even before the Panel transfer, Movants were working cooperatively with defense counsel in the related actions. In addition to the Protective Order (Case Management Order No. 1) which was based on the Protective Order entered in the New Jersey litigation, Movants also negotiated an Order Regarding the Method of Discovery (Case Management Order No. 2) which was entered by this Court. CMO-2 itself refers to the document production in the New Jersey litigation at paragraph 6. (CMO-2, para. 6).[12] Additionally, in the related actions, Movants and Defendants are currently negotiating a Plaintiff Fact Sheet (a questionnaire to be answered without objection by Plaintiffs customarily adopted in lieu of

---

determined that there should be an MDL for consolidated handling of the cases. Plaintiffs will continue to attempt to resolve this issue with McNeil by agreement, but the failure to produce all documents related to all acetaminophen containing Tylenol products continues to cause additional delay and prejudice to Plaintiffs. The cases pending in this Court involve a multitude of acetaminophen containing TYLENOL® products so regardless of how Judge Higbee may view the issue, Plaintiffs will aggressively litigate the issue with his Court, if necessary. Hopefully the parties will resolve the issue before that becomes necessary.

[12] CMO-2 at paragraph 6 "Documents that were kept in their original paper form at the Tylenol repository maintained by Defendant McNEIL-PPC, Inc. and that were produced in Tylenol litigation pending in New Jersey State Court in accordance with the directives of the New Jersey State Court on January 7, 2013 and the subsequent stipulation of the parties in those proceedings shall be produced in these proceedings in the form directed by the Court and agreed among the parties in the New Jersey State Court proceeding."

interrogatories and document requests), as well as a Privilege Order. Finally, in the related actions, Movants have served document requests, interrogatories and request for admissions some of which McNeil has answered. Movants have also served a number of third-party subpoenas and have a number of other proposed Case Management Orders ready to discuss with the Defendants.

Although Movants have accomplished much to date in the Pennsylvania and New Jersey litigation and the related actions, many of the preliminary matters which must be addressed efficiently and immediately to protect the interests of the Plaintiffs still need to be undertaken including negotiation of a Defendant Fact Sheet (a questionnaire customarily used to obtain case-specific information from defendants); negotiation to permit direct filing of cases in this, the transferor court; negotiation of a non-destruct order; preparation of a proposed order concerning financing on behalf of Plaintiffs; preparation of a proposed order concerning compensation for common-benefit work; and negotiation for procedures to coordinate the litigation with anticipated state court actions. Additionally, counsel for Plaintiffs must track the cases filed, be familiar with the injuries alleged, and implement procedures to be sure that the MDL is developing evidence to prove the injuries claimed, or to notify individual counsel if they have alleged a unique issue.

In addition to the preliminary procedural matters already undertaken and the on-going pre-trial discovery, Movants are in the best position to continue the task of working with the world-class experts that they have retained to conduct an extensive review of the scientific literature as well as to continue to organize an effective and efficient process of reviewing the millions of additional pages of information that will be produced (and re-produced) from Defendants.  Plaintiffs also anticipate the need for skilled brief writers with expertise in the law

regarding pharmaceutical torts, including such issues as *Daubert*. All of these tasks require a team of lawyers working in concert to whom responsibilities can be assigned and divided. These tasks also require substantial financial resources which the Movants have and have already started investing in the Pennsylvania and New Jersey litigation.

It should also be noted that Movants represent a substantial number of clients with signed fee agreements and are investigating hundreds of additional claims. Movants use due care in screening cases including reviewing medical records and do not simply "rush" to file a case. As stated above, Movants did not just start working on the TYLENOL® litigation last week, last month or even last year. To the contrary, Movants have been involved in representing victims of TYLENOL® for many years and as such have had ample opportunity to meet, share ideas, organize and litigate these claims on behalf of Plaintiffs.

Movants are uniquely qualified to lead the TYLENOL® MDL litigation by virtue of their vast experience in pharmaceutical mass tort litigation and specific experience in litigation regarding acetaminophen toxicity and liver failure. By appointing counsel with such credentials and backgrounds, the Court will benefit the plaintiffs as a whole, and will reduce the risks, expense and time needed to develop the claims in this litigation because substantial related work has already been developed in the Pennsylvania and New Jersey TYLENOL® litigation. In addition, the Defendant and hopefully the Court will find that the experience of Plaintiffs' counsel is an asset in managing this complex litigation.

## VI.    COUNSEL APPOINTED TO ACT FOR PLAINTIFFS MUST BE PROFESSIONAL AND COOPERATIVE

It is axiomatic that all counsel practicing law in a federal court are expected to display the highest degree of professionalism. However, as noted in the *Manual for Complex Litigation*,

(Fourth) "[t]he added burdens and demands of complex litigation place a premium on attorney professionalism and the judge should encourage counsel to act responsibly." *Manual for Complex Litigation* (Fourth) at §10.21. Such responsibility must include a sincere effort to avoid burdening the Court with unnecessary issues that counsel should be able to resolve through courtesy and communication. The *Manual* notes:

> Counsel need to fulfill their obligations as advocates in a manner that will foster and sustain good working relations among fellow counsel and with the court. They need to communicate constructively and civilly with one another and attempt to resolve disputes informally as often as possible.

*Manual for Complex Litigation* (Fourth) at §10.21.

The undersigned counsel have followed this mandate by working cooperatively with defense counsel to minimize burdening the Court with unnecessary issues. For example, Movant's negotiated CMO-1 and CMO-2 which were submitted to the Court jointly by the parties. Movants will continue to communicate with defense counsel in order to reach compromise and minimize burdening the Court unnecessarily, if appointed by the Court.

## VII.   THE PROPOSED PSC AND LEADERSHIP

Movants propose the following leadership structure which includes counsel that are interested in protecting the interest of all Plaintiffs, have been litigating TYLENOL® liver failure cases with the other firms in state court, working together, sharing resources and avoiding duplicative effort:

### A.   PROPOSED PLANTIFFS' CO-LEAD AND LIASION COUNSEL

The appointment of lead counsel is recognized as a useful and helpful way to avoid duplication of effort and a means to streamline what could otherwise be inefficient and unruly proceedings; in making such an appointment, court should consider such factors as the

18

qualification and competence of counsel, the ability of counsel to fairly represent diverse interests, and "the attorneys' ability to command the respect of their colleagues and work cooperatively with opposing counsel and the court. *Manual* (Fourth) §10.224. *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 2006 WL 2038650 (E.D.N.Y. 2006).

Movants propose Laurence S. Berman and R. Clay Milling as co-lead counsel and Laurence S. Berman as liaison counsel:

### B.      PROPOSED PLAINTIFF CO-LEAD COUNSEL AND LIAISON COUNSEL

**Laurence S. Berman, Esquire**
**LEVIN FISHBEIN SEDRAN & BERMAN**
**510 Walnut St., Suite 500**
**Philadelphia, PA 19106**

Mr. Berman is a Philadelphia native who attended Central High School and then Temple University for both his undergraduate and law degrees. He obtained his undergraduate degree (B.B.A.) at the Fox School of Business, graduating magna cum laude in 1974 and as a member of Beta Gamma Sigma National Honor Society, and obtained his juris doctor degree from Temple University Law School in 1977.

Following his graduation from law school, he was a judicial clerk for two years with the Honorable Charles R. Weiner, of the United States District Court for the Eastern District of Pennsylvania, until 1980 when he began a private practice of law.

In 1982, Mr. Berman joined the law firm of Levin & Fishbein as an associate and became a partner in 1985 when the firm name was changed to Levin, Fishbein, Sedran & Berman ("LFSB"). Mr. Berman has had extensive experience in litigating and managing complex litigation.

In the early 1980's he became a member of the discovery, law and trial committees of *In re: Asbestos School Litigation*, Master File No. 83-0268 (E.D. Pa.). As a member of those committees, he drafted discovery and legal briefs that lead to the successful resolution of the case on behalf of a nationwide class of schools seeking recovery of damages for the costs and expenses they were required to expend to assess the presence of asbestos in school buildings and to remediate under newly enacted rules and regulations of the Environmental Protection Agency, promulgated in the 1970's. In connection with that litigation, he was one of the architects of approaching class certification issues for a nationwide class by the use of a "50" state analysis of

the law, in order to demonstrate the similarity of laws and therefore the manageability of a nationwide class action. The "50" state approach has been followed in other cases.

During the early stages of his career, he litigated numerous environmental class/mass tort cases to successful conclusions. An example would be his litigating a lead contamination case for the residents of a community in the Port Richmond area of Philadelphia, where he drafted the legal briefs and presented the oral argument to obtain class certification of a property damage and medical monitoring class against NL Industries and Anzon. That litigation produced a multi-million dollar recovery for the residents in the class area. Another example would be his representation of homeowners located near Ashland, Kentucky for environmental pollution damage. This case involved representing approximately 700 individual clients for personal injury and medical monitoring relief which also resulted in a multi-million dollar recovery for his clients. There are many other examples of similar cases that he litigated in his early stages of his career for victims of mass environmental torts that produced multi-million dollar recoveries.

Beginning in the 1990's Mr. Berman began his representation of victims of the Three Mile Island accident. The firm represented approximately 2,000 plaintiffs in that matter, and Mr. Berman was responsible for the legal briefing and experts in the case, along with addressing *Daubert* issues. When that case was commenced, *Daubert* had not yet been decided and the governing standard of law was *Frye*. However, with the *Daubert* decision being rendered mis-stream in the litigation of the Three Mile Island case, Mr. Berman was called upon by the presiding Court (Middle District of Pennsylvania) to litigate one of the first *Daubert* hearings conducted. In the Three Mile Island matter, the *Daubert* hearings involved approximately ten full weeks of in court live hearings, and thousands of pages of legal briefing. Ultimately the trial court determined that the expert witnesses offered by the plaintiffs did not meet the *Daubert* requirements, and an appeal was taken to the Third Circuit Court of Appeals, where Mr. Berman both briefed and argued the issues. The Third Circuit affirmed parts of the decision and remanded for further proceedings by the trial court.

In 1989, Mr. Berman began his representation of approximately 1,000 plaintiffs who suffered damages as a result of the Exxon Valdez oil spill. In that role, he managed the claims of each of his firm's clients and worked in the development of their expert evidence and claim materials. As a subset of that litigation, he handled the claims of the Native Opt-Out Settlement Class.

While working on the Exxon Valdez matter, and as his involvement in the Three Mile Island was concluding, Mr. Berman began his role in litigating *In re Diet Drugs*, MDL 1203 (E.D. Pa.). The *Diet Drugs* case was commenced in 1997 and is still active to this date. Mr. Berman's firm was appointed as co-lead counsel, co-class counsel and liaison counsel. The massive size of the *Diet Drugs* case required the commitment of three of the named partners to the case, Arnold Levin, Michael Fishbein and Mr. Berman, as well as a substantial commitment by partner Fred Longer. While Messrs. Levin and Fishbein were formally named as co-class counsel to the case, Mr. Berman had a *de facto* role as co-class counsel and co-lead counsel for the case.

Although the *Diet Drug* case remains active today, Mr. Berman has undertaken in recent years active roles in other pharmaceutical cases, in particular *In re Yaz/Yasmin/Ocella*, which is pending in the Southern District of Illinois, where he was appointed as a member of the discovery and legal briefing committees. In addition, his partner Michael M. Weinkowitz was appointed as Co-Liaison Counsel in the parallel state court litigation pending in the Court of Common Pleas of Philadelphia and served in the parallel action on the discovery and science committees and was appointed to the Plaintiffs Negotiating Committee by the Honorable Arnold New, Philadelphia Court of Common Please. Mr. Berman worked with his partner in these roles and the firm's administrative staff was essential as liaison counsel in the Yaz litigation.

Mr. Berman's pharmaceutical case experience includes litigating the current *In re Fosamax litigation* (D.N.J.), another pharmaceutical case where he spearheaded the plaintiff's position relating to privilege log issues as well as pre-emption and *in limine* issues raised in the bellwether case as well as his representing numerous individual plaintiffs in cases involving *Pradaxa, DePuy ASR Hips, Graunflo Dialysis* and other matters.

As for the present Tylenol matter, Mr. Berman's involvement commenced in 2010 and he has committed a substantial amount of his practice to the case since that time. He has managed the litigation that was commenced in the Philadelphia Court of Common Pleas prior to the removal of the cases to this Court, and has since managed the litigation of those cases that are now pending in this Court. This responsibility has included managing on behalf of the Plaintiffs this Court's initial Rule 16 conference that was held for many of the initial cases prior to the establishment of the MDL for this case, and the entry agreed to Case Management Orders by this Court relating to CMO-1 and CMO-2. Mr. Berman has spoken about the Tylenol case at several seminars, and is a member of the American Association of Justice (AAJ) litigation group for the case. Aside from having spoken about Tylenol at various seminars, Mr. Berman has been a frequent speaker for the Pennsylvania Bar Institute, Mealy's Publications and Harris Martin. His lectures have been accredited for providing CLE credit to the attendees. Mr. Berman has an A.V. Peer Review rating by Martindale-Hubbell, and is an AAJ National College of Advocacy Advocate. He is also a member of The National Trial Lawyers, as well as a member of the American, Pennsylvania and Philadelphia Bar Associations.

Mr. Berman's firm, LFSB is an A.V. peer-rated Philadelphia-based law firm with an extraordinary track record of litigating complex cases and is well-known in the legal community. The firm's offices are located a few blocks from the Eastern of District of Pennsylvania Courthouse at 510 Walnut Street, in Philadelphia. For more than 30 years, the firm has successfully prosecuted hundreds of cases involving defective pharmaceutical and over-the-counter drugs and medical devices, and has led in mass tort and environmental liability exposure litigations.

Senior Partner Arnold Levin graduated from Temple University, B.S., in 1961, with Honors and Temple Law School, LLB, in 1964. He was Articles Editor of the Temple Law Quarterly. He is a member of the Philadelphia, Pennsylvania, American and International Bar Associations. He is a member of the Philadelphia Trial Lawyers Association, Pennsylvania Trial Lawyers Association and the Association of Trial Lawyers of America. He is admitted to the

Supreme Court of Pennsylvania, United States District Court for the Eastern District of Pennsylvania, United States District Court for the Middle District of Pennsylvania, the Third, Fourth, Fifth, Sixth, Seventh, Tenth and Eleventh Circuit Courts of Appeals and the United States Supreme Court. He has appeared *pro hac vice* in various federal and state courts throughout the United States. He has lectured on class actions, environmental, antitrust and tort litigation for the Pennsylvania Bar Institute, the Philadelphia Trial Lawyers Association, the Pennsylvania Trial Lawyers Association, The Association of Trial Lawyers of America, The Belli Seminars, the Philadelphia Bar Association, American Bar Association, the New York Law Journal Press, and the ABA-ALI London Presentations. Mr. Levin has been invited to lecture in the area of mass torts over 100 times and recently on a panel with the Honorable John G. Heyburn II, United States District Court for the Western District of Kentucky, Chair, Judicial Panel on Multi-district Litigation, Louisville, KY on Emerging Trends—Does an MDL Make Sense and, If So, Where Should It Be?

Mr. Levin is a past Chairman of the Commercial Litigation Section of the Association of Trial Lawyers of America, and is co-chairman of the Antitrust Section of the Pennsylvania Trial Lawyers Association. He is a member of the Pennsylvania Trial Lawyers Consultation Committee, Class Action Section, a fellow of the Roscoe Pound Foundation and past Vice-Chairman of the Maritime Insurance Law Committee of the American Bar Association. He is also a fellow of the International Society of Barristers, and chosen by his peers to be listed in Best Lawyers of America. He has been recognized as one of 500 leading lawyers in America by LawDragon. In addition, he has been further recognized as one of the top 100 trial lawyers by The National Trial Lawyers Association. He also has an A.V. peer-rating in Martindale-Hubbell.

For the past few years, LFSB has been actively investigating and litigating TYLENOL® liver failure cases with the other firms in state court in New Jersey and the Philadelphia Court of Common Pleas. Senior Partner Arnold Levin, and Partners Laurence Berman and Michael Weinkowitz have been instrumental in overall strategic planning. Mr. Berman and Mr. Weinkowitz communicate frequently with defense counsel and are involved in all aspects of pre-trial discovery including drafting discovery. Mr. Berman and Fred Longer, along with associates at the firm have been point for legal research and writing. Mr. Weinkowitz, along with David Buchanan of Seeger Weiss and R. Clay Milling of Henry Spiegel Milling LLP have been responsible for organizing document production and managing the on-line document depository. LFSB attorneys have retained and have been working with a number of expert witnesses for the group. LFSB has been the point firm for filings in Pennsylvania and the administrative function for the litigation group. LFSB is the local firm that all Movants have selected to file cases in Pennsylvania and that are pending before this Court. Because of their unique level of knowledge from litigating this case over the past few years, Mr. Levin, Mr. Berman, Mr. Longer and Mr. Weinkowitz, and the other Movants have been called upon to speak publically about the issue of acetaminophen and its association with acute liver failure on multiple occasions.

The dozens of high profile complex actions successfully litigated by the firm include representation of a certified nationwide class of public schools to recover the cost of remediation and abating asbestos contamination in public schools (the "Asbestos School Litigation"), the Ford Explorer SUV rollover case, the Bridgestone tire litigation, the Exxon Valdez Oil Spill

litigation, the Three Mile Island nuclear radiation release litigation, and litigation involving the contamination of the town of Times Beach, Missouri with Dioxin that resulted in the forced closure of that town by the United States government through the EPA and the relocation of all of its citizens. Additionally, the firm's partners have been appointed and served on various other leadership committees including a number of MDL cases in the Eastern District of Pennsylvania. A non-exhaustive list includes: in *In re Diet Drugs Litigation*, MDL 1203 (E.D. Pa.); *In re Orthopedic Bone Screw Products Liability Litigation*, MDL 1014 (E.D. Pa.); *In re Copley Pharmaceutical, Inc., "Albuterol" Products Liability Litigation*, MDL 1013 (D.Wy.); *In re Norplant Contraceptive Products Liability Litigation*, MDL 1038 (E.D. Tex.); and *In re Telectronics Pacing Systems, Inc., Accufix Atrial "J" Lead Products Liability Litigation*, MDL 1057 (S.D. Ohio); *In re Silicone Gel Breast Implants Products Liability Litigation*, Master File No. CV-92-P-10000-S; *In re Rezulin Products Liability Litigation*, MDL 1348 (S.D.N.Y.); *In re Propulsid Products Liability Litigation*, MDL 1355 (E.D. La.); *In re Phenylpropanolamine (PPA) Products Liability Litigation*, MDL 1407 (W.D.WA); *In re Human Tissue Products Liability Litigation*, MDL 1763 (D.N.J.); *In re National Football League Players' Concussion Litigation*, MDL 2323 (E.D. Pa.) and *In re Pool Products Distribution Market Antitrust Litigation*, MDL 2328; *In re: Pradaxa (Dabigatran Etexilate) Products Liability Litigation*, MDL 2385)(S.D.Ill.); *In re: Yasmin and YAZ (Drospirenone) Marketing, Sales Practices and Products Liability Litigation*, (MDL 2100 (S.D. Ill); *In re: Yaz/Yasmin/Ocella/Gianvi Products Liability Litigation*, Civ. No. 1307 (Court of Common Pleas, Philadelphia County); *In Re Chinese-Manufactured Drywall Product Liability Litigation*, MDL 2047 (E.D. La.) and *In re: Zoloft (Sertraline Hydrochloride) Products Liability Litigation*, MDL 2342 (E.D. Pa.).

LFSB's work-ethic was observed in the *Diet Drugs*, *Propulsid* and the *Vioxx* MDL litigations. Additionally, several courts have favorably commented on the quality of work performed by Arnold Levin and the firm. For example, Judge Rambo of the United States District Court for the Middle District of Pennsylvania has favorably acknowledged the quality of work of the law firm in her opinion in *In re Three Mile Island Litigation*, 557 F. Supp. 96 (M.D. Pa. 1982). In that case, the firm was a member of the Executive Committee charged with overall responsibility for the management of the litigation. Notably, the relief obtained included the establishment of a medical monitoring fund for the class. *See also, Township of Susquehanna, et al. v. GPU*, et al., U.S.D.C., Middle District of Pennsylvania, Civil Action No. 81-0437. In certifying the class in *Weiss v. York Hospital*, Judge Muir found that "plaintiff's counsel are experienced in the conduct of complex litigation, class actions, and the prosecution of antitrust matters." *Weiss v. York Hospital*, No. 80-0134, Opinion and Order of May 28, 1981 at 4 (M.D. Pa. Mar. 1981). *See also, Weiss v. York Hospital*, 628 F. Supp. 1392 (M.D. Pa. 1986). Judge Muir, in certifying a class for settlement purposes, found plaintiff's attorneys to be adequate representatives in *In re Anthracite Coal Antitrust Litigation*, Nos. 76-1500, 77-699, 77-1049 and found in the decision that "the quality of the work performed by Mr. Levin and by the attorneys from Adler-Barish [a predecessor to Levin, Fishbein, Sedran & Berman] who assisted him – as exhibited both in the courtroom and in the papers filed – has been at a high level." *In re Anthracite Coal Antitrust Litigation*, (M.D. Pa., Jan. 1979). Judge Muir also approved of class counsel in the certification decision of *Holmes, et al. v. Penn Security and Trust Co.*, et al., No. 80-0747. Chief Judge Nealon found plaintiffs' counsel to satisfy the requirement of adequate representation in certifying a class in *Beck v. The Athens Building & Loan Assn.*, No. 73-605 at 2

23

(D. Pa. Mar. 22, 1979). Judge Nealon's opinion relied exclusively on the Court's Opinion in *Sommers v. Abraham Lincoln Savings & Loan Assn.*, 66 F.R.D. 581, 589 (E.D. Pa. 1975) which found that "there is no question that plaintiffs' counsel is experienced in the conduct of a class action...." Judge Bechtle in the *Consumer Bags Antitrust Litigation*, Civil Action No. 77-1516 (E.D. Pa.), wherein Arnold Levin was lead counsel for the consumer class, stated with respect to petitioner, "Each of the firms and the individual lawyers in this case have extensive experience in large, complex antitrust and securities litigation." Furthermore, the Court notes that the quality of the legal services rendered was of the highest caliber. In *Gentry v. C&D Oil Company*, 102 F.R.D. 490 (W.D. Ark. 1984), the Court described counsel as "experienced and clearly able to conduct the litigation." In *Jaroslawicz v. Engelhard Corp.*, No. 84-3641 (D.N.J.), in which this firm played a major role, the Court praised plaintiffs' counsel for their excellent work and the result achieved. In *In re: Orthopedic Bone Screw Products Liability Litigation*, 2000 WL 1622741, *7 (E.D. Pa. 2000), the Court lauded Levin, Fishbein, Sedran & Berman counsel as follows: "The court also finds that the standing and expertise of counsel for [plaintiffs] is noteworthy. First, class counsel is of high caliber and most PLC members have extensive national experience in similar class action litigation." In *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Products Liability Litigation*, MDL Docket No. 1203, the Court commented on Levin, Fishbein, Sedran & Berman's efforts regarding the creation of the largest nationwide personal injury settlement to date as a "remarkable contribution". PTO No. 2622 (E.D. Pa. October 3, 2002).

## C.   PROPOSED PLAINTIFF CO-LEAD COUNSEL

**R. Clay Milling, Esquire**
**HENRY SPIEGEL MILLING LLP**
**Atlanta Plaza, Suite 2450**
**950 East Paces Ferry Road, N.E.**
**Atlanta, GA  30326**

Mr. Milling, a partner in the Atlanta, Georgia law firm Henry Spiegel Milling LLP, is one of the "originators" of this litigation before this Court and has been working continuously on Tylenol/Acetaminophen and its relation to acute liver failure, both in an investigative manner and through litigation, since approximately 2007.  Mr. Milling filed the initial case of *Boka v. McNeil-PPC, Inc., et.al* in the Superior Court for Atlantic County, New Jersey, with Seeger Weiss, LLP serving as local counsel, in 2010.  The *Boka* case is the case that began this litigation, which has now blossomed into this MDL.

Mr. Milling is a native of New Orleans, Louisiana. He graduated from Vanderbilt University in 1988 with a degree in Economics and then continued his studies at Vanderbilt University School of Law, graduating in 1991.

Over the last 21 years, Mr. Milling has served as lead plaintiff's counsel in hundreds of significant pieces of civil litigation including complex medical malpractice actions, road design defect litigation, aviation litigation, automotive products liability litigation and pharmaceutical litigation.

As it pertains to the MDL presently before this Court, Mr. Milling has served "in essence" as lead counsel since the inception of the litigation.  As noted, he filed the initial Tylenol Liver Failure lawsuits in the State Court of New Jersey in 2010, which were consolidated for discovery purposes by the Honorable Carol Higbee. Since the filing of the initial cases in 2010, Mr. Milling has been the de facto leader of the Plaintiffs' counsel. He has guided the strategy of the Plaintiffs' team; he has handled and coordinated all discovery and motions practice in the litigation along with the other Movants; he has appeared as lead counsel or co-lead counsel at all Court hearings; he has overseen and participated extensively in document discovery; he has arranged and taken depositions of key defense witnesses; he has interacted continuously with defense counsel; he has met with every expert that the plaintiffs either have retained or are considering retaining for this litigation.

Due to his unique level of knowledge of this drug and this litigation, Mr. Milling is the Chair of the American Association for Justice's Acetaminophen Litigation Group and he has been called upon to speak publically about the issue of acetaminophen and its association with acute liver failure on multiple occasions over the years.

Mr. Milling understands the responsibilities of serving on the PSC and as Co-Lead Counsel and is committed to working with the Plaintiff's counsel, counsel for the Defendants (with whom he has been working since 2010) and the Court to move this litigation expeditiously and professionally.

Mr. Milling is admitted to practice in all Georgia State Courts as well as the United States District Court for the Northern District of Georgia.  In addition, Mr. Milling has *appeared pro hac vice* in multiple State and Federal Courts throughout the Country over the years.  Although he has not filed an application for *pro hac vice* admission in the cases before this Court, he represents many if not most of the lead Plaintiffs in this MDL along with Movants Levin, Fishbein, Sedran & Berman.

Mr. Milling is a recognized leader in the Bar of the State of Georgia.  He speaks at Continuing Legal Education Seminars multiple times per year, most recently conducting a class at Georgia State University School of Law on Civil Litigation from the Plaintiff's Perspective on May 3, 2013.

Mr. Milling has always received the highest ranking for competency and ethics from Martindale-Hubbell, he has been recognized as a Georgia Super Lawyer by his peers multiple years running, and he has been selected as one of Georgia's top trial lawyers on multiple occasions.

Finally, Henry Spiegel Milling LLP, Mr. Milling's firm, is a distinguished Atlanta, Georgia plaintiff's firm founded in 1986 by partner Philip C. Henry.  The firm has demonstrated a strong commitment to representing plaintiffs in highly complex litigation both in Georgia and throughout the country over the years, and the firm has the financial capacity to fund and lead

this MDL. The firm and all of its partners are A.V. rated attorneys and the firm is listed in US News and World Reports' Best Law Firms in America.

Mr. Milling's *Application* to serve on the PSC and in the capacity of Co-Lead Counsel of this MDL is made with the full support of all of the other applicants seeking leadership positions. Indeed, all Movants discussed and agreed that Mr. Milling was uniquely qualified to serve on the PSC as Co-Lead Counsel due to his experience with this litigation, his tremendous knowledge of the facts and issues, combined with the fact that he has in essence already been serving as lead counsel in the litigation since 2010.

### D.   PROPOSED PLANTIFFS' STEERING COMMITTEE

**Laurence S. Berman, Esquire**
**LEVIN FISHBEIN SEDRAN & BERMAN**
**510 Walnut St., Suite 500**
**Philadelphia, PA  19106**

(See above)

**R. Clay Milling, Esquire**
**HENRY SPIEGEL MILLING LLP**
**Atlanta Plaza, Suite 2450**
**950 East Paces Ferry Road, N.E.**
**Atlanta, GA  30326**

(See above)

**Chris Seeger, Esquire**
**SEEGER WEISS, LLP**
**550 Broad Street**
**Suite 920**
**Newark, NJ  07102**

Mr. Seeger is the founding partner of Seeger Weiss LLP, an approximately thirty-lawyer firm with offices in several states including Philadelphia, Pennsylvania.  In recent years, Mr. Seeger have led and helped lead several comparable and similarly challenging MDLs and their coordinated state litigations—*e.g., Vioxx, Chinese Drywall, Zyprexa, DePuy ASR and National Football Players' League*. Beyond general leadership, discovery, and generic expert work-up, Mr. Seeger has served as lead trial counsel in bellwether MDL cases, actively facilitated federal-state coordination, and served as a lead negotiator for the global resolutions of these and other MDLs.  Every MDL presents unique challenges, and this one is no exception.  Mr. Seeger believes that his experience in other MDLs and their parallel state litigations will be of substantial value in ensuring the success of this MDL for all affected Tylenol patients.

To date, Mr. Seeger's firm is primary counsel in twenty-one (21) pending Tylenol

cases—fifteen (15) currently pending in Federal court and the remainder in state court, along with the other Movants herein. Numerous additional cases have been prepared for filing, but have not yet been filed pending the Court's case management guidance. Mr. Seeger expects that the Tylenol litigation will be one of his (and his firm's) primary litigation responsibilities over the next several years.

As this Court is well aware, cases such as the instant MDL pose enormous substantive, logistical, and resource challenges on appointed counsel. Mr. Seeger and his firm have consistently risen to and met those challenges, assuming lead, liaison, and other significant, substantive leadership roles (and supplying the necessary resources) in many challenging and successful MDLs over the last decade.[13] Beyond the general leadership and effort involved with such appointments, Mr. Seeger has also served as lead trial counsel in bellwether trials (*e.g., Vioxx, Chinese Drywall, Rezulin, and National Football Players' League*) and negotiating counsel in successful global settlement discussions for such MDLs (*e.g., Zyprexa, PPA, Vioxx, and Chinese Drywall*). Through these experiences, Seeger Weiss has developed extensive experience working collaboratively and cooperatively with both fellow plaintiffs' counsel (including the other Movants) and counsel for the defense—many of whom are involved in the instant MDL and with whom Mr. Seeger has successfully worked in the past. Relatedly, Mr. Seeger's frequent involvement in state court proceedings that track those of the various MDLs in which he have been involved has enabled me to assume parallel leadership roles in both federal and state proceedings to facilitate federal-state cooperation.

**James F. Green, Esq.**
**Ashcraft & Gerel, LLP**
**2000 L Street, N.W.**
**Suite 400**
**Washington, DC 20036**

---

[13] Mr. Seeger has been appointed as lead counsel, liaison counsel, and a member of plaintiffs' executive and executive committees in a variety Federal multidistrict litigations throughout the United States, *e.g., In re Vioxx Products Liability Litig.* (E.D. La., MDL No. 1657) (Co-Lead); *In re Gadolinium-Based Contrast Agents Products Liability Litig.* (N.D. Ohio, MDL No. 1909) (Plaintiffs' Executive Committee); ); *In re Chinese-Manufactured Drywall Products Liability Litig.* (E.D. La., MDL No. 2047) (PSC); *In re DePuy Orthopaedics ASR Products Liability Litig.* (N.D. Ohio, MDL No. 2197) (Plaintiffs' Executive Committee); *In re Zyprexa Products Liability Litig. (E.D.N.Y., MDL No. 1596)* (Liaison Counsel); *In re Ortho Evra Products Liability Litig.* (N.D. Ohio, MDL No. 1742) (PSC) *In re Vytorin/Zetia Marketing, Sales Practices & Products Liability Litig.* (D.N.J., MDL No. 1938) (Co-Liaison Counsel); *In re Fosamax Products Liability Litig.* (S.D.N.Y., MDL No. 1789) (Liaison Counsel and PSC); *In re MCI Non-Subscriber Tel. Rates Litig.*, (S.D. Ill., MDL No. 1275) (PSC); *In re Yasmin and Yaz (Drospirenone) Marketing, Sales Practices, and Relevant Products Liability Litig.* (S.D. Ill., MDL No. 2100) (PSC); *In re Bextra and Celebrex Marketing Sales and Products Liability Litig.* (N.D. Cal., MDL No. 1699) (PSC); *In re PPA Products Liability Litig.* (W.D. Wash., MDL No. 1407) (PSC); *In re Propulsid Products Liability Litig.* (E.D. La., MDL No. 1355) (PSC); *In re Rezulin Products Liability Litig.* (S.D.N.Y., MDL No.1348) (PSC); *In re National Football Players' League Concussion Injury Litigation* (E.D.PA., MDL No. 2323)

Mr. Green is a Senior Partner with Ashcraft & Gerel, LLP charged with the organization and development of the legal team responsible for Toxic Tort work. He was born in Pittsfield, Massachusetts. Mr. Green was educated at St. Anselm College where he was a member of Delta Sigma Rho, Tan Kappa Alpha and graduated with a Bachelor of Arts Degree in Philosophy and Political Science in 1970. He received his Juris Doctor from Suffolk University School of Law in 1973, where he was a member of Phi Alpha Delta. He joined Ashcraft & Gerel, LLP in 1975.

Mr. Green is a member of the Massachusetts, District of Columbia and Virginia Bars. He is also a member of the Bar of the United States Supreme Court, where he has had the honor to appear and argue cases on behalf of injured persons. He is an active member of the Bar Association of The District of Columbia, The Virginia State Bar Association, The American Association for Justice, The Trial Lawyers Association of Metropolitan Washington, DC and The Virginia Trial Lawyers Association. He has also served as past National Chairman and Vice Chairman of various committees of these associations.

He is an active lecturer and author in local and national Continuing Legal Education (CLE) programs. He has been repeatedly voted by his peers to membership in Best Lawyers in America for personal injury and mass toxic tort and has been named by The Washington Post in its list of "Washington DC's Top Lawyers". He holds an A.V. Preeminent Peer Reviewed rating from members of the Bar and Judiciary by the Martindale Law Directory. Over the past several decades, Mr. Green has been the subject of multiple biographical entries in Who's Who in America and Who's Who in American Law.

Mr. Green has focused his practice on the areas of workers' compensation, products liability, pharmaceutical and medical device litigation, and mass toxic tort. He has been appointed by the Judges of various Federal Courts to serve on Multi-District Litigation committees. These appointments include the Plaintiff Steering Committee for Rezulin, Discovery committee work for Baycol and PPA, Co-Chair of the PPA discovery subcommittee of the Dexatrim defendants, Delaco Corporation and Chattem Industries. After completion of their defendant discovery, Mr. Green helped to successfully negotiate, oversee and administer their settlements in Bankruptcy (Delaco) and Limited fund personal injury class action (Chattem). A representative cross section of his MDL case work would include the litigations in Fosamax, Rezulin, PPA, Zyprexa and Ortho Evra.

For the past few years, Ashcraft & Gerel, LLP has been actively investigating and litigating TYLENOL® liver failure cases with the other firms primarily in the state court in New Jersey. Mr. Green and his partners Christopher V. Tisi and Michelle Parfitt commenced work in the litigation in 2010 and they and their associate attorneys and staff have committed a substantial amount of time and resources along with the other Movants. Mr. Green, Mr. Tisi and Ms. Parfitt have retained and worked with many of the world-class experts that Movants intend to utilize in this litigation. Mr. Tisi, along with Mr. Milling, Gil Gainer of Toliver & Gainer, and Dr. Joe Kott from Herman, Herman, Katz & Cotlar LLP have developed substantial expertise in the science of acetaminophen toxicity and various regulatory issues relevant to the case.

**Leonard Davis, Esquire**
**HERMAN, HERMAN, KATZ & COTLAR LLP**
**820 O'Keefe Avenue**
**New Orleans, Louisiana 70113**

Mr. Davis, is a partner of Herman, Herman & Katz, LLC (New Orleans, Louisiana) and the national firm of Herman Gerel, LLP (Atlanta, Georgia).

Mr. Davis is a native of New Orleans, Louisiana, earned his bachelor's degree in business from The University of Texas at Austin (1981) and his juris doctor from Tulane University Law School (1984).

Mr. Davis' practice primarily include complex and multidistrict litigation, class actions, product liability, property damage, corporate law, business and commercial law and railroad crossing and derailment litigation. Mr. Davis is an A.V. rated attorney with Martindale-Hubbell. He is admitted to practice in both state and federal courts in Louisiana and due to his unique level of knowledge of multidistrict litigations, Mr. Davis has appeared *pro hac vice* in a number of jurisdictions throughout the country over the years and has been invited to speak publically about practices, procedures and time and billing in MDLs.

Mr. Davis has been appointed to leadership positions in MDL-2047 *In Re: Chinese-Manufactured Drywall Products Liability Litigation*; MDL-1355 *In Re: Propulsid Products Liability Litigation;* MDL-1657 *In Re: Vioxx Products Liability Litigation*; MDL-2243 *In Re: Fosamax (Alendronate Sodium) Products Liability Litigation (No. II)*; and MDL-2197 *In Re: DePuy Orthopaedics, Inc. ASR Hip Implant Products*. He presently serves on the Plaintiffs' Steering Committee on the *Fosamax* and *DePuy* MDLs. He has also assisted with Liaison Counsel duties in several multidistrict litigations, such as *Propulsid*, *Vioxx* and *Chinese Drywall*, that have or are pending in the United States District Court, Eastern District of Louisiana.

Mr. Davis has a number of memberships in professional organizations, has received recognitions, published works and provided a number of presentations all of which can be obtained from the Herman Herman & Katz, LLC website located at www.hhklawfirm.com where a full biography for Mr. Davis can be obtained, as well as an overview of his firm.

Mr. Davis, and his partners at the HERMAN HERMAN & KATZ, LLC, Russ Herman, Steve Herman and Dr. Joe Kott have worked continuously on TYLENOL®/Acetaminophen matters for several years. Further, Mr. Davis has continuously been involved and participated with other counsel involved the TYLENOL®/Acetaminophen litigation since the inception of the litigation. He has participated in strategy, discovery, document productions, and motion practice, in the litigation.

**Gil Gainer, Esquire**
TOLIVER & GAINER
**942 Green St SW**
**Conyers, GA 30012**

Mr. Gainer and the firm of TOLIVER & GAINER have litigated TYLENOL® liver injury cases as single "one-off" cases for well over a decade in a number of states throughout the country. Mr. Gainer has gained extensive knowledge related to the specific mechanism of injury caused by acetaminophen toxicity, as well as the particular circumstances that place consumers at a higher risk for liver injury while taking it. To that end, and to the best of his knowledge, his firm was the first in the country to litigate a case against the makers of Tylenol based upon their "failure to warn" of the heightened risk of acute liver failure from acetaminophen when food/ caloric intake is restricted (sometimes referred to as a "fasting state").

Mr. Gainer has made numerous presentations on the issue of acetaminophen-induced liver injury at legal seminars. He has acted as a reference source for all the members of this group regarding acetaminophen toxicity and liver damage since its inception. Over the course of time in litigating TYLENOL® cases, Mr. Gainer has worked with some of the leading liver experts and regulatory experts in the country. His understanding and experience with the subject matter of this MDL makes him particularly suited to serve in a leadership role on the PSC. Mr. Gainer's application to serve on the PSC is made with the full support of all the other applicants seeking leadership positions.

Mr. Gainer currently serves as co-counsel of record in twenty one (21) TYLENOL® cases currently pending before this Court. Several other cases, presently pending in the Court of Common Pleas of Philadelphia County (which are expected to be removed to this Court), include his clients. Now that this MDL has been established, Mr. Gainer fully anticipates filing a number of his firm's additional TYLENOL® cases directly into this Court.

Mr. Gainer has been admitted to practice before all the state trial courts and appellate courts in Georgia, as well as the United States District Court of Georgia (Northern and Middle Districts), the United States Court of Appeals for the Eleventh Circuit, and the Supreme Court of the United States. Mr. Gainer is a highly respected trial attorney with over thirty (30) years of experience. He currently serves on the Board of Governors for the State Bar of Georgia and as a Vice President of the Georgia Trial Lawyers Association. He has consistently received the highest rating for legal ability and ethical standards A.V. from Martindale-Hubbell over many years, based upon the confidential opinions expressed by members of the Bar and the Judiciary.

Mr. Gainer graduated magna cum laude from the University of Georgia in 1978 and received his J.D. degree from Walter F. George Law School, Mercer University, in 1981. Since 1987, he has devoted his practice primarily to the representation of Plaintiffs. He has acted as lead counsel in hundreds of injury and wrongful death cases in a number of states, and has obtained record-setting verdicts in complex personal injury, medical negligence, and pharmaceutical cases.

**Dianne Nast, Esquire**
**NASTLAW**
**1101 Market Street**
**Suite 2801**
**Philadelphia, Pennsylvania 19107**

Ms. Nast is the founder of the Philadelphia law firm, NastLaw LLC. From 1995 to 2012, she was a senior shareholder, officer and director of RodaNast, P.C. From 1976 to 1995, she was with the Philadelphia law firm of Kohn, Nast & Graf, P.C., where she was a senior shareholder, officer and director. She graduated *magna cum laude* from Rutgers University School of Law.

She served as a Director of the Federal Judicial Center Foundation from 1992 until 2002, appointed by the late Chief Justice William H. Rehnquist. In January 1998, the Chief Justice named Ms. Nast Chair of the Foundation for a five year term.

In January 2001, the late Judge Edward Becker, then Chief Judge of the United States Court of Appeals for the Third Circuit, appointed Ms. Nast to serve on the fifteen-member Third Circuit Task Force on Selection of Class Counsel. The Task Force issued a report, Selection of Class Counsel, Report of the Third Circuit Task Force, (Daniel J. Capra, Reporter) 208 F.R.D. 340 (2002).

In July 2004, Ms. Nast was selected by The American Law Institute to serve as an Adviser for the ALI's Principles of the Law of Aggregate Litigation Project.

Ms. Nast chaired the Lawyers Advisory Committee for the United States Court of Appeals for the Third Circuit and served a three-year term on that Committee. She served for eight years on the Third Circuit's Committee on Revision of Judicial Conduct Rules of the Judicial Council and on the Judicial Conference Long Range Planning Committee.

Ms. Nast has served as Lawyer Chair of the Judicial Conference of the United States Court of Appeals for the Third Circuit. She is a member of the Historical Society of the Third Circuit, and chaired the Circuit's Centennial Celebration.

She was appointed by the late Chief Judge Alfred L. Luongo to Chair the Eastern District of Pennsylvania's Lawyers Advisory Committee, and served for four years in that position. She served for three years as President of The Historical Society for the United States District Court for the Eastern District of Pennsylvania and as Editor of the Society's Historical Calendar.

She is a member of the American Bar Association Litigation Section, where she served on the Task Force on State Justice Initiatives and on its consulting committee on counsel fees. Additionally, she served on the Task Force on the State of the Justice System and the Task Force on Strategic Planning. She co-chaired the Section's Committee on Liaison with International Professional Associations, and served a three-year term on the Section's Council. She was co-chair of a Section Joint Conference with the British Bar, a weeklong conference in London on Civil Justice. She served as a Section Division Director, and co-chaired the Section's Antitrust Committee.

Ms. Nast is member of the Pennsylvania Bar Association Disciplinary Committee. She is a Fellow of the American Bar Foundation and a member of the American Law Institute. Ms. Nast is a member of the Board of Directors of the Sedona Conference, a member of the American Antitrust Institute and the Public Justice Foundation. She is a member of the National Association of Professional Women.

She has participated as a Panelist on programs at the Judicial Conferences of the United States Courts of Appeals for the Third and Fourth Circuits. She frequently serves as a faculty member or Panelist on legal educational programs, including programs for the American Bar Association, the American Law Institute, the National College of Advocacy, the American Trial Lawyers Association, the University of Pennsylvania Law School, Rutgers School of Law, Dickinson School of Law, the Pennsylvania Bar Association, Philadelphia Bar Association, Allegheny County Bar Association, Harris Martin and Prentice-Hall and Mealey Law Publishers.

Ms. Nast has been selected by fellow lawyers to be listed in The Best Lawyers in America, and has been included in each edition since 2003. The National Law Journal has selected Ms. Nast as one of the nation's top fifty women litigators. Ms. Nast was also selected by Philadelphia Magazine as one of Philadelphia's Best Complex Litigation Lawyers. She has been named as one of Pennsylvania's Top Fifty Women Lawyers.

She is a member of the Board of Directors for the Center for Research on Women and Newborn Health and serves as President of the Foundation's Board. She served on the Lancaster Catholic High School Board of Education and chaired local elementary school board for four years.

Ms. Nast has served as Court-appointed Lead Class Counsel and Steering or Major Committee member in a variety of pharmaceutical, antitrust, consumer protection, and other complex cases, including by way of example the following representative cases (in alphabetical order). The Pharmaceutical and medical device cases include *Avandia Marketing, Sales Practices and Products Liability Litigation*, MDL No. 1871 (E.D. Pa.); *Federal State Liaison, Plaintiffs' Advisory Committee, Chair, Fee Committee*; *Baycol Products Litigation*, MDL No. 1431 (D. Minn.) Plaintiffs' Steering Committee; *Darvocet, Darvon and Propoxyphene Products Liability Litigation*, MDL No. 2226 (E.D. Ky.) Plaintiffs' Co-Lead Counsel; *Diet Drug Product Liability Litigation*, MDL No. 1203 (E.D. Pa.) Sub Class Counsel, Plaintiffs' Steering; *Committee Factor Concentrate Litigation*, MDL No. 986 (N.D. Ill.) Plaintiffs' Co-Lead Class Counsel; *Felbatol Products Liability Litigation*, MDL No. 1048 (N.D. Cal.) Plaintiffs' Steering Committee; *Heparin Products Liability Litigation*, MDL No. 1953 (N.D. Ohio) Plaintiffs' Executive Committee *Medtronic, Inc. Products Liability Litigation I*, MDL No. 1726 (D. Minn.) Plaintiffs' Steering Committee; *Medtronic, Inc. Sprint Fidelis Leads Products Liability Litigation II*, MDL No. 1905 (D. Minn.) Plaintiffs' Steering Committee; *Silicone Breast Implant Litigation*, MDL 926 (N.D Ala.) Plaintiffs' Steering Committee; *Serzone Products Liability Litigation*, MDL 1477 (S.D. Va.) Plaintiffs' Steering Committee; *Transvaginal Mesh Products Liability Litigation, MDL Nos. 2187, 2325, 2326, 2327 and 2387* (S.D. W.V.) Plaintiffs' Steering Committee *Yasmin and Yaz (Drospirenone) Marketing, Sales Practices and Products Liability Litigation*, MDL No. 2100 (S.D. Ill.); Federal State Liaison Counsel *Yaz/Yasmin/Ocella/Gianvi Products Liability Litigation*, No. 1307 (Court of Common Pleas, Philadelphia County); and Plaintiffs' Co-Lead Counsel; *Zoloft (Sertraline Hydrochloride) Products*

*Liability Litigation*, MDL No. 2342 (E.D. Pa.) Plaintiffs' Co-Lead Counsel.

### E.     PROPOSED PLAINTIFF NEW JERSEY FEDERAL-STATE LIASION COUNSEL

As stated above, it is vital to the success of an MDL to coordinate and cooperate with counsel representing clients in parallel state court actions in order to efficiently move the litigation as a whole. The New Jersey state court litigation will play an active role in the litigation and development of this case. To this end, Movants propose that a federal-state court liaison counsel be appointed to liaison between this MDL and the parallel litigation pending in New Jersey. Specifically, Movants propose:

**David Buchanan, Esquire**
**SEEGER WEISS, LLP**
**550 Broad Street**
**Suite 920**
**Newark, NJ 07102**

Mr. Buchanan submit this application in support of his request for appointment as the Federal-New Jersey State Liaison Counsel for this MDL proceeding. Mr. Buchanan is a partner of Seeger Weiss LLP, an approximately thirty-lawyer firm with several offices in this region, including Philadelphia, New York, and Newark. His partner, Christopher Seeger, has submitted by separate application his request to serve on the Plaintiffs' Steering Committee (PSC), and if appointed he will serve as Seeger Weiss, LLP's firm's primary representative on the PSC. Mr. Buchanan anticipates further serving on several subcommittees necessary to ensure the successful prosecution of the cases in this MDL. Together with Mr. Seeger and others from Seeger Weiss, the firm will commit to devoting the resources necessary to do so.

Mr. Buchanan's practice is focused on large, complex litigation involving substantial numbers of aggrieved individuals, generally taking the form of mass actions and class actions. Pertinent to the instant MDL proceeding, Mr. Buchanan has assumed leadership positions in many of the most significant mass tort proceedings in the last 10 years. In particular, he currently serve as Liaison Counsel in coordinated state-court litigation proceedings involving Accutane, DePuy Orthopedic Hips, Fosamax, Gadolinium contrast agents, Yaz/Yasmin, and Zometa. Similarly, he often serve in leadership positions (as a chair or co-chair of various committees) in parallel MDL proceedings, leading discovery, expert development, and trial efforts. He is also a member of the Court appointed Plaintiffs' Executive Committee in the *National Football Players' League Concussion Litigation*. In the recent past, he has served as Liaison Counsel for the closely watched New Jersey Vioxx Litigation, which involved approximately 16,000 individual cases; in the Vioxx MDL, he served as discovery co-chair. Through both roles, he helped lead the discovery and expert efforts, and coordinated the efforts of dozens of plaintiffs' counsel, all in support of the successful resolution of

that litigation.

Similar to the philosophy of Seeger Weiss more broadly, Mr. Buchanan is a strong advocate of our civil justice system, and prides himself in taking cases from inception through discovery, and as necessary, through trial and appeal. In that regard and by way of example, for the Accutane mass tort proceedings Counsel, he has been co-trial counsel in the five (5) trials that have reached verdict in New Jersey-notably, six (6) of the eight (8) plaintiffs in those cases prevailed and received substantial trial verdicts. He has further handled the appeals in those matters, in one instance, to the New Jersey Supreme Court.

To date, Seeger Weiss is primary counsel in twenty-one pending Tylenol cases—fifteen currently pending in Federal court and the remainder in state court, although we suspect many of these state cases to be transferred to the Federal Court shortly. Numerous additional cases have been prepared for filing, but have not yet been filed pending the Court's case management guidance.  Mr. Buchanan expects that the TYLENOL® litigation will be one of his and his firm's primary litigation responsibilities over the next several years.

As this Court is well aware, cases such as the instant MDL pose enormous substantive, logistical, and resource challenges on appointed counsel. Over the years, Mr. Buchan has consistently risen to and met those challenges, assuming lead, liaison, and other significant, substantive leadership roles (and supplying the necessary resources) in many challenging and successful MDLs over the last decade.

Importantly, Judge Carol Higbee, the Judge in the TYLENOL® state court litigation is the Judge assigned to manage the New Jersey Vioxx, Fosamax and Accutane state court litigations, which Mr. Buchanan was appointed co-liaison counsel. Mr. Buchanan is thus, uniquely qualified for the position of Federal-New Jersey State Liaison Counsel in this litigation.

Movants' firms have already committed significant resources investigating and litigating these claims in state court and intend to commit significant numbers of senior and experienced attorneys, staff and money as needed to prosecute this claim.

These combined firms with their experiences and resources present an outstanding group to lead this litigation. Furthermore, all of the firms have well-qualified and experienced attorneys dedicated to the successful prosecution of this litigation. The firms in this proposed structure represent the best of the best of the plaintiffs' bar involved in pharmaceutical litigation, reaching from all parts of the country and with experience in litigating TYLENOL® acetaminophen liver toxicity cases against McNeil.

## VII.   CONCLUSION

It is respectfully suggested that given the magnitude of this MDL, and that other state court proceedings are already underway, that it is important for this Court to act swiftly in approving an organizational structure for Plaintiffs, as well as setting an initial case management conference. In light of the above factors and reasoning, and after much careful thought and consideration, we respectfully submit to the Court this proposed PSC and leadership slate, and respective applications, to lead this MDL, and jointly and uniformly request that the Court so appoint. We, the members of this proposed slate, thank the Court for its time and consideration.

Respectfully submitted,

_____/s/_____
Arnold Levin, Esquire
Laurence S. Berman, Esquire
Fred S. Longer, Esquire
Michael M. Weinkowitz, Esquire
LEVIN FISHBEIN SEDRAN & BERMAN
510 Walnut St., Suite 500
Philadelphia, PA 19106
215-592-1500
215-592-4663 (facsimile)
ALevin@lfsblaw.com
LBerman@lfsblaw.com
FLonger@lfsblaw.com
MWeinkowitz@lfsblaw.com

R. Clay Milling, Esquire
HENRY SPIEGEL MILLING LLP
Atlanta Plaza, Suite 2450
950 East Paces Ferry Road, N.E.
Atlanta, GA 30326
(404) 832-8000
(404) 832-8050 (facsimile)
RCM@HSM-LAW.COM

Chris Seeger, Esquire
David Buchanan, Esquire
SEEGER WEISS, LLP

35

77 Water Street
New York, NY  10005
(212) 584-0700
(212) 584-0799 (facsimile)
CSeeger@seegerweiss.com

James F. Green, Esquire
Christopher V. Tisi, Esquire
Michelle Parfitt, Esquire
ASHCRAFT & GEREL, LLP
SUITE 400
2000 "L" St., N.W.
Washington, D.C.20036
(202) 783-6400
(202) 416-6392 (facsimile)
jgreen@ashcraftlaw.com

Leonard Davis, Esquire
Russ Herman, Esquire
Steve Herman, Esquire
HERMAN, HERMAN, KATZ & COTLAR LLP
820 O'Keefe Avenue
New Orleans, Louisiana 70113
(504) 581-4892
(504) 561-6024 (facsimile)
LDavis@HHKC.com

Gil Gainer, Esquire
TOLIVER & GAINER
942 Green St SW
Conyers, GA 30012
(770) 929-3100
(770) 785-7879 (facsimile)
Gainer@tiloverandgainer.com

Dianne Nast, Esquire
NASTLAW
1101 Market Street
Suite 2801
Philadelphia, Pennsylvania19107
(215) 923-9300
(215) 923-9302 (facsimile)
DNast@nastlaw.com

## CERTIFICATE OF SERVICE

I, Michael M. Weinkowitz, Esquire, hereby certify that on this 18th day of April, 2013, I electronically filed the foregoing *Plaintiffs' Response to Defendants' Motion to Stay Proceedings Pending Entry of MDL 2436 Case Management Orders and Joint Cross-Application for the Appointment to the Plaintiffs' Steering Committee* and the accompanying *Memorandum of Law* with the Clerk of Court using the CM/ECF system and that electronic notice and service will be completed through the ECF system. In addition, I have sent via E-mail and regular mail a copy to the following interested counsel:

Christy D. Jones, Esquire
Michael B. Hewes, Esquire
Butler, Snow, O'Mara, Stevens & Cannada, PLLC
1300 25th Ave., Suite 204
Gulfport, MS 39501
Direct: (228) 575-3039
Michael.Hewes@butlersnow.com
*Attorneys for McNeil PPC, McNeil Consumer
Healthcare, Johnson & Johnson*

David Abernethy, Esquire
Melissa Graff, Esquire
Meredith Nissen Reinhardt, Esquire
Drinker Biddle
One Logan Square, Ste. 2000
Philadelphia, PA 19103-6996
(215) 988-2700
David.Abernethy@dbr.com
Melissa.Graff@dbr.com
Meredith.reinhardt@dbr.com
*Attorneys for McNeil PPC, McNeil Consumer
Healthcare, Johnson & Johnson*

Taylor B. Mayes, Esquire
Robert Trentham, Esquire
Butler, Snow, O'Mara, Stevens & Cannada PLLC
1200 One Nashville Place
150 Fourth Ave., North
Nashville, TN 37219-2433
(615) 503-9100
Taylor.mayes@butlersnow.com
*Attorneys for McNeil PPC, McNeil Consumer
Healthcare, Johnson & Johnson*

Lauren E. O'Donnell, Esquire
Terry M. Henry, Esquire
Blank Rome LLP
130 N. 18th Street
Philadelphia, PA  19103-6998
(215) 569-5735
odonnell@blankrome.com
thenry@blankrome.com
*Counsel for Watson Pharmaceuticals*

Brandon L. Goodman, Esquire
Richard M. Barnes, Esquire
Robert A. Limbacher, Esquire
Goodell Devries Leech & Dann, LLP
One Commerce Square
2005 Market Street, Suite 1940
Philadelphia, PA  19103
(267) 765-3604
bgoodman@gdldlaw.com
rmb@gdldlaw.com
rlimbacher@gdldlaw.com
*Counsel for Perrigo Company and L. Perrigo Company*

Madeline M. Sherry, Esquire
Stephen J. Finley, Esquire
Gibbons, P.A.
1700 Two Logan Square
18th and Ach Streets
Philadelphia, PA  19103-2769
msherry@gibbonslaw.com
sfinley@gibbonslaw.com
*Counsel for Novartis Consumer Health, Inc.*

Kathryn L. White, Esquire
James D. Shannon, Esquire
Shannon Law Firm, PLLC
100 West Gallatin Street
Hazlehurst, MS  39083
(601) 894-2202
kwhite@shannonlawfirm.com
jshannon@shannonlawfirm.com

2

Lowell W. Finson, Esquire
Phillips Webster
Citigroup Center Building
444 South Flower Street, 33 Rd Floor
Los Angeles, CA  90071
(213) 808-6741
Lowell@justiceforyou.com


Mollie Fleming Benedict, Esquire
William Henry Dance, Esquire
Su-Lyn Combs, Esquire
Tucker Ellis LLP
515 South Flower Street
42nd Floor
Los Angeles, CA  90071-2223
(213) 430-3400
Mollie.benedict@tuckerellis.com
William.dance@tuckerellis.com
Su-lyn.combs@tuckerellis.com

Brett Andrew Zekowski, Esquire
Parker & Waichman, LLP
111 Great Neck Road
Great Neck, NY  11021
(516) 466-6500
bzekowski@yourlawyer.com

Debra O'Gorman, Esquire
Dechert LLP
30 Rockefeller Plaza
New York, NY  10112
(212) 698-3500
Debra.ogorman@dechert.com

Michael Eugene Planell, Esquire
Rose Lee Amandola, Esquire
Dechert, LLP
1095 Avenue of the Americas
New York, NY  10036
(212) 695-3500
Michael.planell@dechert.com
Rose.amandola@dechert.com

3

Edward L. Birk, Esquire
Marks Gray, P.A.
1200 Riverplace Blvd., Suite 800
P.O. Box 447
Jacksonville, FL  32201
(904) 807-2179
ebirk@marksgray.com

Joseph R. Johnson, Esquire
Babbitt, Johnson, Osborne & Leclainche, P.A.
Suite 100, 1641 Worthington Road
West Palm Beach, FL  33409
(561) 684-2500
jjohnson@babbitt-johnson.com

R. Clay Milling, Esquire
Henry Spiegel Milling LLP
Atlanta Plaza, Suite 2450
950 East Paces Ferry Road, N.E.
Atlanta, GA  30326
(404) 832-8000
RCM@HSM-LAW.COM

Jeptha Fowlkes Barbour, Esquire
Marks Gray. P.A.
1200 Riverplace Blvd., Suite 800
P.O. Box 447
Jacksonville, FL  32201
(904) 398-0900
jbarbour@marksgray.com

David R. Buchanan, Esquire
Seeger Weiss, LLP
550 Broad Street
Suite 920
Newark, NJ  07102
(973) 639-9100
dbuchanan@seegerweiss.com

4

Michael S. Appel, Esquire
Sugarman, Rogers, Barshak & Cohen, P.C.
101 Merrimac Street
9th Floor
Boston, MA  02114-4737
(617) 227-3030
appel@srbc.com

Christopher V. Tisi, Esquire
James F. Green, Esquire
Susan C. Minkin, Esquire
Ashcraft & Gerel, LLP
4900 Seminary Road
Suite 650
Alexandria, VA  22311
(703) 931-5500
cvtisi@aol.com
jgreen@ashcraftlaw.com
sminkin@ashcraftlaw.com

Michelle A. Parfitt, Esquire
Ashcraft & Gerel
2000 L Street, NW
Suite 400
Washington, D.C.  20036
(202) 783-6400
mparf@aol.com

Joseph R. Johnson, Esquire
Babbitt Johnson & Osborne
1450 Centrepark Boulevard
Suite 100 P.O. Box 4426
West Palm Beach, FL 33402-4426
jjohnson@babbitt-johnson.com

Barry L. Davis, Esquire
Christine Saidi Egner, Esquire
Thornton Davis & Fein
Brickell Bay View Centre
80 SW 8th Street
Suite 2900
Miami, FL 33130
(305) 446-2646
Davis@tdflaw.com
saidi@tdflaw.com

Dianne Nast, Esquire
NastLaw
1101 Market Street
Suite 2801
Philadelphia, Pennsylvania 19107
Tele: (215) 923-9300
Fax: (215) 923-9302
Dnast@nastlaw.com

Roger C. Denton
Schlichter, Bogard & Denton, LLP
100 South Fourth Street, Ste 900
St. Louis, MO 63102
314-621-6115    314-621-7151 (fax)
Rdenton@uselaws.com

_____/s/_____
Michael M. Weinkowitz
LEVIN FISHBEIN SEDRAN & BERMAN
510 Walnut St., Suite 500
Philadelphia, PA  19106
215-592-1500
215-592-4663 (facsimile)
MWeinkowitz@lfsblaw.com