**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: TYLENOL (ACETAMINOPHEN) MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | § § § § § § | **MDL NO. 2436**<br><br>**2:13-md-02436**<br><br>**HON. LAWRENCE F. STENGEL** |

This Document Relates to:

Civil Action No. 2:12-cv-07263

| | |
|---|---|
| Rana Terry, as Personal Representative and Administrator of the Estate of Denice Hayes, Deceased,<br><br>Plaintiff,<br><br>vs.<br><br>McNEIL-PPC, Inc., McNeil Consumer Healthcare, and Johnson & Johnson, Inc.,<br><br>Defendants. | § § § § § § § § § § § § § |

**M E M O R A N D U M**

**Stengel, J.**                                        **March 2, 2016**

This case is part of a Multidistrict Litigation (MDL) involving claims of liver

damage from the use of Tylenol at or just above the recommended dosage.[1] This is the

---

[1] See Master Compl., 13-md-2436, Doc. No. 32. There are over two hundred other cases included in this MDL, along with several similar cases in New Jersey state court.

first "bellwether" scheduled for trial.[2] The defendants move to exclude testimony by the plaintiff's marketing expert Dr. Marvin Goldberg. I will grant this <u>Daubert</u> motion in part and deny it in part.

## I.   LEGAL STANDARD

The admissibility of expert testimony is governed by Federal Rules of Evidence 702 and 703 as well as by <u>Daubert v. Merrell Dow Pharms, Inc.</u>, 509 U.S. 579 (1993), and its progeny.[3] <u>See</u> <u>In re Paoli RR Yard PCB Litigation (Paoli II)</u>, 35 F.3d 717, 735 (3d Cir. 1994). "Under the Federal Rules of Evidence, a trial judge acts as a 'gatekeeper' to ensure that 'any and all expert testimony or evidence is not only relevant, but also reliable.'" <u>Pineda v. Ford Motor Co.</u>, 520 F.3d 237, 243 (3d Cir. 2008)(quoting <u>Kannankeril v. Terminix Int'l, Inc.</u>, 128 F.3d 802, 806 (3d Cir. 1997)). The Third Circuit recognizes a "liberal policy of admissibility" regarding Rule 702. <u>Pineda</u>, 520 F.3d at 243 (quoting <u>Kannankeril</u>, 128 F.3d at 806); <u>United States v. Schiff</u>, 602 F.3d 152, 173 (3d Cir. 2010).[4]

"[B]ecause expert evidence is often more misleading than other evidence, Rule 403 gives a judge more power over experts than over lay witnesses." <u>In re</u>

---

[2] A "bellwether" case is a test case. "Bellwether" trials should produce representative verdicts and settlements. The parties can use these verdicts and settlements to gauge the strength of the common MDL claims to determine if a global resolution of the MDL is possible. <u>See</u> FEDERAL JUDICIAL CENTER, MANUAL FOR COMPLEX LITIGATION, FOURTH EDITION 360 (2004); DUKE LAW CENTER FOR JUDICIAL STUDIES, MDL STANDARDS AND BEST PRACTICES 16-21 (2014).

[3] <u>Daubert</u> held that the Federal Rules of Evidence, specifically Rule 702, controlled the issue of when experts were qualified. <u>Daubert v. Merrell Dow Pharms, Inc.</u>, 509 U.S. 579, 587-88 (1993). It found that Rule 702 superseded the Court's prior precedent on the subject found in <u>Frye v. United States</u>, 54 App.D.C. 46, 47, 293 F. 1013, 1014 (1923). <u>Id.</u> at 587. <u>Daubert</u> went on to clarify what was required under Rule 702, as compared to <u>Frye</u>. <u>See id.</u> at 589-598.

[4] <u>See also</u> <u>Holbrook v. Lykes Brothers Steamship Company, Inc.</u>, 80 F.3d 777, 780 (3d Cir. 1996); <u>Zaprala v. USI Servs. Gp., Inc.</u>, No. 09–1238, 2013 WL 1148335, at *6 (E.D. Pa. Mar. 20, 2013)(quoting <u>Pineda</u>, 520 F.3d at 243).

2

Paoli RR Yard PCB Litigation (Paoli II), 35 F.3d 717, 747 (3d Cir. 1994).

However, "in order for a district court to exclude scientific evidence, there must be

something particularly confusing about the scientific evidence at issue—

something other than the general complexity of scientific evidence." Id.

### a. Rule 702

Federal Rule of Evidence 702 has three major requirements: 1) the expert must be

qualified; 2) the expert must testify about matters requiring scientific, technical, or

specialized knowledge; and 3) the testimony must assist the trier of fact.[5] Pineda, 520

F.3d at 243 (citing Kannankeril, 128 F.3d at 806). 702's inquiry should be a "flexible

one." Daubert v. Merrell Dow Pharms, Inc., 509 U.S. 579, 594 (1993).

### i.   Expert Must Be Qualified

An expert's qualifications may include education, provided it is in a field

related to the one in which the expert intends to testify. Fedor v. Freightliner, Inc.,

193 F. Supp. 2d 820, 827 (E.D. Pa. 2002). Overall, the court will consider both

academic training and practical experience to determine if the expert has "more

---

[5] Federal Rule of Evidence 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)  the testimony is based on sufficient facts or data;
>
> (c)  the testimony is the product of reliable principles and methods; and
>
> (d)  the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.

knowledge than the average lay person" on the subject. Id. at 827-28 (citing

Waldorf v. Shuta, 142 F.3d 601, 627 (3d Cir. 1998)). "An expert may be generally

qualified but may lack qualifications to testify outside his area of expertise."

Calhoun v. Yamaha Motor Corp., U.S.A., 350 F.3d 316, 322 (3d Cir. 2003).

However, this does not mean that the "best qualified" expert must testify.

"[W]itnesses may be competent to testify as experts even though they may not, in

the court's eyes, be the 'best' qualified." Holbrook v. Lykes Bros. S.S. Co., Inc.,

80 F.3d 777, 782 (3d Cir. 1995).[6]  "Rule 702 and Daubert put their faith in an

adversary system designed to expose flawed expertise." U.S. v. Mitchell, 365 F.3d

215, 244-45 (3d Cir. 2004)(citations omitted). "As long as an expert's scientific

testimony rests upon 'good grounds, based on what is known,' it should be tested

by the adversary process—competing expert testimony and active cross–

examination—rather than excluded from jurors' scrutiny for fear that they will not

grasp its complexities or satisfactorily weigh its inadequacies." Id. at 244

(citations omitted).

### ii.    Expert's Methods Must be Reliable

This Circuit interprets the second factor as one of "reliability," i.e., the testimony

is admissible so long as the process or technique the expert used in formulating the

opinion is reliable. Pineda, 520 F.3d at 244. An expert's opinion need not be correct, only

reliable. See In re Paoli RR Yard PCB Litigation (Paoli II), 35 F.3d 717, 744 (3d Cir.

---

[6] See also Keller v. Feasterville Family Health Care, 557 F. Supp. 2d 671, 675 (E.D. Pa. 2008)(Rice, J.).

1994)("This does not mean that plaintiffs have to prove their case twice—they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are *correct*, they only have to demonstrate by a preponderance of evidence that their opinions are reliable." (emphasis in original)). "[A]n expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." <u>Daubert</u>, 509 U.S. at 592.  "[I]t is the burden of the party offering the expert scientific testimony to demonstrate reliability by a preponderance of the evidence." <u>In re TMI Litig.</u>, 193 F.3d 613, 705 (3d Cir. 1999)(citing <u>Paoli II</u>, 35 F.3d at 744).[7]

"Rule 702 grants the district judge the discretionary authority, reviewable for its abuse, to determine reliability in light of the particular facts and circumstances of the particular case." <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 158 (1999). Judges considering this factor should look to whether a theory, technique, or opinion can be tested or has been subject to peer review or publication. <u>Daubert</u>, 509 U.S. at 593. "The fact of publication (or lack thereof) in a peer reviewed journal thus will be a relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised." <u>Id.</u> at 594. A court should also consider the known or potential rate of error involved in a scientific method. <u>Id.</u> "Reliability" does not require that a technique or methodology be generally accepted by a scientific community. <u>Id.</u> <u>See also</u> <u>id.</u> at 597-98. However, "[w]idespread acceptance can

---

[7] <u>See also</u> Fᴇᴅ. R. Eᴠɪᴅ. 702, Advisory Committee Note (2000 Amendments)("Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence." (citing <u>Bourjaily v. United States</u>, 483 U.S. 171 (1987)).

be an important factor in ruling particular evidence admissible" while a minimally supported technique "may properly be viewed with skepticism." Id.

### iii.    Expert Must be Helpful

The third factor "is typically understood in terms of whether there is a sufficient 'fit' between the expert's testimony and the facts that the jury is being asked to consider." United States v. Schiff, 602 F.3d 152, 172-73 (3d Cir. 2010)(citing Daubert, 509 U.S. at 591). See also In re: TMI Litigation, 193 F.3d 613, 670 (3d Cir. 1999). This factor is about relevance. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." Daubert, 509 U.S. at 591 (quoting 3 Weinstein & Berger ¶ 702[02], p. 702–18). "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." Id. at 591-92.

### b.  Rule 703

Under Federal Rule of Evidence 703, the data underlying the expert's opinion is the central focus. Rule 703 states:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

FED. R. EVID. 703. The trial court must evaluate whether the data used by an expert is reasonably relied upon by experts in the field. See In re Paoli RR Yard PCB Litigation (Paoli II), 35 F.3d 717, 747-49 (3d Cir. 1994).

## II.     Marvin Goldberg, Ph.D. (Plaintiff's Marketing Expert)

The defendants move to exclude Dr. Marvin Goldberg's opinion as inadmissible under Daubert and Rules 702 and 703. The plaintiff offers Dr. Goldberg as an expert on marketing, advertising, and consumer psychology. He explains that the standard of care in marketing "is that the company must provide accurate, reliable and non-misleading information about its product, its safety, its usage, etc." He opines that the defendants' advertising and marketing blunted or negated warnings, leading consumers to believe Extra Strength Tylenol was safer than it was. Overall, he explains how the defendants engaged in a series of integrated marketing strategies—including direct marketing and advertising to consumers, marketing to physicians and hospitals, package design, sampling to consumers through doctors, public relations, and endorsements by third party organizations—in order to build the Tylenol brand. He offers insight into how the defendants targeted both consumers and the medical community in this process. The plaintiff argues this information is relevant to her failure-to-warn and fraud claims.[8]

### a.   Dr. Goldberg is Qualified as an Marketing Expert

Dr. Goldberg's credentials and experience qualify him as an expert in marketing and consumer psychology. Dr. Goldberg, an Emeritus Professor of Marketing, has academic and professional experience in marketing and consumer psychology.[9] He holds

---

[8] The defendants also argue to exclude certain opinions: 1) about the defendants' corporate state of mind or ethics; 2) that the defendants manipulated research studies to support its marketing efforts; and/or 3) that the defendants engaged in ghost-writing for medical journals. The plaintiff concedes these opinions will not be offered. These arguments, therefore, are moot.

[9] Curriculum Vitae of Marvin E. Goldberg, Ph.D. (Pl. Ex. 5). See also M. Goldberg Dep., Jun. 6, 2014 (Pl. Ex. 10). Dr. Goldberg's qualifications, outlined in this section, are taken from his CV and deposition testimony.

a Ph.D. in marketing from the University of Illinois, along with a Master's in Sociology from Columbia University. Until his retirement, he held an endowed position at the Pennsylvania State University as a Professor of Marketing, served as the Interim Dean of Smeal College of Business Administration, as well as the Chairman of the Marketing Department at Penn State. He is a past President and Fellow of the Society of Consumer Psychology. He is a member of the editorial board for the *Journal of Consumer Research*, *Journal of Public Policy and Marketing*, and the *Journal of Social Marketing*. He was the recipient of the inaugural Richard W. Pollay prize honoring "Intellectual Excellence in Research on Marketing and the Public Interest." He has also received the Thomas C. Kinnear/Journal of Public Policy and Marketing Awards for significant contributions to the understanding of marketing and public policy. During his career, Dr. Goldberg taught college courses in marketing research, consumer behavior/consumer psychology, and social psychology.

Dr. Goldberg has testified as an expert in over twenty cases.[10] He has been qualified as a marketing expert in several other drug products liability cases involving the defendants. See Johnson v. Johnson and Johnson, et. al., Civ. Act. No. TC018540 (Cal. App. 2d. Dist. 2008), B211123, 2010 WL 4108429, at *5 (Cal. Ct. App. Oct. 20, 2010)(Goldberg admitted to testify as an expert in consumer behavior and marketing communications)(Pl. Ex. 6, filed under seal); Maya v. Johnson & Johnson, et al., No. 002879 (Ct. Cmn. Pl. Phila. Feb. Term 2009)(Quiñones, J.)(Pl. Ex. 7, filed under

---

[10] See Curriculum Vitae of Marvin E. Goldberg, Ph.D. (Pl. Ex. 5).

seal)(same); Persuad v. Johnson & Johnson, et al., No. 3428 (Ct. Cmn. Pl. Phila. Jan. Term, 2009)(Pl. Ex. 8, filed under seal)(same; Blyth, et al. v. SmithKline Beecham Corp. d/b/a GloxoSmithKline, et al., No. 3305 (Ct. Cmn. Pl. Phila. Sept. Term 2007)(Transcript of Goldberg Voir Dire attached as Pl. Ex. 9, filed under seal)(admitting testimony regarding Paxil drug).[11]

The defendants argue that Dr. Goldberg is not qualified to offer an opinion about whether warning labels were adequate as compared to advertising.[12] They argue that his area of expertise is not warning labels or FDA-regulated products. Dr. Goldberg's published research has focused on the effects of advertising on consumers. He has conducted research on how marketing impacts the behavior of children and adults. Specifically, he has done extensive research and presented on how advertising affects the way consumers perceive related health effects for products such as cigarettes, alcohol, food, etc.

Dr. Goldberg explains how the defendants' marketing and advertising campaigns were perceived by consumers and how their integrated marketing strategies may color consumers' understanding of the warnings provided. Essentially, he outlines the "context" of the warnings, as a way of explaining their ultimate effectiveness. From this

---

[11] See also Schwab v. Philip Morris USA, Inc., 449 F.Supp.2d 992, 1159-63 (E.D.N.Y. 2006), *rev'd sub nom. on other grounds*, McLaughlin v. Am. Tobacco Co., 522 F.3d 215 (2d Cir. 2008)(admitting Dr. Goldberg's testimony regarding cigarette advertising's effect on consumers).

[12] The defendants also argue that Dr. Goldberg's opinions about FTC regulations should be excluded because he is not a regulatory expert. I agree that his opinions related to FTC regulations should be excluded but for reasons related to "fit" which I explain below.

standpoint, he is qualified to offer an opinion about how consumers may have perceived warnings.

The defendants also argue that Dr. Goldberg offers opinions about the effects of inappropriate medical marketing on physicians. The defendants claim this is improper because he does not have a background in medical marketing.[13] Dr. Goldberg's research focuses on the effects marketing strategies can have on those targeted by that marketing. Whether the target of the marketing is consumers or physicians, it would seem that the psychological principles employed by marketers would apply equally. Dr. Goldberg is certainly qualified to offer an expert opinion on how marketing to physicians affected their perception of Tylenol products.

### b.  Dr. Goldberg's Methods are Reliable

Next, the defendants claim Dr. Goldberg's opinion is not supported by adequate facts or data produced by valid methodology. Dr. Goldberg is not a scientist; this does not preclude his testimony nor require he use "scientific" techniques. "[T]here are many different kinds of experts, and many different kinds of expertise." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 150 (1999).  "[I]n cases not involving scientific testimony, '[t]he factors identified in Daubert may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony.'" Betterbox Commcns. Ltd. v. BB Techs., Inc., 300 F.3d 325, 329 (3d Cir. 2002)(quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150 (1999)). "In such

---

[13] I note that Dr. Goldberg also has given presentations to medical professionals on how marketing may be used to influence their perceptions of products. This experience also offers additional support for his being qualified in this area.

cases…'the relevant reliability concerns may focus upon personal knowledge or experience.'" Id. (quoting Kumho Tire, 526 U.S. at 150).[14]

A marketing professional's review and analysis of company documents to extrapolate marketing strategies, coupled with the expert's experience and background may be enough to establish that the expert's methodology is reliable. See Schwab v. Philip Morris USA, Inc., No. CV 04–1945(JBW), 2005 WL 2401647, at *5 (E.D.N.Y. Sept. 29, 2005)("Dr. Pollay is a Professor Emeritus of Marketing with adequate credentials in his field….Dr. Pollay's experience, analytical techniques and reports meet all elements of Daubert and Rule 702's requirements. His report could be reliable and helpful to the jury."); Goldberg v. 401 North Wabash Venture LLC, No. 09 C 6455, 2013 WL 212912, at *5 (N.D. Ill. Jan. 18, 2013)("Trump Defendants' argument that Levin's methodology is unreliable because he applies his personal experience and knowledge of industry customs and practices to actions taken by the Trump Defendants is misguided…. Levin's analysis is not inherently unsound because he draws upon his experience and industry knowledge rather than a proven formula, surveys, or established data.")(citation omitted); Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Management, Inc., 618 F.3d 1025, 1043 (9th Cir. 2010)("Fueroghne has forty years of experience in the marketing and advertising industry, strongly suggesting that he is familiar with what companies within the industry do when placing words on a product.")(expert qualified by

---

[14] See also Kannankeril, 128 F.3d at 806 ("In order for the expert testimony to be 'reliable,' we have required that the testimony be based on the 'methods and procedures of science,' rather than on 'subjective belief or unsupported speculation.'")(citing Paoli, 35 F.3d at 744); Holbrook v. Lykes Bros. S.S. Co., Inc., 80 F.3d 777, 784 (3d Cir. 1995)("The reliability requirement, however, should not be applied too strictly."); id. ("If the expert has 'good grounds' for the testimony, the scientific evidence is deemed sufficiently reliable.").

40 years of experience in marketing to opine about practice of companies in doing trademark research before placing words on product). See also U.S. v. Davis, 397 F.3d 173, 178–79 (3d Cir. 2005)(explaining that "years of experience" was a reliable basis for rendering a non-scientific opinion).

Dr. Goldberg analyzed how Tylenol was marketed, promoted, and advertised to consumers and healthcare providers from the 1970s through the date of injury. He reviewed and examined the defendants' own extensive market research and consumer surveys. He synthesized these materials and offered opinions about how the defendants employed various marketing and psychological techniques to build the Tylenol brand—as the "safest" analgesic, "the one hospitals use most," and "the one that doctors recommend most." He explained how the defendants used a multi-faceted approach to marketing, including: sampling provided through doctors, marketing to doctors along with consumers, product positioning that encouraged the purchase of Extra Strength Tylenol over Regular Strength Tylenol, and packaging that created the effect of "safety" and "trust."  With each of these techniques, he described how defendants' marketing decisions (i.e., colors on packages, tone of voice in commercials, etc.) created a certain effect on consumers' perception of Tylenol products—essentially the goal of marketing.

From this information he provides opinions about what expectations consumers developed about Tylenol products. For example, he explained that it was reasonable for a consumer to think that taking slightly more than the recommended dose, if still in pain, would not be harmful. He drew on his background and expertise in rendering his

opinions. The methods he used appear to be sound and show a careful review of the information presented to him about the Tylenol brand, built over forty years.

For these reasons, I find Dr. Goldberg's methodology to be reliable.

### c. Dr. Goldberg's Opinion May be Helpful to the Jury in Understanding Foreseeability of Misuse and Consumer Expectations[15]

Lastly, the defendants argue that Dr. Goldberg's opinion is irrelevant and/or lacks "fit." The defendants claim the information in Dr. Goldberg's opinion is not relevant because there is no longer a negligent marketing claim in this case. To the extent that Dr. Goldberg opines about the defendants breaching a standard of care related to their legal and ethical duties as marketers, I agree. Without a negligent marketing claim, it is irrelevant if Dr. Goldberg believes that their actions fell below what a "reasonable marketer" would be expected to do. Dr. Goldberg's opinions to this effect will be excluded.[16]

The defendants argue that Dr. Goldberg's opinion would not be helpful to the jury but instead would invade the province of the jury. See Wolfe v. McNeil-PPC, Inc., No. 07-348, 2011 WL 1673805, at *8-9 (E.D. Pa. May 4, 2011)(excluding Goldberg's expert testimony because it included inappropriate legal conclusions, offered testimony that does not fit the case, and did not use reliable methodology in forming opinion). At trial, Dr. Goldberg would not be permitted to draw legal conclusions or give opinions about the ultimate issues in this case. However, his opinions do not appear to be that far-

---

[15] The defendants' motion in limine 14 also discusses how marketing "fits" into this case. I discuss further marketing's relevance in addressing that motion.

[16] This includes his opinions about FTC regulations and whether or not the defendants violated those regulations.

reaching. Dr. Goldberg offers the opinion that the defendants' marketing of Extra Strength Tylenol "negated whatever warnings they may have provided about the risk of liver toxicity that accompanied the products over the roughly 40 years that they have been on the market" and that "[t]he manner of marketing and promotion made inadequate whatever liver toxicity warnings that were provided." Goldberg Expert Report, Pl. Ex. 1 at 2. He explains the various marketing strategies (i.e., sampling, advertising, coupons and discounts, marketing to physicians, public relations, etc.) employed by the defendants to encourage the purchase of their products.

"[W]hen an issue before the court pertains to the effect of a marketing an [sic] advertising campaign on a potential consumer, courts regularly permit expert testimony to aid the jury on the precise topic of marketing strategies." Merisant Co. v. McNeil Nutritionals, LLC, 515 F. Supp. 2d 509, 541 (E.D. Pa. 2007).[17] The average person may not know about the subtle applied psychological techniques drug companies use to market their products. See Schwab v. Philip Morris USA, Inc., No. CV 04–1945(JBW), 2005 WL 2401647, at *5 (E.D.N.Y. Sept. 29, 2005)("Advertising methodologies are esoteric; the average juror could be helped by an explanation of how they work and were used by defendants."). See also U.S. v. Davis, 397 F.3d 173, 179 (3d Cir. 2005)(explaining how non-scientific expert's testimony was admissible "because it is not within the common knowledge of the average juror").

---

[17] I note that Merisant Co. v. McNeil Nutritionals, LLC was a case brought under the Lanham Act for claims of false and misleading advertising. 515 F. Supp. 2d 509, 511 (E.D. Pa. 2007) and id. at 541 ("Because this is a case concerning allegations of false and misleading advertising, expert testimony regarding advertising, marketing and brand positioning adequately 'fits' the issues at hand.").

Marketing is especially relevant to the plaintiff's claims in this case because this action involves an over-the-counter (OTC) product. "A consumer of over-the-counter drugs is, as it were, self-prescribing and is intended, expected, and indeed encouraged by the drug industry to do so." See Torsiello v. Whitehall Labs., Div. of Home Prods. Corp., 165 N.J. Super. 311, 326 (App. Div. 1979). Because a drug company directly markets an OTC medication to the general public, a consumer is "likely to use an over-the-counter product based on his own judgment, molded by advertising, and without ever consulting a physician at all." Id. "[The consumer] must, therefore, also be given such information by the manufacturer as will permit him to self-prescribe with a minimum of risk." Id.

Marketing and branding are especially important to this MDL because acetaminophen, the main ingredient in Tylenol, is no longer covered by a patent. What this means is that the only real difference between generic acetaminophen and brand-name Tylenol is the brand itself. Consumer perceptions that come with the brand are crucial to product sales. In this case, the decedent's sister Rebecca testified that she and her sister preferred Tylenol (and presumably bought lots of it) because of their perceptions that it was safer and was a brand that could be trusted. Having Dr. Goldberg explain how this brand was built may offer the jury insight into the defendants' intentions in marketing their products and protecting the Tylenol "brand."

While there is no independent or separate cause of action for negligent marketing under Alabama law, the plaintiff argues that expert testimony about marketing would still be relevant to the plaintiff's failure-to-warn, fraud, and design defect claims.

### i.       Failure-to-Warn Claim

Under Alabama law, misuse is a defense the defendant may raise in a failure-to-warn action. See, e.g., Kelly v. M. Trigg Enterprises, Inc., 605 So.2d 1185, 1192 (Ala. 1992). The plaintiff can then rebut this defense. If a person misuses a product, despite an adequate warning, she may still have a product liability claim if the misuse was one that was foreseeable. See id.

One outstanding question in this case is whether the decedent took the recommended dose of Tylenol as directed by the label or whether she may have taken more unintentionally. If the jury believes the latter to be true, the question then may be whether this unintentional overdose was foreseeable. Foreseeability is determined by looking at what was known or should have been known to the defendants at the time of the decedent's death. The way the defendants were marketing Extra Strength Tylenol may be relevant to a foreseeable misuse rebuttal. In this way, Dr. Goldberg's opinion may help a jury understand what effect marketing and advertising may have had on consumers (including the decedent's) decisions when using Extra Strength Tylenol.[18]

The defendants also undertook market research about whether the warnings on the label were effective in providing consumers with adequate warnings. Through this research, the defendants found that consumers did not fully grasp the severity of

---

[18] The defendants also argue that Dr. Goldberg's opinion wouldn't be helpful because there was no evidence that their marketing prevented the decedent from reading the label. I do not see Dr. Goldberg's opinion as going this far. Instead, he opines that, in light of the defendants' advertising Extra Strength Tylenol as "safe" without fully disclosing the consequences of an overdose of the product, it is foreseeable that a consumer would not be as careful in following the directions as she would have been if the advertising led her to believe the product could cause liver failure and death.

acetaminophen's side effects. Dr. Goldberg's opinion helps explain this relevant market research evidence.

### ii.     Fraud Claims

An explanation of the defendants' marketing strategies may be relevant to the plaintiff's fraud claims, in showing what the defendants may or may not have known, as compared to what they purported to know through their advertising. See Schwab v. Philip Morris USA, Inc., No. CV 04–1945(JBW), 2005 WL 2401647, at *5 (E.D.N.Y. Sept. 29, 2005)("The charge of fraud makes relevant both what defendants knew and intended and how their activities were designed to influence the beliefs and activities of consumers. It can be assumed that the tobacco companies' advertising budgets and programs affected consumer reactions.").

### iii.     Design Defect Claim

Marketing evidence may be relevant to the plaintiff's design defect claim by showing Extra Strength Tylenol was an "unreasonably dangerous product." See McClain v. Metabolife Int'l, Inc., 193 F. Supp. 2d 1252, 1257 n.5 (N.D. Ala. 2002)("Plaintiffs may argue that the manner in which Metabolife 356 was marketed contributed to it being an 'unreasonably dangerous product'…[though] there can be no separate cause of action for 'negligent marketing.'"). Under Alabama law, "a defective product is one that is unreasonably dangerous, i.e., one that is not fit for its intended purpose or that does not meet the reasonable expectations of the ordinary consumer." Beam v. Tramco, Inc., 655 So.2d 979, 981 (Ala.1995)(citing Casrell v. Altec Industries, Inc., 335 So.2d 128, 133 (Ala.1976); Entrekin v. Atlantic Richfield Co., 519 So.2d 447 (Ala. 1987)). Market

research evidence would be relevant to showing "the reasonable expectations of the ordinary consumer."[19]

The Tylenol label itself included the defendants' marketing message of "How Tylenol® Products are Different." This message, on the box of Tylenol products, stated that Tylenol is "[r]ecommended the most by doctors and used the most by hospitals" and is "[u]nlikely to cause the gastric irritation often associated with aspirin, naproxen sodium or even ibuprofen."[20] This information most certainly would be relevant, given Rebecca Hayes' testimony that her sister took Extra Strength Tylenol—as opposed to another pain reliever—because she thought it was gentler on her stomach and was a safer product. A jury could conclude from this information that the decedent expected it to be a safe product—one which would not cause her irreparable harm and death.

The decedent's sister Rebecca testified that Denice chose to take Extra Strength Tylenol, over other pain medication, because she considered it to be safe and "easy on the stomach." She also testified that Denice was surprised when she learned that she had developed acetaminophen-induced acute liver failure, upon being admitted to the hospital before she died.[21] Dr. Goldberg's testimony may help the jurors understand how she

---

[19] See Wilson Sporting Goods Co. v. Hickox, 59 A.3d 1267, 1276 (D.C. 2013)("There was evidence that Wilson's representative told Mr. Hickox that the mask would disperse energy and protect against concussion, and that the mask was the best and safest technology. Mr. Hickox also testified that he believed that companies like Wilson tested new products and did not sell them unless they were safe to use. Jurors could consider such testimony in combination with their own reasonable inferences to determine an ordinary consumer's expectations.").

[20] This point also makes marketing relevant to the plaintiff's failure-to-warn and fraud claims.

[21] See R. Hayes Dep. at 197.

18

developed those expectations of Extra Strength Tylenol, in making her decision to buy and consume the product.

Overall, I find Dr. Goldberg's opinions would be helpful to the jury.

### d.  Dr. Goldberg's Opinions about Whether the Advertising was False or Misleading

The defendants argue that these opinions are not appropriate because they invade the province of the jury and offer legal conclusions. The plaintiff counters that Dr. Goldberg's opinions meet all the criteria of <u>Daubert</u>. Specifically, she argues that Dr. Goldberg's opinions about a marketing strategy used by the defendants called "the truth effect" would aid the jury. I agree that explanations of the defendants' marketing strategies, including the "truth effect," will help the jury understand the context with which the decedent made her decision to purchase and consumer the product. However, an opinion that the advertising was misleading or false would properly come from the jury, not from an expert.

Dr. Goldberg's opinions about the standard of care related to marketing would not be relevant.[22] There is no negligent marketing claim in this case.[23] Hence, Dr. Goldberg

---

[22] Dr. Goldberg's use of the Johnson & Johnson Credo to show "standard of care" would also be inappropriate.  The defendants' own Credo should not be held out as the legal standard by which it should conduct its affairs. <u>See Johnson v. Mountainside Hospital</u>, 239 N.J. Super. 312, 323 (App. Div. 1990)("It was potentially misleading because it attempted to exalt an exhortatory statement in the by-laws of the Hospital into the legal standard for determining whether or not the defendant physicians committed malpractice. The relevant legal standard is defined by law."). Additionally, any probative value the Credo may serve would be substantially outweighed by the potential jury confusion—of this standard with what was legally required. <u>See In re Paoli RR Yard PCB Litigation (Paoli II)</u>, 35 F.3d 717, 747 (3d Cir. 1994)(explaining how "Rule 403 gives a judge more power over experts than over lay witnesses" but this exclusion of evidence should only happen when they is "something particularly confusing about the scientific evidence at issue—something other than the general complexity of scientific evidence").

The plaintiff argues that the defendants' Credo simply serves as an acknowledgement of the standard of care to which they must adhere. Johnson & Johnson's Credo requires more of its employees than the legal standard of care (i.e., putting consumers, not shareholders, first). Allowing the company to be judged on this standard could

cannot offer an opinion that the defendants were deficient in the way they marketed or advertised their products.

### e.  Scope of Dr. Goldberg's Opinion

The defendants also argue that Dr. Goldberg's testimony about dollar amounts spent would be highly prejudicial because it could induce a jury to render a verdict based on improper bias or emotion. They argue such evidence would also be a waste of time or would be confusing. I disagree. Dr. Goldberg is describing a pervasive, sophisticated marketing plan that created the images of safety, which overwhelmed the few clearly stated warnings on the package. The amount of money they spent is strong evidence of the extent of that effort.[24]

---

discourage companies from creating internal policies that go beyond what the law asks. See Cast Art Indus., LLC v. KPMG LLP, 416 N.J. Super. 76, 106-07 (2010)(explaining how applying company's internal procedures with a higher standard of care than common-law standard could discourage companies from creating procedures that exceed common law duties), rev'd on other grounds, Cast Art Indus., LLC v. KPMG LLP, 209 N.J. 208 (2012); Branham v. Loews Orpheum Cinemas, Inc., 819 N.Y.S.2d 250, 255 (App. Div. 2006)("While a defendant's internal rules may be admissible as evidence of whether reasonable care was exercised, such rules must be excluded, as a matter of law, if they require a standard of care which transcends the traditional common-law standard of reasonable care under the circumstances." (citations omitted)).

[23] Compare In re Prem Pro Prods. Liab. Litig., No. 03-CV-1507, 2006 W.L. 5217764, at *5 (E.D. Ark. Sept. 13, 2006)(allowing expert marketing expert's testimony on the standard of care in a consumer protection action based on state statutory violations).

[24] However, Dr. Goldberg will not be permitted to offer financial information to implicate defendants' net worth. See, e.g., Southern Life Health Ins. Co. v. Whitman, 358 So.2d 1025, 1026-1027 (Ala. 1978)("Our cases have long held that evidence of the defendant's wealth is highly prejudicial and, therefore, inadmissible."); Industrial Chemical & Fiberglass Corp. v. Chandler, 547 So.2d 812, 835-836 (Ala. 1989)("Our cases have long held that evidence of the defendant's wealth, or lack of wealth, is highly prejudicial and, therefore, inadmissible (and our cases recognize no distinction between situations involving compensatory damages and those involving punitive damages)…"); Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 19 (1991)("Any evidence of Pacific Mutual's wealth was excluded from the trial in accord with Alabama law."). My decision on defendants' motion in limine #17 will further address this issue.

The defendants argue that he cannot offer an opinion because it is not clear what advertising the decedent saw.[25] The plaintiff counters that this is unnecessary because Dr. Goldberg's opinion is meant to be a more general opinion about what the defendants intended to accomplish with marketing Extra Strength Tylenol in the way they did. Dr. Goldberg offers both a general opinion on the causal effect marketing may have had on consumers; he also offers a specific opinion on what effect specific marketing may have had on the decedent and her sister (as the purchaser of the product). Overall, his opinions offer insight into the decision-making process of the defendants, which may be relevant to the defendants' state of mind and the plaintiff's punitive damages claim.[26]

The defendants argue that Dr. Goldberg's testimony about the history of Tylenol marketing is inadmissible because it simply regurgitates a historical background without offering any additional insight or opinion.  "[A]n expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence." See In re Fosamax Prods. Liab. Litig., 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009)(citations omitted). Narrative testimony only for this purpose would invade the province of the jury.[27] Nonetheless, a narrative may be admissible if it involves

---

[25] Specifically, the defendants argue that Dr. Goldberg's opinion is irrelevant because "[t]here is no evidence of the specific content and no evidence of what Denice Hayes thought or believed because of any advertisements." The defendants downplay the testimony of the decedent's sister Rebecca, who lived with her. In a wrongful death action, proving what a decedent saw or did with actual physical evidence is typically difficult. Often such conclusions are drawn by a jury using circumstantial evidence. This case is not unlike other wrongful death cases in that regard.

[26] More specifically, the plaintiff has offered evidence that the defendants' marketing employees and science experts worked hand-in-hand on deciding how best to sell and market Tylenol products. Given that decisions about Tylenol's safety were made both by marketing and science professionals working for the defendants, evidence of marketing efforts would be relevant.

[27] See Wolfe, 2011 WL 1673805 at *8 ("It will be the role of the jury, not Dr. Goldberg, to determine if McNeil acted negligently."); Brill v. Marandola, 540 F. Supp. 2d 563, 570 (E.D. Pa. 2008)("Mr. Newman's extensive

complicated facts which the expert can help extrapolate for the jury.[28] Dr. Goldberg's explanation of the actions undertaken by the defendants in creating the Tylenol brand is not simply a recitation of facts. He translates the meaning of those actions and what purpose they serve in branding. For these reasons, I will allow his explanation of the history of the Tylenol brand to be admitted.

## III.   CONCLUSION

For the foregoing reasons, I will **GRANT** the defendants' motion **in part and DENY it in part without prejudice.** Dr. Goldberg is excluded from offering opinions about whether the defendants fell below a standard of care related to marketing. In all other respects, he is qualified, his methods are reliable, and his testimony "fits" this case. His testimony would aid the jury in rendering its decision.

An appropriate Order follows.

---

interpretation of the relevant legal documents and suggested credibility determinations as presently included in his written report are not admissible because they usurp the fact-finding role of the jury and distract more than they aid."); Gallatin Fuels, Inc. v. Westchester Fire Ins. Co., 410 F. Supp. 2d 417, 423 (W.D. Pa. 2006)("An expert simply is not in any better position than the jury to assess another's subjective intent.").

[28] See In re Welding Fume Prod. Liab. Litig., No. 1:03–CV–17000, 2005 WL 1868046, at *17 (N.D. Ohio Aug. 8, 2005)("Thus, a 'narrative' by an expert is not automatically inadmissible; it is only when, as in In re Rezulin, the narrative is purely 'a repetition of the factual allegations in plaintiffs' complaint,' involving 'nothing technical or scientific,' that a court might find the expert testimony unhelpful, because the expert is providing only 'simple inferences drawn from uncomplicated facts.'… In this case, the great majority of the documents and articles that Dr. Levy is reviewing and comparing are complicated, and the inferences those documents may or may not support are not at all simple. It is through the application of his expertise that Dr. Levy may allow the trier of fact to better understand what the documents do (and don't) mean, and, thus, what the defendants did (or didn't) know.")(citation omitted). See also In re Yasmin & YAZ (Drospirenone) Mktg., Sales Practices & Products Liab. Litig., 3:09-MD-02100-DRH, 2011 WL 6302287, at *8 (S.D. Ill. Dec. 16, 2011)("As to defendant's argument regarding narrative testimony, the Court has broad discretion over the mode and order of examining witnesses and presenting evidence and may allow testimony in narrative form at trial if the Court finds that it would helpful to the jury."(citing FED.R.EVID. 611; United States v. Pless, 982 F.2d 1118, 1123 (7th Cir. 1992)).