```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3                          -  -  -

 4   IN RE:  TYLENOL            :  2:13-md-02436-LS
     (ACETAMINOPHEN) MARKETING, :  PHILADELPHIA, PA
 5   SALES PRACTICES AND        :
     PRODUCTS LIABILITY         :  April 27, 2016
 6   LITIGATION                 :  10:11 a.m.

 7   TRANSCRIPT OF IN-PERSON AND TELEPHONE STATUS CONFERENCE
               BEFORE THE HONORABLE LAWRENCE F. STENGEL
 8                 UNITED STATES DISTRICT JUDGE

 9   APPEARANCES:

10   For the Plaintiffs: LAURENCE S. BERMAN, ESQUIRE
                         THE LAW OFFICES OF LEVIN,
11                       FISHBEIN, SEDRAN & BERMAN
                         510 Walnut Street, Suite 500
12                       Philadelphia, PA 19106
                         (215) 592-1500
13
                         R. CLAY MILLING, ESQUIRE
14                       HENRY, SPIEGEL, MILLING, LLP
                         Suite 2450
15                       950 East Paces Ferry Road, NE
                         Atlanta, GA 30326
16                       (404) 832-8000

17                       CHRISTOPHER V. TISI, ESQUIRE
                         ASHCRAFT & GEREL, LLP
18                       1825 K Street, NW, Suite 700
                         Washington, D.C. 20006
19                       (202) 783-6400

20

21
     (Proceedings recorded by electronic sound recording,
22   transcript produced by transcription service.)

23           VERITEXT NATIONAL COURT REPORTING COMPANY
                        MID-ATLANTIC REGION
24            1801 Market Street - Suite 1800
                     Philadelphia, PA  19103
25                      (888) 777-6690
```

```
 1    APPEARANCES (continued):

 2    For the Defendants: DAVID M. COHEN, ESQUIRE
                          BUTLER SNOW, LLP
 3                        1700 Broadway
                          New York, NY 10019
 4                        (646) 606-2995

 5                        ALYSON B. JONES, ESQUIRE
                          BUTLER SNOW, LLP
 6                        Suite 1400
                          Renaissance at Colony Park
 7                        Ridgeland, MS 39158
                          (601) 985-4427
 8
      AUDIO OPERATOR:     LAURA BUENZLE
 9
      TRANSCRIBER:        JUDI Y. OLSEN, RPR
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                           I N D E X

                                                    PAGE
2
    COLLOQUY                                          4
3
    ARGUMENT:
4     By Mr. Cohen                                 12, 96
      By Mr. Tisi                                  52, 99
5

6

7

8

9

10

11

12                        E X H I B I T S

13   NUMBER      DESCRIPTION           MARKED    ADMITTED

14    (None marked.)

15

16

17

18

19

20

21

22

23

24

25

```
 1                        -   -   -
 2                THE COURT:  And we have a rather limited
 3     but packed agenda.  I think the main event here is
 4     the discussion of the supplemental reports, and so
 5     we'll get to that very shortly.
 6                In terms of where we are in New Jersey,
 7     Mr. Berman?
 8                MR. BERMAN:  Yes, Your Honor.  Laurence
 9     Berman for the plaintiffs.  I'd like to address two
10     points first, if I may.
11                With respect to the New Jersey report,
12     Mr. Milling will actually give you a supplement
13     today, as there was a conference call with Judge
14     Johnson yesterday.  I was not available to
15     participate in that, so he will be able to give you
16     more up-to-date information about the New Jersey
17     on-goings.
18                THE COURT:  Okay.
19                MR. BERMAN:  The second point I wanted
20     to make -- and I'm not quite sure how -- how to make
21     it -- is that the plaintiffs were a bit surprised
22     about the audio/visual demonstrative display that was
23     set up for today's presentation.
24                THE COURT:  I didn't do it.
25                MR. BERMAN:  Well, I -- we were not
```

1    given any notice about that.

2                    THE COURT:  Right.

3                    MR. BERMAN:  And, certainly, if we had

4    known that that was the intent of the defendants, we

5    may have chosen to make our presentations in a

6    different format or a different manner.

7                    THE COURT:  There's no extra credit for

8    PowerPoint (indiscernible).

9                    MR. BERMAN:  And we actually have no

10   idea what is going to be displayed.  We --

11                   THE COURT:  Right.

12                   MR. BERMAN:  Your Honor's standing order

13   has always been, provide courtesy copies of exhibits,

14   which we're prepared to do, for hand-up and so that

15   the court can follow.

16                   We -- we don't know if this is cuts of

17   depositions, whether there's video.  It's a complete

18   surprise, Your Honor, and we just feel that we were

19   entitled to notice and that, you know, perhaps we can

20   reserve an objection to the manner of presentation

21   that the defendants choose to make.

22                   MR. MILLING:  Good morning, Your Honor.

23                   THE COURT:  Mr. Milling, good morning.

24                   MR. MILLING:  Clay Milling for the

25   plaintiff.

1             As Your Honor, I think, is aware, the

2    parties are going full bore on multiple issues right

3    now as it relates to the Taylor (ph) case, which is

4    set for trial in late May.

5             We are -- have been working with the

6    defense on deposition designations because the

7    Taylor (ph) case involves two claims; failure to warn

8    is where the Jackson -- and -- and design defect,

9    while the case last year was just one claim.  We're

10   lining up the deposition of treaters.

11            We are -- have jury questionnaire due on

12   the 9th, evidence list due on the 16th.  So we're

13   going as fast as we can on that.

14            At the same time, the defendants'

15   motion, as it relates to the Acute Liver Failure

16   Group, has stretched everyone thin, with depositions

17   all over the country last week, from the East Coast

18   to the state of Washington.

19            Briefing on the Acute Liver Failure

20   Study Group issue in New Jersey, Your Honor, is due

21   on May 9th, with only a seven-day reply -- reply

22   period, and the parties are to be in New Jersey

23   beginning on May 16th for day-to-day arguments on

24   pretrials -- issues continuing until they're

25   completed; jury selection to begin May 23rd.

1           As Mr. Berman mentioned, there was a

2    call yesterday, a conference call, with Judge --

3    slash hearing with Judge Johnson.  He wanted an

4    update on our ability to -- to meet the deadlines in

5    the scheduling order.

6           And then we had considerable discussion

7    about the Acute Liver Failure Study Group.  He is

8    aware that Your Honor is hearing argument today.  He

9    asked when we thought you would rule, to which we

10   said we did not know, but that the plaintiffs had

11   asked for expedited hearing and ruling.

12          And he was asked whether he would like a

13   copy of the transcript from today, and he said he

14   would, and he asked us if we could somehow work with

15   the court reporter to get a thumb drive so that we

16   can deliver a transcript of today's hearing to Judge

17   Johnson for his read.

18          He is currently reading the lead

19   deposition, the plan deposition, the (indiscernible)

20   deposition, trying to get his hands on the issue, but

21   he has not seen the motions and, again, would like

22   the benefit of the oral argument today.

23          So we're going in a lot of different

24   directions as fast as we can.  Thank you, sir.

25          THE COURT:  Okay.  Thank you,

1   Mr. Milling.  We should be able to accommodate the

2   request for an expedited transcript.  I'll have to

3   look into the thumb drive request.

4                INDISCERNIBLE SPEAKER:  (Indiscernible.)

5                THE COURT:  Okay.  All right.

6                MR. MILLING:  And Judge Johnson's pretty

7   technologically savvy, so I -- I think just a quick

8   call and figure out how -- how we can get it over

9   there, no worries.

10               THE COURT:  All right.  We can do that.

11               All right.  From the defendants'

12   perspective, Ms. Jones?

13               MS. JONES:  Yes, Your Honor.

14               THE COURT:  Good morning.

15               MS. JONES:  Good morning.  Ms. Jones.

16               The -- the -- I do not have anything --

17   additional comment.  I think that Mr. Milling

18   accurately reflected what's been going on in

19   New Jersey.

20               There has been a significant amount of

21   information or documents transferred between both

22   courts, and so I want to -- we want to be sure that

23   we give Your Honor what he wants as well as what

24   we're doing in New Jersey as well.

25               So, for example, the -- Judge Johnson

1    does have copies of all of the briefing that's been

2    made in this court in the MDL.

3              One of the things that Judge Johnson has

4    been provided that the plaintiffs have actually been

5    providing to him in realtime are transcripts of all

6    the depositions as they've been taken.

7              So we -- we have copies of those, to the

8    extent that Your Honor would want those or want to be

9    furnished those.  And so I just want to make sure

10   that all of the information is being shared to the

11   extent the court wants it.

12             THE COURT:  Okay.

13             MR. MILLING:  Lastly, just in terms of

14   coordination, Judge Johnson was -- has also been

15   provided Your Honor's rulings on motions in limine.

16   (Indiscernible) were helpful.

17             And so we -- as Alyson mentioned, we are

18   trying to keep both Your Honor and Judge Johnson in

19   the loop, given where everything seems to be with the

20   litigation generally.

21             THE COURT:  All right.

22             MR. BERMAN:  I just want to add, Your

23   Honor, you were previously provided with Judge

24   Johnson's scheduling order.  I think it was the order

25   that was dated January 29th.  And that's the order

1   that provided that the Kemp motions, which is similar

2   to Daubert, would not be filed until the depositions

3   were completed.  So what he has been provided with

4   has been the courtesy copies of the filings in this

5   court.

6             THE COURT:  Okay.  Thank you.

7             MR. BERMAN:  Thank you.

8                    -  -  -

9                    (Pause)

10                   -  -  -

11            THE COURT:  Okay.  Why don't we talk

12   about the supplemental reports.  Who's going to argue

13   that for the defendant?

14            MS. JONES:  Yes, Your Honor.  David

15   Cohen from our office is going to argue on behalf of

16   the defendants.

17            THE COURT:  And are you responsible for

18   all this equipment, Mr. Cohen?

19            MR. COHEN:  I am the guilty party, Your

20   Honor.

21            THE COURT:  Okay.

22            MR. COHEN:  Guilty -- we -- we had

23   presented an argument to Judge Johnson in September

24   on the Kemp motion, and we used audio/visual, and

25   there was no objection at that time.

1            THE COURT:  Okay.

2            MR. COHEN:  We did not, for this

3   purpose, Your Honor, use any video because of the

4   time frame involved from the depositions.  So the

5   purpose of the -- of the visual -- we haven't used --

6   we're not using videotapes.  The purpose of the

7   presentation of the visual was to, essentially, be

8   more efficient since there has been such a mountain

9   of evidence that has been produced in such a short

10  period of time and we have a short period of time

11  today to argue.  So if I may?

12           THE COURT:  Thank you.  Now, in terms of

13  our schedule, I have a sentencing that was scheduled

14  at 2:00.  I have a -- a commitment at 12:30.  So

15  we'll -- we'll take about an hour on each side to --

16  to get this done.

17           Mr. Tisi?

18           MR. TISI:  Judge, may I approach the

19  bench with -- with -- with Ms. -- with Ms. Jones for

20  a moment?

21           THE COURT:  Sure.

22                      -  -  -

23           (Whereupon, a sidebar conference was had

24  between 10:19 a.m. and 10:21 a.m.)

25                      -  -  -

1                    THE COURT:  All right.  Mr. Cohen.

2                    MR. COHEN:  Thank you, Your Honor.

3                    The 19 so-called low-dose cases

4    published by the Acute Liver Failure Study Group in

5    the Larson 2005 paper, in our view, cannot reliably

6    support an opinion -- an expert opinion that 4 grams

7    or less of acetaminophen per day causes acute liver

8    failure.

9                    I'd first like to start by posing a few

10   questions and trying then to answer them with

11   reference to actual documents in evidence, which I

12   hope will assist this court in making an assessment

13   of the underlying reliability of this evidence as

14   part of its gatekeeping role under Federal Rule of

15   Evidence 702 and Daubert.

16                   The questions I would like to pose are

17   as follows:

18                   First, what is the design of the ALFSG

19   Larson 2005 paper, and can it be used to establish

20   causation?

21                   Second, what is the methodology that was

22   used to identify the low-dose cases in Larson 2005?

23                   And, third, are there flaws in the

24   methodology that make the low-dose data unreliable

25   evidence of causation?

1                    The plaintiffs' reliance, as the court

2     is aware, of this evidence is part and parcel of

3     their core medical causation theory in this MDL;

4     namely, that recommended doses of acetaminophen

5     caused plaintiffs' liver injury or liver failure.

6                    And to prove this theory, the plaintiffs

7     and their experts rely upon a single paragraph in the

8     Larson paper, which is here.  This is the abstract,

9     which is that.  And this single paragraph is the

10    quote, unquote, low dose.

11                   And when we refer to "low dose" today,

12    Your Honor, I'm referring to the way in which the

13    ALFSG in the paper defined "low dose," which is at or

14    under 4 grams of acetaminophen per day.

15                   At the Jackson trial that we had in

16    New Jersey in September and October of this past

17    year, the plaintiffs' principal hepatologist,

18    Dr. Kaplowitz, testified to this data, and virtually

19    all of the plaintiff experts cite the Larson 2005

20    paper and the low-dose cases in their reports.

21                   Dr. Davern, one of their experts, is a

22    coauthor of the paper, and he testified at his MDL

23    deposition that these 19 cases establish causation.

24                   And, finally, as Your Honor may recall,

25    there has been much reference made by plaintiffs to

1    the FDA Working Group report on acetaminophen, and

2    that report also references the Larson 2005 paper and

3    the 19 low-dose cases.

4              This litigation sinks or swims on the

5    claim that 4 grams or less of acetaminophen causes

6    acute liver failure.  That, in turn, relies on the

7    plaintiff expert opinion testimony on causation,

8    which, in turn, relies on the evidence in these 19

9    cases.

10              Plaintiffs' experts cite this article

11    because it is the only study of acute liver failure

12    that reports low doses of acetaminophen ingestion and

13    ALF.  They cite to it because it was published by the

14    ALFSG, which they describe as, and their experts

15    testify as, the most important study of acute liver

16    failure in the United States.

17              I'd like to make some preliminary

18    observations, if I can get this right, before we talk

19    about the study --

20              Excuse me.

21              Thank you.

22              -- about the context.

23              In 2005, when the study was published,

24    there were 28 billion doses of acetaminophen

25    purchased by U.S. consumers.  28 billion with a B.

1    8 billion of those were single ingredient

2    over-the-counter acetaminophen products.  And that's

3    from the FDA advisory committee.

4                    Second, Larson 2005 low-dose cases

5    essentially stand alone.  No other group of

6    researchers anywhere in the world have claimed to

7    have discovered this many cases of ALF attributed to

8    this dose of acetaminophen ingestion.

9                    And, third, since 2005, since that one

10   paragraph was published in Larson, the ALFSG has not

11   published any follow-up studies on these cases.  It

12   bears reminder that the study itself, the paragraph,

13   does not discuss specific cases.  It does not discuss

14   how the ALFSG identified and evaluated those cases,

15   and since 2005, there has been no information

16   forthcoming from the ALFSG on these 19 cases.  McNeil

17   asked for information but was rebuffed.

18                    Now, the first question I'd like to

19   address is, what is the ALFSG, and is it capable of

20   establishing that low-dose acetaminophen ingestion

21   causes ALF?

22                    The ALFSG is comprised of a collection

23   of cases that were collected on case report forms.

24   We're going to talk a lot today about case report

25   forms or CRFs.

1             Here is how Dr. Larson, the lead author

2    of the paper, when asked by plaintiffs' counsel how

3    she got the data, responded:  The data was collected

4    on paper case report forms that we had identified

5    specific things we wanted to track.

6             So yes, the ALFSG is a series of case

7    reports, and they are reported -- and they are

8    described in the ALFSG protocol, known as the Manual

9    of Operations, as case report forms.

10            We will actually look at one of those

11   forms in a little bit, but the point I want to make

12   here preliminarily is that the -- is that the ALFSG

13   uses the term "case report" to describe its own data.

14            Now, Dr. Larson confirmed this, to

15   confirm the design of the ALFSG, at her deposition,

16   and -- where she said -- and then there are things

17   called case series, which are, say, a collection of

18   case reports?  And she said, yes, correct.  And the

19   ALFSG, as a registry, is, essentially, a series of

20   cases?  Correct.

21            Dr. Larson then confirmed that the ALFSG

22   does not have a control group.  Correct.  She said,

23   it's not designed as a controlled study.  And then

24   she was asked whether it's ever published risk

25   ratios.  Those would be such as odds ratios or

1    relative risks.  And she agreed.  That's correct; we

2    are not designed to do that, was her testimony.

3              The ALFSG, therefore, as Dr. Larson

4    testified at her deposition, was not designed to

5    answer the question of whether acetaminophen

6    ingestion of 4 grams per day in divided doses causes

7    ALF.

8              So the ALFSG, therefore, is not a

9    clinical trial.  It is not an analytical

10   epidemiological study with a control group.  It is

11   simply a collection of case reports, known as a case

12   series.

13             So let's turn to the -- specifically to

14   the Larson 2005 paper.  This paper was not designed

15   specifically by the ALFSG also to answer the question

16   of whether low doses causes ALF.  Dr. Lee conceded

17   that.

18             Question:  And can we agree that

19   Dr. Larson -- that Larson 2005 was not designed to

20   answer the question of whether acetaminophen

21   ingestion of 4 grams per day in divided doses causes

22   ALF?  Dr. Lee responded, that's correct.

23             Dr. Larson said exactly the same thing,

24   a little bit differently, but let's go through it.

25             And in that protocol, you have in it, in

1   front of you -- there is not a single reference to

2   low-dose acetaminophen ingestion, is there?

3                 And that's the Manual of Operations.

4                 Over objection, she answered, that was

5   not the design of the study.

6                 Dr. Lee acknowledges that the paper does

7   not report a statistically significant association

8   between acute liver failure and acetaminophen

9   ingestion of 4 grams or less.

10                He was asked this specific question,

11  whether there were any risk ratios reporting

12  statistically significant association between ALF and

13  low dose ingestion, and he said, it's -- there is

14  none.

15                Before moving to the low-dose cases

16  themselves, I'd like to offer two observations about

17  why the design of the ALFSG is so important to the

18  question of causality presently before the court.

19                First, case reports and case series

20  cannot establish causal associations.  That's a

21  well-accepted principle in science and medicine.

22                Second, if Drs. Lee and Larson

23  themselves believed that the case report data in the

24  ALFSG and, specifically, in Larson 2005 established a

25  causal relationship between low-dose ingestion of

1   acetaminophen and ALF, they would have said that.

2              Instead, let's look briefly at what they

3   published and have told the scientific community that

4   acetaminophen -- about acetaminophen ingestion up to

5   4 grams a day.

6              And I want to just preface this by

7   pointing out that the Larson paper, which was

8   published in 2005, is based upon data collected by

9   the ALFSG between 1998 and 2003.  The article took

10  two years to write and to publish.  So the period of

11  which they -- when they collected data is 1998 to

12  2003.

13             In 2003, Dr. Lee published this with one

14  of his colleagues, Dr. Schiodt, S-c-h-i-o-d-t.  And

15  in this paper, he -- they -- these two authors wrote,

16  taken within recommended doses, maximum 4 grams per

17  day, acetaminophen is a safe drug.

18             We asked Dr. Lee about that statement at

19  his deposition, and we asked, does it say that?  It

20  does.  Is that what you wrote 13 years ago?  Yes.

21  You stand by that in general?  Yes, we all know that

22  it's a safe drug in general.

23             We asked him again, do you stand by the

24  article?  I would think it represents our thinking in

25  2003, yes.  And you haven't withdrawn it?  No, it's a

1   book chapter.

2             Actually, it's a series that comes out

3   either on a monthly or quarterly basis, and so it can

4   be, of course, annotated and updated.

5             Dr. Larson also wrote in 2007 an article

6   on acetaminophen hepatotoxicity.  Now, this is, of

7   course, two years after Larson was published --

8   Larson 2005 was published.

9             And in that article, she wrote,

10  acetaminophen is effective and safe when consumed as

11  recommended, 1 to 4 grams per day.

12            We asked Dr. Larson about that.  Did you

13  write that?  I did.  Do you stand by that?  I do,

14  with some caveats -- which we're going to come back

15  to.  And since this article has been published,

16  Dr. Larson, have you withdrawn that statement in any

17  articles you've published since then?  No.  And is

18  this article written two years after you -- you

19  published your 2005 paper?  Yes.  So at the time, you

20  knew about the 19 cases of low-dose ingestion?  And

21  she said, yes.

22            Now, Your Honor, in 2009, Dr. Lee was

23  invited to the FDA to testify before the advisory

24  committee on acetaminophen.  He was asked many

25  questions about that during his deposition by

Page 21

1  plaintiffs' counsel.

2              But he was also asked at that testimony

3  at the FDA the following question:  Is there a

4  point -- this is a question to Dr. Lee at the FDA

5  advisory committee.  Is there a point where you would

6  opine that acetaminophen is a safe drug or that you

7  think would be a reasonable, safe dose for people to

8  take?  And Dr. Lee responded, I guess I'd rather not

9  be pinned down; that's a tough one.

10              Now, we asked Dr. Lee about that.  Is

11  that what you told the FDA?  He said, it looks like

12  it.

13              Now, in 2013, Dr. Lee made a

14  presentation at the American Association for the

15  Study of Liver Disease, known as the AASLD.  We've

16  heard a lot about it.  They had an annual meeting, as

17  they always do.  He was invited, and he even was

18  invited to give a presentation in honor of Hy

19  Zimmerman, known as the Zimmerman presentation.

20              And during his presentation, he -- he

21  elected -- I should preface this.  He elected to

22  focus his presentation on acetaminophen.  And he

23  showed a slide, number 21, and at the end of his

24  presentation -- and his presentation was virtually

25  all on overdose and the problem of overdose and how

1    to stop overdoses of acetaminophen causing liver

2    injury, which everybody acknowledges happens.

3              But he said at the end in his slide on

4    controversies remaining, low-dose ingestions,

5    question mark, as a controversy remaining.

6              So we asked him about this at his

7    deposition.  And so you see there, so you wrote in

8    the second bullet point, low-dose ingestions,

9    question mark?  Right, right.  Why did you write it

10   as a controversy?  And this is what he said, because

11   it's still uncertain; as you -- we just discussed a

12   moment ago, that these -- that we -- we haven't been

13   able to prove these completely, but there's certainly

14   evidence in favor of them existing.

15             And he went on -- I'm not

16   Mr. Finlay (ph).  Well, what is a controversy in

17   medicine, we asked him.  It means that people

18   disagree; they have friendly disagreements.  And

19   there's nothing wrong with that, right?  That's

20   right.  For physicians and scientists to disagree

21   about science?  And his answer was, there's

22   uncertainty.

23             Since collecting the 19 low-dose cases

24   between 1998 and 2003, this is what Drs. Lee and

25   Larson have said and published to the medical

1    community.

2                    And I submit that if the methodology

3    used by the ALFSG to identify these 19 cases in a

4    paragraph in Larson 2005 were reliable and

5    convincing, I don't know how Dr. Lee could have

6    published in 2003 an article stating that 4 grams are

7    safe.

8                    I don't know how Dr. Larson could have

9    published two years later, in -- after the article

10   was published, in 2007, that 4 grams are safe.

11                   I don't know how Dr. Lee would have been

12   able to tell the advisory committee in 2009, when

13   asked about a safe dose, that he'd rather not be

14   pinned down.

15                   And I don't know how Dr. Lee would have

16   told the annual meeting of the AASLD in 2013 that

17   this is still a controversy, a remaining controversy.

18                   Dr. Lee certainly would not have

19   explained his prior writings and statements in this

20   proceeding as he did, using the words that -- we

21   haven't been able to prove these, and there is

22   uncertainty.

23                   Where there is a lack of proof and a

24   lack of certainty, I submit that there cannot be

25   scientific reliability about causation.

1                    I'd now like to turn to the second

2    question of the methodology of the ALFSG and,

3    specifically, Larson 2005.  And so, as I mentioned a

4    moment ago, we're going to look at a case report form

5    to understand what went wrong.

6                    These are the case report forms.  This

7    is page 1.  They're used -- they were designed by the

8    ALFSG.  They're designed to enroll patients by the

9    different study sites into the registry.  And

10   there's -- reminder, that these do not become part of

11   the patient chart.

12                         -   -   -

13                    (Phone ringing.)

14                         -   -   -

15                    INDISCERNIBLE SPEAKER:  I'm sorry.  I

16   thought it was off.

17                    MR. COHEN:  After the CRFs are filled

18   out by the study coordinators or the study

19   investigators at the different sites, they were

20   then -- at the time the Larson paper was written,

21   they were faxed to UTSW in Dallas.

22                    A physician reviewed the forms at UTSW.

23   The physician may have queried the sites for

24   additional or missing data or resolution of

25   ambiguities.  That's what Dr. Lee said they did in

1    his declaration.

2                    Once the query responses were returned,

3    if there were any, the data in the CRFs that are

4    filled out in these forms was then entered into a

5    computer database.

6                    And it's important to recall what they

7    said about this.  It was entered in a head-down data

8    entry, which I just now have learned means that

9    somebody types the data into the database, no

10   questions asked.  It's -- as it comes in, it gets

11   just put into the database without any questions.

12                   Now, the Manual of Operations that the

13   ALFSG and Dr. Lee created for the ALFSG emphasized

14   getting good data and being careful.  Here's what he

15   wrote, as the saying goes, garbage in, garbage out;

16   the data is only as good in the way in which it is

17   collected.  And at the end of this quote here, he

18   says, this is vital; nothing will sink this project

19   like poor data collection.

20                   THE COURT:  And who said this?

21                   MR. COHEN:  Dr. Lee in the -- in -- in

22   the Manual of Operations -- I can't say it was

23   Dr. Lee.  The ALFSG Manual of Operations.  And the

24   specific cite for that, Your Honor, is the First

25   Edition, 1997, page 12.

1            We can -- we have copies of everything

2    we can give you, by the way.  At any moment you need

3    a hard copy, we have everything.

4            There are several key sections for the

5    court, I think, to understand that are relevant to

6    the question of the reliability of the acetaminophen

7    dosing histories in these 19 cases, so let me just

8    walk you through them very quickly.

9            Section 13 is the date of onset of

10   hepatic encephalopathy or coma.  This is the -- this

11   is the -- they have four grades, one through four.

12   In order to be enrolled in the ALFSG, you had to have

13   hepatic encephalopathy, which means altered mental

14   status.

15            They also tracked risk factors, and one

16   that they tracked was ETOH, which is alcohol.  Also

17   important.

18            Another thing in the case -- case report

19   form is a section called Medications.  And here you

20   can see -- and I meant to highlight it, but I -- I

21   failed to do it -- that it's -- it's medications last

22   six months, including toxins, herbs, mushrooms, and

23   OTC meds.  That's anything over the counter, even

24   vitamins.

25            And then, finally, in section 18,

1   relating to acetaminophen specifically, they called

2   this section Acetaminophen Overdose.  It bears worth

3   noting that in the case report form, they never --

4   they never had a section about low dose.  They

5   assumed it was going to be all overdose.  And so they

6   called this section Acetaminophen Overdose and called

7   for additional information on that.

8              And then, finally, they had a section

9   called Tox Screens, which we'll talk about, and the

10  acetaminophen level.  And that's the blood level of

11  acetaminophen in patients when they get to the

12  hospital.

13             And then the last thing here, which are

14  blank, of course, since this is a blank form, are --

15  they provided two comment sections on the two

16  different parts of the form.

17             Now, the focus of Larson 2005, as I

18  mentioned a moment ago, was on acetaminophen

19  overdose.  Of the 275 patients in the paper, 256 were

20  overdoses.  There's only that one paragraph that I

21  described and showed earlier on page 1368 that

22  describes these 19 cases.

23             Dr. Larson was the primary author, and

24  Dr. Lee verified that the paper was written from a

25  spreadsheet.

1              Dr. Larson confirmed that the paper
2    was -- was written from a spreadsheet and,
3    specifically, the 19 cases.
4              So -- and tell us, Dr. Larson, how did
5    it come about that these 19 cases were identified?
6    Answer:  When we looked at this data, we noted that
7    there were several cases, 19 -- I think there were
8    actually a couple more -- that had reported taking
9    less than 4 grams --
10             And I've highlighted "reported" because
11   these were reported --
12             -- which was at the time considered the
13   therapeutic limit, and we just wanted to look at them
14   and see if they differed from the patients who had
15   taken more.
16             And then Dr. Larson said -- we -- we
17   followed up and said, well, you said, when we looked
18   at this data.  And she responded, and looked at all
19   the doses that we had available; that's when we saw
20   that there was some cases that fell outside of over
21   the 4 grams.
22             In other words, she was looking at a
23   spreadsheet, and here, she -- she confirms that,
24   which was marked as Exhibit -- as an exhibit to the
25   deposition.  And, in fact, that's what Dr. Lee

1   verified in his declaration of January 30, 2016.

2             So it's important to keep that in mind

3   because what happened was, she never looked at the

4   case report forms when she wrote the paper.  They

5   were never even sent to her.  And that she confirmed

6   at her deposition.

7             And as you said earlier today, you

8   didn't write the paper from the case report forms?

9   No, they were at the main site --

10            That was in Dallas.  She was in

11   Washington, the state of Washington.

12            -- and questions went to Dr. Lee and

13   other authors at the site if I had questions in the

14   database.

15            And she also didn't have a protocol that

16   was designed to help her confirm the low doses in

17   these 19 cases.  Quote, there was no protocol

18   specifically for those 19 cases, other than the --

19   the main protocol, which is the Manual of Operations,

20   which has nothing about low-dose cases.

21            And, in fact, she confirmed, in the

22   Manual of Operations, there is nothing about low-dose

23   acetaminophen ingestion.  No protocol, no mention,

24   nothing.  That's their protocol.

25            Dr. -- excuse me.  Dr. Davern, who is a

1   plaintiffs' expert in this case, Your Honor, in the

2   MDL, is a coauthor on this paper.  I'm going to

3   mention him very briefly.

4              He testified at his deposition that he

5   never saw the low-dose CRFs, never evaluated them,

6   did nothing to verify the doses, and did not discuss

7   the low-dose cases with any of the site

8   investigators, with Dr. Lee, or with Dr. Larson --

9   that's at his deposition, page 41, line 10 to 42,

10  line 2 -- that he did not see any written analyses of

11  these cases, these 19 cases, before they were

12  published.  And he -- and that's at page 42, lines 3

13  to 21.  And he was a coauthor, and he reviewed

14  drafts, as he testified, of the manuscript.

15             Now, the part of the CRFs that's most

16  relevant to whether a -- low-dose case information

17  relating to acetaminophen is, of course, the

18  acetaminophen information in the form.

19             And Dr. Lee testified that the

20  credibility of these 19 cases rises and falls on

21  these low -- on the dosing histories.  Well, the

22  basis for the classification is the credibility of

23  the dosing history that's in the CRF, correct?

24  Answer, the question is correct as you phrased it.

25             Now, I'd like to turn to the third and

1    final question, which is, are these cases flawed as a

2    result of the methodology that was used to write this

3    paragraph in this paper?

4                    And as a just quick background, in this

5    proceeding, Your Honor, over very strenuous

6    objections made by the plaintiffs and after almost

7    two years of litigation in Texas, we have discovered

8    evidence about cases that has never been disclosed

9    before, not to the FDA, not to the NIH, not to the

10   editors or peer reviewers of the Journal of

11   Hepatology, which published the article.

12                   We have also now received testimony that

13   has never been heard by anyone in the scientific

14   community.  Dr. Lee admits publically for the first

15   time that three of the 19 cases should be withdrawn

16   as low-dose cases.

17                   Here is the first one.  And what we've

18   done here is just X'd out the first two digits of the

19   CRF number so that we don't have to have anything

20   sealed, because UTSW requires that that information

21   not be disclosed without confidentiality -- due to

22   confidentiality.

23                   So this is -- we're going to refer to

24   them as the last three numbers of the CRF number.  So

25   this is 026.  And I have a binder, which plaintiffs'

1    counsel actually prepared.  If they don't mind, I'll

2    just hand it to the court.  CRF 026 is at tab 19.

3    May I approach?

4              THE COURT:  Sure.

5              MR. COHEN:  Thank you.

6              THE COURT:  Thank you.

7              MR. COHEN:  And everything I'm going to

8    show you is on the screen, but I just wanted you to

9    have it.

10             And you can see here, in the Medications

11   and in the Acetaminophen Overdose section, what was

12   written in was, a handful, by the study

13   investigators, handful of Tylenol.  Not, obviously, a

14   precise dose.  Dr. Lee withdrew that case as a low-

15   dose case.

16             THE COURT:  Well, 6 is still a pretty

17   low dose, isn't it?

18             MR. COHEN:  It's 50 percent more than

19   the maximum therapeutic dose.  Sure, it's not 10

20   grams, but it's not 4 grams, and the criteria for

21   that paragraph was 4 grams or less.

22             And I will also submit to Your Honor, we

23   can present evidence, not today, about that case,

24   which puts that 6-gram dose into substantial

25   question.  But I did not prepare to do that today.

1    And the reason I didn't prepare to go into that case

2    in very great detail with Your -- with Your Honor is

3    because Dr. Lee has withdrawn that case from the

4    publication as a low-dose case.

5              Now, the second case he withdrew is 035,

6    and here are some of the relevant portions of it.

7    And that's because the study site investigators on

8    the CRF had written Macrobid in three different

9    places -- actually, four.  There's a reference to

10   nitrofurantoin in the Medication section.  That's the

11   same as Macrobid, so in four places.

12             And that is an antibacterial agent known

13   to cause liver injury and acute liver failure, but it

14   got in and was published as one of the 19.  And Dr.

15   Lee has concluded that that case should be withdrawn.

16             THE COURT:  And he did that, really, on

17   the basis of that adduct test, right, that was

18   conducted after the Larson paper?

19             MR. COHEN:  He says that the adduct test

20   may have helped him understand more about these

21   cases.

22             THE COURT:  All right.

23             MR. COHEN:  But what he also testified

24   was that this had an alternative cause, which was in

25   the CRF, but was not used in 2005 as a basis to

1    exclude it.

2                    THE COURT:  All right.

3                    MR. COHEN:  It was ignored.  And, of

4    course, as you know, they didn't have adducts in

5    2005.

6                    THE COURT:  All right.

7                    MR. COHEN:  And we'll talk about adducts

8    later.

9                    So we're going to look at one more case.

10   I'm not going to go through the details yet of this

11   case.  I will in a few minutes.  But this case

12   involves a very unfortunate, tragic situation of a

13   35-year-old female, who was drinking substantial

14   quantities of alcohol, took a Tylenol overdose, as

15   written in the record, then took d-CON -- now, d-CON

16   is rat poison -- in a suicide attempt noted in the

17   CRF and died very tragically.

18                   And she was -- a death note was sent to

19   the L.A. coroner's office by the medical institution,

20   signed by a doctor and a second person, indicating

21   she died of acetaminophen overdose.

22                   And so when we presented all that to

23   Dr. Lee, when asked, well, given all that data,

24   classifying this case as somebody who simply took

25   acetaminophen as directed, he said, I would have to

1    say no.

2                    And so we got -- after these three cases

3    with Dr. Lee in his deposition, we asked this

4    question.  This comes right after this d-CON case.

5    We call it the d-CON case, just to remind ourselves.

6    So you withdrew this from that classification,

7    correct?  Question:  So we've withdrawn three cases,

8    right?  And his answer was, yes.

9                    Now, Dr. Larson, the first author on the

10   paper and who wrote the paper, withdrew two cases

11   immediately.  Dr. Larson attempted to defend the

12   d-CON case, case 042, which Dr. Lee had agreed to

13   withdraw.  I will show you this testimony, because

14   it's an outstanding example of why this paper and

15   this discussion of 19 cases is methodologically

16   flawed.

17                   Let's look at the case report form 042,

18   which is at tab 14 of your binder, but you can look

19   at it on the screen.

20                   And here, you can see, in section 13,

21   that this patient came in with hepatitic coma -- so

22   she had altered mental status -- and proceeded very

23   quickly to a very serious state of -- where she

24   became comatose very quickly.

25                   She was drinking 80 grams of alcohol a

1    day for an unknown period of years.  80 grams.

2                    The medication list in this CRF for this

3    patient, Your Honor, is completely blank.  There's

4    not a single acetaminophen product listed, not

5    Tylenol, not Lortab, not Vicodin, not generic

6    acetaminophen.  We don't know the date last taken.

7    We don't know the total dose.  We don't know

8    duration.  Everything is completely blank in the CRF.

9                    The only reference to her dose is in the

10   Overdose section, where somebody wrote in 1,200 --

11   1,200 milligrams.  That's 1.2 grams.  I'll get back

12   to that.

13                   And the acetaminophen level, she had a

14   level of 120, and -- and -- and that number may not

15   have relevance in the abstract, but the typical

16   level -- depends on the -- on the institution -- is

17   anywhere -- for recommended dosing of acetaminophen,

18   the maximum level ranges from about 20 to 30.  She

19   was at 120.

20                   Her history was given by the father and

21   the investigator.  The treating doctors, the study --

22   the study investigator for this site who enrolled

23   this patient, here's what they wrote:  35-year-old

24   female, Tylenol overdose and d-CON ingestion along

25   with heavy alcohol use several days prior to a

1    suicide attempt.

2                    Dr. Larson --

3                    Oh, last part.  This is the coroner's

4    office record -- or the -- the note to the coroner's

5    office on a coroner's form from the county of

6    Los Angeles, where you can see acetaminophen overdose

7    written four times by the doctor and whoever else

8    submitted that form.  Two people signed it.

9                    So we asked Dr. Larson.  First of all,

10   she said, well, I wasn't reviewing the CR -- the CRF.

11   She didn't review all that information we just saw.

12                   So we asked her, okay, well, how do

13   you -- even though you aren't reviewing the

14   information -- she knew it was 1,200 milligrams

15   because she had a spreadsheet -- well, how do you

16   take 1,200 milligrams?

17                   And -- and let me just explain that.

18   Tylenol or acetaminophen comes in 325- and

19   500-milligram doses.  You can't multiply those in

20   whole tablets in any combination to get to 1,200.

21   We -- we tried.  We did some simple math.  It doesn't

22   work.  You have to cut up pills to get to 1,200.

23                   Somebody making a suicide attempt, where

24   the history is being recorded by the father, is

25   unlikely cutting up pills to commit suicide and get

1    to 1,200 milligrams of acetaminophen.

2              So she -- she admits it's an incorrect

3    dose.

4              And then, why -- I asked her, why would

5    the Tylenol overdose referenced in section -- why was

6    that specific reference, the reference we saw by the

7    treating doctor, never queried, the reference to

8    Tylenol overdose?  I don't know, because the main

9    site was the location where all -- where -- where

10   these were all initially vetted.  So you don't know

11   why this was not queried in 2002?  No, I do not know.

12   Or in 2005 when you wrote the paper?  No, I did not

13   have the case report forms.

14             And then, of course, she knew about the

15   fact that it says acetaminophen overdose in four

16   places in the -- in the report of the death to the

17   L.A. coroner's office.  We asked her, do you have any

18   basis to dispute that?  No.

19             And, finally, she said -- we asked her,

20   you would not present this case today based on the

21   CRF and the death?  She said, it would have been more

22   carefully queried today than it was 14 years ago.

23   You're on the causality committee now, right?  Yes.

24   And as a member of that causality committee --

25   answer, we would have queried it.  And you would not

1    today categorize this case of a low-dose case of

2    acetaminophen causing ALF, correct?  Answer:  We

3    would have potentially have called it an unknown

4    dose.

5                    Your Honor, this testimony from

6    Dr. Larson, I think, highlights and shows the flaws

7    in the methodology that was used to evaluate and

8    query or not query the acetaminophen dose information

9    in the CRFs.

10                   Like Dr. Lee, Dr. Larson now believes

11   that at least three out of these 19 cannot be

12   classified as ALF from low-dose ingestion of

13   acetaminophen.  That's almost 16 percent error rate.

14   That's an error rate unacceptable in any field of

15   science and, specifically, in medicine.

16                   Let's look at one more CRF.  Let me see.

17   Hang on, please.

18                        -  -  -

19                   (Pause)

20                        -  -  -

21                   MR. COHEN:  And it's case 008, and it's

22   at tab 9.  Now, Dr. Lee testified that the data in

23   the CRF for this case do not fulfill criteria for

24   assigning acetaminophen as the cause of the patient's

25   ALF.

 1                   "Criteria" means -- in the study, to be

 2      assigned acetaminophen, you had to take either more

 3      than 4 grams, you had to have an ALT over a thousand,

 4      or you had to have some level of acetaminophen in

 5      your blood when you came into the hospital.  Those

 6      were the attribution criteria for acetaminophen.

 7                   Matt, could you show us Lee 299?  Do you

 8      have that handy?

 9                   Dr. Lee explained that the study's

10      prespecified criteria for attributing acetaminophen

11      to that case were waived.  Let's see if we can find

12      it.

13                   And I'm sorry.  It may not be here, so

14      I'm going to read it into the record.  That's the

15      problem with technology.

16                   Ah, here it is.  Found it.

17                   Dr. Lee testified --

18                   INDISCERNIBLE SPEAKER:  I think I

19      (indiscernible).

20                   MR. COHEN:  Oh, you're right.

21                   THE COURT:  Go back one.

22                   MR. COHEN:  Yeah, it keeps jumping on

23      me.

24                   INDISCERNIBLE SPEAKER:  Forward.

25      Forward.  Forward.

Page 41

1              MR. COHEN:  Yeah, that's it.

2              So he said he waived it, he said.  He

3    waived the criteria.  So we said, who waived it?

4    That would have been me.  Where is the waiver

5    discussed in the CRF?  Oh, this was usually a

6    telephone call from the site.  To who?  To me, from

7    the site investigator to me.  Is that telephone call

8    documented in any part of the CRF or any other

9    documentation you can provide to us today?  This was

10   the first six months of the study being started in

11   1998.  Well, how do you recall this was waived, given

12   the age of the case?  Answer:  Because that was a

13   common practice, I would say, in the beginning; if

14   they were -- if somebody had the data from the

15   previous hospitalization and it looked like a good

16   case, we were eager to get cases in those early days,

17   and we -- I might have accepted it even though the

18   labs didn't quite compute.

19              Frankly, Your Honor, I found this

20   testimony to be astonishing.  It clearly shows bias

21   in methodology.  A single person had a -- in an

22   unblinded fashion simply waived criteria for

23   assigning acetaminophen, didn't document his waiver,

24   and never informed the peer reviewers and the readers

25   of the Journal that this was, quote, a common

1    practice in the early days.

2                    When a researcher admits that he's

3    collected data in violation of his own predetermined

4    criteria because he's eager to get cases and then

5    doesn't disclose it, I submit, Your Honor, that is

6    bias in research and bias in reporting.

7                    But don't believe me on that.  Here's

8    Patricia Robuck, who the plaintiffs also have

9    sponsored as a non-party witness.  She was the

10   program officer at the NIH for the ALFSG, and she

11   testified about this very issue.

12                   Are you aware, in the ALFSG study, if

13   scientists could unilaterally waive -- decide to

14   waive qualification requirements and admit a subject

15   or enrollee?  Answer:  No one is allowed to do that,

16   but no, they are not allowed themselves,

17   individually; that's what being part of a protocol is

18   all about; you must follow the protocol.

19                   Now, Dr. Robuck told us that even if the

20   waiver in a study was performed, it must be

21   documented.  Let's go back to the question of waiver.

22   If an individual scientist decided to waive some of

23   the qualifying criteria, any or all of the qualifying

24   criteria, you would expect that waiver to be

25   documented in the record, wouldn't you?  Answer:

Page 43

1   Yes.  Question:  And it's important that it be

2   documented, correct?  Answer:  Yes.

3              Dr. Robuck even said the NIH expects a

4   lack of bias in research and reporting and the NIH

5   also expects from its grant recipients, of which the

6   ALFSG is one -- it is true, a lack of bias in the

7   reporting?  Answer:  Yes.  A lack of bias in the

8   researching?  Yes.

9              Dr. Lee's waivers, which he testified he

10  never documented, which he did so commonly in the

11  early days to get cases, clearly do not conform to

12  Dr. Robuck's testimony on what the NIH expects from

13  its researchers.

14             Now, Dr. Larson was asked about this

15  same CRF, the one in which Dr. Lee unilaterally

16  waived criteria and didn't document.  Now, because he

17  didn't document it, Dr. Larson didn't know about the

18  waiver.  She didn't know.  Therefore, unlike Dr. Lee,

19  Dr. Larson testified that although this patient was

20  properly in the ALFSG, because the patient had ALF,

21  the patient would not properly be included in the

22  paper.

23             And here's what she said.  You have

24  study criteria for a reason?  Yes.  And if patients

25  don't meet those criteria, they should not be in the

1   study?  As I said, this would be queried more

2   carefully -- today more carefully.  Question:  This

3   patient should not be in the study?  Answer:  This

4   patient is appropriate for the study; this patient

5   would not be included in the paper.  In the paper?

6   Yes.

7                So -- so Dr. Larson has now conceded

8   that there are four cases where the -- of the

9   low-dose cases where the methodology was so flawed

10  that today she would say they don't belong in the

11  paper.

12               That is an error rate of over 21

13  percent.  That's not acceptable in medicine or

14  science.  No one -- no one wants his or her doctor to

15  practice medicine with a 21 percent error rate.

16               I have now shown you four cases that are

17  so obviously flawed that Dr. Lee, for three of them,

18  and Dr. Larson, for four of -- four of them, would

19  not today characterize them as low-dose cases.

20               And plaintiffs have made a lot about the

21  fact that the FDA and the NIH have reviewed and

22  approved the methodology of the ALFSG.  It's all over

23  their papers and all over the declarations that were

24  written for these experts.  Yet Dr. Lee tells us that

25  these CRFs were never provided to the FDA or to the

1    NIH, so these agencies had no reason to know about

2    this.

3              Okay.  You never sent -- this is to

4    Dr. Lee.  You never sent the CRFs for the 19 cases to

5    the FDA?  Answer:  Not that I'm aware, no.  Question:

6    And you never sent them to the NIH?  No.

7              Your Honor, there's a more grotesque

8    aberration of science we still need to discuss with

9    respect --

10             THE COURT:  You're going to have to wrap

11   it up shortly.

12             MR. COHEN:  -- to these cases.

13             I will.

14             In June 2009, Dr. Lee told the FDA

15   advisory committee that the ALFSG was going to

16   publish Larson 2.  All right?  And he said that.

17   Here's the statement from his testimony to the FDA.

18   You can see Larson 2.  That's in June 2009, and

19   here's the slide that he showed; we plan a Larson 2

20   paper.  Okay?

21             And, in fact, what we found was that

22   they actually started looking back at the Larson 2005

23   data in 2009 as part of something they called the

24   Data Clean Project.  And that's an email that

25   describes -- or that conveys some spreadsheets to

Page 46

1    Dr. Lee about Project Data Clean.

2                    And it takes a little bit of me to

3    explain this to you, so bear with me, if you will,

4    and I'll do it as quickly as I can.

5                    But Dr. Larson testified that the --

6    they wanted to make the data as clean as it could be,

7    presumably for Larson 2.

8                    And here is the spreadsheet, 3 --

9    UTSMC30059.  And it has colors, and one of the colors

10   is gray, and gray means excluded from the study for

11   some reason.

12                   This is a medical student who's going

13   through the data at Dr. Lee's request and looking and

14   seeing, how is the data from Larson 2005?

15                   And so what he concluded was that case

16   042, the d-CON case, should be excluded.  It was in

17   gray.  And he concluded that another case, 051,

18   should be excluded.  It was in gray.

19                   And he concluded in the green, a case,

20   116, should be re-categorized not as -- not excluded

21   from the ALFSG or the registry but re-categorized as

22   an overdose case because of a dosing -- a problem in

23   the dose -- the day -- the day of the -- the days of

24   dosing.

25                   And then they put together this

Page 47

1    spreadsheet, which is -- which has a column called

2    Delete on it.  And here, you can see case 042,

3    (indiscernible) d-CON poisoning, in the Delete

4    column.

5              And we asked Dr. Larson, what does the

6    graying indicate in the spreadsheet, and that

7    spreadsheet has suggested this was excluded.  And we

8    asked Dr. Larson, so according to the spreadsheet,

9    this was excluded?

10             And this is one of the other cases I

11   just talked about.  I'm going to try to hurry this

12   along.

13             And she said, yes, it was excluded in

14   2009.  And -- and -- and then we asked Dr. Larson

15   again what this all meant, and if you go back to this

16   spreadsheet, does it indicate that this was

17   reclassified from a low dose to an overdose?  That's

18   the green case that I showed you, 116.

19             And she eventually said -- do you

20   remember this?  I mean, I remember they were doing

21   it, yes, that they had re- -- reclassified that case

22   as an overdose.

23             And so we asked her, you were

24   reevaluating -- the ALFSG was reevaluating the Larson

25   2005 cases as part of the total second group?  Yes, I

1    believe that's true.  This is in 2009.

2                  And then she said, so let's -- we then

3    go back to the 042 case, and she says, I'm asking

4    you -- or I asked you, I'm asking you, in 2009, you

5    and Dr. Lee and the ALFSG decided that it should be

6    deleted for Larson 2?  And that she -- and she

7    answers, that would appear what this says.

8                  And so, therefore, in 2009 -- this is

9    case 116.  It falls out.  That's the 116 case.  I'm

10   just going to hurry this along.

11                 So I asked her, don't you think it's

12   important information to the question of whether or

13   not these are reliable cases of low-dose ingestion at

14   4 grams per day or less, this Data Clean, this -- all

15   these spreadsheets showing this reevaluation?  And

16   she admitted, yes, it's important.

17                 But here's the point, Your Honor.

18   Dr. Larson doesn't mention Project Data Clean in her

19   declaration.  Dr. Lee doesn't mention it in his

20   declaration.  They don't mention that in 2009, they

21   went through this evaluation process and excluded

22   cases.

23                 And here's how Dr. Larson described it.

24   So nobody ever learned that these low-dose cases had

25   been excluded by the ALFSG other than the ALFSG?

 1    Answer:  This just hasn't been done yet.  Question:

 2    In 2009, when the ALFSG decided to delete these two

 3    cases, did you have any conversation with anybody at

 4    the ALFSG about correcting Larson 2005?  No.  Did you

 5    think about sending an errata or an explanation; hey,

 6    the data has been reanalyzed, and we've excluded five

 7    cases, and two of them were low-dose cases -- because

 8    we went through three others that were not low dose.

 9    No.  And that's never been made public until today?

10    Answer:  Well, yes, that's probably true.  Never told

11    the FDA?  No.  Never told the NIH?  No.

12              We didn't examine today every single CRF

13    with Dr. -- we didn't examine at their depositions

14    every single CRF with Dr. Lee and Dr. Larson.  That

15    would have taken a couple of days.  We didn't have a

16    couple of days.  They're non-party witnesses.  There

17    was a lot of resistance to us having time to depose

18    them, but we deposed them as best we could.

19              And what we now have learned is that we

20    already have, at a minimum, either 16, up to 21

21    percent of the -- of the cases being excluded based

22    upon the methods -- based upon the methods used to

23    publish these data.

24              And what is important about these flawed

25    data is exactly what Dr. Robuck has said.  Can you

1    point to me any NIH document where NIH says, there's

2    certain amounts of data that we can accept as flawed?

3    No.  Can you point me to any NIH protocol where they

4    say, eh, a little bit of data -- bad data is okay?

5    No.  Can you point me to any -- any NIH protocol, any

6    NIH regulation, any federal regulation which supports

7    your statement and your testimony earlier that you

8    said a certain amount of data problems are okay; can

9    you point me to that?  No.

10               And, finally, Dr. Lee wrote to a U.S.

11   senator in 2006 in connection with a clinical

12   research study involving a different drug, not

13   acetaminophen, which was believed to cause liver

14   injury.  Dr. Lee wrote to the U.S. senator about the

15   company's sponsorship of that study.

16               The company is certainly to blame for a

17   faulty study, and no one should consider that any

18   flawed data in a study -- and one should consider

19   that any flawed data in a study throws out all that

20   data.

21               In conclusion, Your Honor, science

22   requires setting up a hypothesis, designing a study

23   to test it, and testing it.  Acetaminophen causing

24   ALF at low doses was not the design of the ALFSG, and

25   it was not the design of Larson 2005, as both Dr. Lee

1    and Larson testified.

2              Where a study is not designed to answer

3    a question of causation, data pulled from that study

4    cannot be later used to answer that question.  This

5    is not an analytical epidemiological study.  That is

6    not what the ALFSG is all about.

7              But even if we accept that this is the

8    only valid way of examining acute liver failure and

9    low-dose acetaminophen, which we dispute, the methods

10   used here to collect and analyze the data with

11   respect to the dosing of acetaminophen in these 19

12   cases was obviously highly flawed.

13             We have seen now several examples that

14   even the lead principal investigator and the lead

15   author of the paper have testified that they would

16   not stand by those cases today as low-dose cases.

17             Dr. Lee's testimony in a short

18   deposition produced the astonishing admission of a

19   16 percent error rate, and Dr. Larson admitted to a

20   21 percent error rate.

21             The FDA didn't know about these cases.

22   The NIH didn't know.  The readers of Hepatology

23   didn't know.  The only people who know are us, and

24   sometimes flawed studies get past peer review, and

25   this is one example.

1                When Dr. Larson wrote in 2006, one

2      should consider that any flawed data in a study

3      throws out that data, he was right.  That principle

4      applies here.

5                Your Honor, there are some additional

6      issues that I would like to reserve a few minutes of

7      time to discuss, if I may be permitted, after counsel

8      for plaintiffs presents.

9                THE COURT:  Let's see how we are with

10     time.

11               MR. COHEN:  Thank you.

12               THE COURT:  Thank you.

13               Mr. Tisi.

14               MR. TISI:  Judge, I'd like to, first

15     off, thank the court for agreeing to hear this on an

16     expedited basis.  It's, obviously, important to the

17     parties as a practical matter for not only this trial

18     and the evidence that will come, that we have to

19     amass for a September trial, but it's also important,

20     as Mr. Milling pointed out, I think Judge Johnson is

21     looking, if I can be so bold, to some of the things

22     that we're doing here.

23               As I also indicated, we were taken

24     off -- a little bit off with the PowerPoint

25     presentation, but I'm going to do the best I can to

1    jump around.

2              I did prepare for Your Honor a binder,

3    as we -- as has been typically done in the past for

4    exhibits that we might refer you during the course

5    of -- of this argument.  And with your permission, I

6    would --

7              THE COURT:  Sure.

8              MR. TISI:  -- like to hand it to you.

9              THE COURT:  Alyssa (ph), you can take

10   it.

11             Thanks.

12             MR. TISI:  The question that we have

13   before the court is -- is pretty straightforward;

14   does Daubert require the court to relitigate -- or

15   allow the court to relitigate, as defendants have

16   suggested the court do, the validity of a study like

17   this that has passeded -- passed not only peer review

18   by the -- by the Journal of Hepatology but, as you

19   will hear, the National Institute of Health?  And

20   this data has been presented to the -- to the FDA.

21             Specifically, you're going to be asked

22   whether or not we should wrap 11 cases or 17 cases

23   into the trial of this single case and whether or not

24   this is a -- ultimately, in the end of the day, a

25   collateral issue that doesn't go to the issues in the

1    case.

2              The answer to those questions, I would

3    submit, is no.  The study is reliable for the

4    proposition for which it is being used and for which

5    it is being cited.  That is three issues.

6              First, that there are, in fact, cases of

7    low-dose acetaminophen-induced acute liver failure.

8    Two, there is a narrow margin of safety for

9    acetaminophen.  Three, that all of the cases in this

10   study, not just the 19, establish this margin of

11   safety, and the defendant has not challenged the rest

12   of the study.

13             Importantly, Mr. Cohen has indicated

14   that this is the only study out there that suggests

15   that there is a risk at low dose.  Of course, this

16   court has been involved in this case for a long time

17   and knows that that is not true.

18             For example, the FDA scientists who have

19   looked at this question in the Working Group document

20   that Mr. Cohen referred to has indicated that the

21   Larson results reported in this paragraph are

22   identical to those reported by the FDA in its own

23   database.

24             So, for example, if I can point out to

25   you, in your binder, there is the FDA Working Group

1   document, which the court is familiar with but may

2   not have focused on this particular paragraph on

3   paragraph number -- on page number 11, where the FDA

4   Working Group --

5                   And it's -- I have a copy if the

6   court --

7                   THE COURT:  Is that in this binder,

8   Mr. Tisi?

9                   MR. TISI:  It is in this binder.  I

10  believe it's the fourth tab.

11                  THE COURT:  The one that says, Working

12  Group?

13                  MR. TISI:  Yes, correct.

14                  THE COURT:  What page?

15                  MR. TISI:  If you look at page 11 --

16  it's actually on page 10.  It talks about the

17  recommendation that the dose be lowered to increase

18  the margin of safety --

19                  THE COURT:  Right.

20                  MR. TISI:  -- for acetaminophen.  You --

21  do you see where I am, Your Honor?

22                  THE COURT:  I do.

23                  MR. TISI:  Okay.  It says, although the

24  acetaminophen manufacturer asserts that the data do

25  not support the assertion that repeated

1    supratherapeutic ingestion of less than 10 grams a

2    day presents a risk of hepatic injury, the EHRs

3    database -- and that's an FDA database -- and the

4    database of the Acute Liver Failure Study Group show

5    that doses closer to 4 grams a day, the current

6    maximum dose, presents a dose -- a risk in some

7    individuals.

8                    And if you look at the footnote, it

9    indicates the EHRs database and the F -- ALFSG

10   database shows the median daily dose of acetaminophen

11   was 5 to 7.5 grams a day.  And that's the median.

12   That's the -- that's midpoint.  So some below, and

13   some above.

14                   If you go to the next page, go to -- the

15   FDA Working Group reiterates that point because

16   McNeil, again, said what Mr. Cohen said; the case

17   reports are unreliable evidence for the -- for

18   determining risk.

19                   And the FDA Working Group says, the FDA

20   acknowledges the difficulty in defining a safe daily

21   dose relying on case reports; there are, however, two

22   different databases that suggest toxicity may occur

23   in some people with doses close to 4 grams a day.

24                   So the FDA has indicated that this ALFSG

25   database is reliable because it has been replicated,

Page 57

1    not only in their database, but elsewhere.

2                    I would also point out that there are

3    clinical trial data that indicates that at 4 grams,

4    there is an elevated risk of -- of hepatotoxicity.

5                    There are other individual cases,

6    including what the defendant has indicated is not, in

7    the medical literature and which you will see is

8    actually in this group of 19 cases, cases where

9    people were administered acetaminophen in a hospital

10   setting, in a -- in a situation in which the dose is

11   considered to be reliable because it's administered

12   by a doctor, and the person goes on to develop acute

13   liver failure.

14                   So the first thing I would like to say

15   when we start out is that -- is that this evidence,

16   as important as it is, does not stand alone, as

17   Mr. Cohen suggests, but is, in fact, part of a

18   larger -- a larger spectrum of evidence, from animal

19   data to clinical trials to epidemiology observations

20   like this to case reports, that has convinced the

21   scientific and medical community, except for McNeil,

22   that there is a narrow therapeutic margin and a risk

23   at or near 4 grams.

24                   Mr. -- before diving into my argument on

25   this, Mr. Cohen made several startling

1    characterizations of some of the witnesses in this

2    case.  I would start with one to illustrate the point

3    and the point of using snippets, like Mr. Cohen used,

4    to illustrate here.

5            If you recall, when -- he indicated that

6    Dr. Lee had indicated that there -- this is a safe

7    drug and that there was no risk until you get to

8    close to 10 grams.  There was a 2003 article on that.

9    There are multiple articles, from 2003 forward, where

10   Dr. Lee indicated there was a risk at 4 grams.

11           In fact, if you go to your binder -- I

12   didn't think I was going to have to do this, but if

13   you go to the binder, under the section -- there's a

14   section in which I collected testimony from the

15   various witnesses who have been -- testified in this

16   case on various issues.

17           And one is on the issue of the risk at

18   10 grams, and I asked Dr. Lee the following

19   questions.  And it's on page 86 of his deposition.

20   Before I get to --

21           THE COURT:  Where are you in the binder?

22           MR. TISI:  It's on the page -- it's in

23   the binder on number 3, risk at less than 10 grams.

24           THE COURT:  Right.  Got it.

25           MR. TISI:  And I pulled -- there are --

1    there is -- this was actually for another purpose

2    that I had this binder made, but there are snippets

3    from the various deposition --

4                THE COURT:  Did you make this for me?

5                MR. TISI:  I did.  I did, but it was

6    a -- I didn't intend to use it, frankly.  I intended

7    to use it, frankly, with -- in another context.

8                But there is -- there are pieces of

9    deposition testimony from the various witnesses in

10   this -- behind this binder.  But if you go to the one

11   that deals with Dr. Lee, page 86, I asked him the

12   question at line 17:  Before I get to discussing the

13   Larson paper specifically --

14               And my preface question was, I want to

15   talk about your public statements, the things you

16   have published in the past 10 to 15 years on

17   acetaminophen.

18               Before I get to discussing the Larson

19   paper specifically, let me ask you a global question;

20   in your 20-year work with the federally funded Acute

21   Liver Failure Study Group, have you developed and

22   reported an opinion in the medical literature that

23   some patients with acetaminophen- induced liver

24   failure can occur at 4 grams or less?  Yes.  Can it

25   occur at 5 grams?  Yes.  Can it occur at 6 grams?

1    Yes.  And so forth.

2                    And then I asked him the question, on

3    line 11, if anyone were to say that a human being

4    cannot develop acute liver failure until they get to

5    10 grams a day, is that something that would be

6    consistent with your experience running the largest

7    acute liver failure registry in the world?  No.

8                    Are these opinions that you, on behalf

9    of the Acute Liver Failure Study Group, reported to

10   the FDA in a public forum?  Yes.  And I go through

11   all the opportunities that he had to actually put

12   that out there.

13                   So when Mr. Cohen puts out a 2003

14   chapter from a medical -- from -- that Dr. Lee wrote

15   and ignores the rest of his published literature for

16   the past 15 years, I think you ought to take note of

17   that.

18                   Let me go -- let me take a big picture

19   here and back up a minute and see where we are and

20   why we're here a year and a half after we started

21   filing the various motions in this case discussing

22   the Acute Liver Failure Study Group.

23                   As this court is aware, there are two

24   big picture questions that deal with the generic

25   issue, not only in the Taylor (ph) case -- excuse

1    me -- not only in the Hayes (ph) case, but in all of

2    the cases.

3               Number one, can acetaminophen cause

4    acute liver failure at or near 4 grams either above

5    that dose or below that dose?

6               Number two, should McNeil have had

7    knowledge of acetaminophen's narrow therapeutic

8    margin such that they should have taken risk

9    reduction measures in the early to mid-2000s,

10   including, among other things, lowering the dose,

11   giving better instructions, redesigning the product

12   to increase the margin of safety?

13              To answer these two important generic

14   questions at trial, the plaintiffs rely heavily not

15   only on the science but on the consensus of the

16   medical and scientific and regulatory community about

17   acetaminophen.

18              As both this court and Judge Johnson has

19   noted, it is -- it is the consensus of the medical

20   and scientific community and that McNeil stands

21   squarely outside of that consensus.

22              In fact, we quoted in our papers the

23   numerous times that Judge Johnson has said that there

24   appears to be a consensus in the medical and

25   scientific community; McNeil just wasn't part of it.

1          So that's the background, and so we have

2     to understand what it is that the defendant is trying

3     to do here, because the defendant is standing

4     squarely against the FDA, the FDA Working Group, the

5     Acute -- the American Association for the Study of

6     Liver Disease, the American Liver Foundation, the FDA

7     advisory committee votes, and the Acute Liver Failure

8     Study Group.

9          So what are they doing here, and why are

10    we doing this?  Well, they're trying to undo the

11    decades of consensus.  McNeil believes that if they

12    can attack this single article, which is of this

13    Acute Liver Failure Study Group, they can illustrate

14    that the rest of the medical community, the rest of

15    the scientific community, and the rest of the

16    regulatory community got it wrong.

17         In particular, they attack the Larson

18    study.  And that -- I -- I assume you have a copy of

19    it, so I won't give you another copy of it, but that

20    article was designed to look at a bunch of things.

21         It was designed to look at the spectrum

22    of acetaminophen-induced liver failure seen in the

23    first six-years of this NIH-funded registry, from

24    1998 to 2003.

25         They didn't just study the 19 cases.

1   They studied 275 acetaminophen-induced acute liver

2   failure cases.  And in that study, they reported

3   about half of the people in the study had attempted

4   to harm themselves by committing suicide.

5              But the important part of that study is,

6   about half of those patients were trying to get

7   better.  They were trying to treat themselves, or

8   their doctors were trying to treat them, for pain.

9              Now, as part of that spectrum -- and --

10  and that's why it's important to talk about the big

11  picture here -- they described what they called the

12  low-dose cases, and those are the 19 cases that --

13  that Mr. Cohen talked to you about.

14             Now, Mr. Cohen spent a lot of time

15  talking about how medical histories are unreliable

16  and that somehow, the medical and scientific

17  community did not know that there were issues with

18  respect to the reported dosing history of some of

19  these cases.

20             Frankly, Your Honor, that's an

21  astonishing proposition because it's not true.  In

22  the article itself -- and if you go to the article,

23  the page that Mr. Cohen did not cite for you -- on

24  page 1370, in the Discussion section of the paper,

25  they talk about the cases in which people are not

1    trying to commit suicide.

2                They say, among -- quote, among the

3    unintentional overdose patients, most reported that

4    they were taking the medication specifically for pain

5    and constitutional symptoms.

6                It goes on to say -- I'm skipping a

7    couple sentences -- why, then, the sudden onset of

8    severe liver injury?  Our data suggests that there is

9    a narrow therapeutic margin and that consistent use

10   of as little as 7.5 grams a day may be hazardous;

11   however, precise information on dosing is often

12   difficult to acquire in some of the patients.

13               They told the readers of this article

14   that there are some patients -- and I say "some"

15   because, as I will show you, certainly not all --

16   some patients had difficulty giving and getting a --

17   a dosing history.

18               It's not -- it's not surprising that

19   Mr. Cohen would spend his time talking about those

20   some, but there are many other cases in this 19 in

21   which the dosing history was reliable, including the

22   dosing history provided by one of defendants' own

23   experts, unknown to him when he wrote his report.

24               Dr. Flamm and his medical center

25   provided a case, 010, in which the patient was

1    described by the -- by the -- by their institution as

2    having acetaminophen-induced liver failure, and

3    Dr. Flamm personally confirmed the low dose.

4               So while the defendant has spent a lot

5    of time talking about how unreliable this is and

6    picking apart little parts of the paper, not only did

7    the authors disclose that there was a problem with

8    some patients, they didn't talk about -- fairly talk

9    about the -- the breadth of the cases, of the 19

10   cases.

11              Now, I want to emphasize before I really

12   get into the argument in this case that this 2005

13   article is one of the lines of evidence that the FDA,

14   the ASLD, and the FDA Working Group relied on to

15   recommend that there be better instructions for

16   acetaminophen, that the dose be lowered, that the

17   margin of safety is too small, and that there is a

18   risk with this problem -- with this drug.

19              Now, to -- to -- having set up where

20   this argument fits in in the -- in -- in -- in the

21   spectrum of this case, now I want to turn to what

22   McNeil's attacks are and how this issue unfolded so

23   that we're here in early 2016 talking about this

24   instead of something that happened a long time ago.

25              To support its attack on this peer-

1    reviewed article, McNeil has procedurally collected

2    all the CRFs for the Larson study.  They could have

3    focused on all of them, but they didn't.  They chose

4    to focus on the 19.

5                   THE COURT:  Is it a problem with the

6    methodology that the authors of the report

7    acknowledge that they didn't look at the CRFs?

8                   MR. TISI:  No, because this is -- if you

9    look at the paper, Your Honor, the paper has

10   something in the range of, I think, 11 authors.  Each

11   of them do a part of the paper.

12                  Dr. Lee was involved in actually looking

13   at the CRFs, and he testified to that.  Dr. --

14   Dr. Larson was -- her job was to take the information

15   that was in the spreadsheet that was provided as a

16   result of this process and collate it and -- and --

17   and write a first draft.

18                  The important thing about the

19   methodology, Your Honor -- and Dr. Robuck testified

20   to this extensively, and it's in her declaration --

21   the procedures for collecting and analyzing the data

22   were not set up by the Acute Liver Failure Study

23   Group in a vacuum.

24                  These were set up in connection with the

25   National Institutes of Health, which not only

1  approved and reapproved and reapproved the grant for

2  the -- for the Acute Liver Failure Study Group, but

3  the practices, including the Manuals for Operation,

4  including the data collection, including all of

5  that -- was approved by the F -- by -- by the

6  National Institutes of Health.

7            They had monthly steering committee

8  meetings, where -- Dr. Robuck sat in on those

9  steering committees, and these cases were -- were

10 presented and discussed, and any issues related to

11 the conduct of the Acute Liver Failure Study Group

12 were -- were conducted.

13           They had a once-a-year meeting of all

14 the investigators.  And during the course of this,

15 any issues related to data collection were -- were --

16 discussed.

17           She testified that the low-dose cases

18 were specifically discussed, not only within --

19 within the -- within the ASLD themselves, but with

20 the NIH, and they were provided with summaries of

21 these patients.

22           She took those patients and went back to

23 what's called a data safety monitoring board, which

24 is an internal board -- it's described in her

25 declaration -- with the NIH.  Dr. Lee and none of the

1    investigators were part of that.

2                The summaries of these patients were

3    provided so that any information, any problems with

4    data collection, with patient safety, with any

5    conduct of this study over the -- the almost 20 years

6    it's been -- it's been in effect, would be identified

7    by the -- by the data safety monitoring board and be

8    brought back to the Acute Liver Failure Study Group

9    and corrected.

10               And so while Mr. Cohen has spent a lot

11   of time taking apart individual cases, the truth of

12   the matter is, the methodology that was used by the

13   Acute Liver Failure Study Group was unique to almost

14   any study that I've been involved with in the years

15   that I've been doing this, in that it was

16   scrupulously supervised by the National Institutes of

17   Health, its procedures were subject to peer review,

18   its procedures and -- were subject to renewal every

19   three to five years, and it passed every single time.

20               In fact, Dr. Robuck -- I believe her

21   last question and answer in her deposition was, have

22   you ever seen a study that was more meticulously

23   done, even if there were flaws in various -- as will

24   inevitably happen in 20 years, that there would be

25   things missing in forms and those kinds of things,

1    but when you look at the conduct of the study, how

2    does it compare?  And he (sic) said -- both Dr. Lee

3    and this study were remarkable in -- in their

4    contribution to the understanding of this -- of this

5    disease.

6              So to answer your question directly,

7    Your Honor, there were checks and balances for the

8    methodology that was employed for this study, the

9    data collection, the data analysis, and that was

10   provided by the National Institutes of Health.

11             So what happened in this case -- and

12   I -- I believe -- returning to my argument, what I

13   think we have to do is go back to where we were in

14   January.

15             The defendants produced a report.  The

16   report's from three experts; a Dr. Brown, a

17   Dr. Flamm, and a Dr. Brent (ph).  Importantly, and as

18   I'll discuss in a moment, none of these three

19   litigation experts have ever focused their research

20   activities on acetaminophen, on acute liver failure

21   related to any drug.

22             They're -- even though two of them were

23   members of the Acute Liver Failure Study Group,

24   remember, the Acute Liver Failure Study Group does a

25   lot of things other than study drugs.  That was their

 1    focus.  They weren't studying acetaminophen.

 2                    But they come marching into this

 3    courtroom in January with reports that say four

 4    things, and we can't forget those four things because

 5    it calls into question the methodology that they used

 6    to analyze these cases.

 7                    They said, number one, many of these

 8    cases didn't even have acute liver failure; they had

 9    things like sepsis or shock or some other things;

10    many of them didn't even have acute liver failure.

11                    Number two, they said, well, if they had

12    acute liver failure, they must have been due to other

13    things other than acetaminophen.  They mentioned

14    things like hepatitis A.  They mentioned things like

15    alcoholic liver disease or cirrhosis.

16                    Number three, they say, well, in the few

17    cases that were actually acute liver failures --

18    acute liver failure and in those even fewer cases

19    that were due to acetaminophen, not one, not a single

20    one was a case that can qualify as low dose.

21                    And they further argue, even though one

22    of them was listed as a participant in the study and

23    the other one, in fact, participated in the study,

24    said the article ought to be retracted and should not

25    be -- should not have been published in the first

1    place.

2                Now, over the past two months, we have

3    provided declarations to the court of the following

4    people so the court understands and the record is

5    clear as to who they are.

6                William Lee is the private

7    investigator -- the principal investigator for 20

8    years for the Acute Liver Failure Study Group and the

9    holder of the NIH grant and the senior author of the

10   Larson study.  He's authored close to 150 articles on

11   acute liver failure and acetaminophen toxicity.  He

12   was not retained or paid a dime.

13               Anne Larson was the site investigator

14   and lead author for the Larson article.  She's

15   published over 30 articles on acetaminophen-induced

16   liver failure.  She has not been paid a dime.

17               Dr. Robuck, the NIH fund official in

18   charge of the NH- -- Acute Liver Failure Study Group

19   grant, she was not retained and has not been paid a

20   dime.

21               I emphasize this to note that these

22   willing -- that these patients -- that these doctors

23   were willing to come forward at -- at -- at

24   tremendous time and on short notice to provide the

25   declarations that are before the court.

1                    In addition, we provided the reports of

2    Dr. Kaplowitz, who was the acute -- who is widely

3    considered one of the nation's authorities on -- in

4    this area and published a textbook on -- on

5    drug-induced liver disease; Dr. Davern, who was a

6    site investigator and author on the -- on the Larson

7    paper, and two toxicologists.

8                    I go through this because I think you

9    need to understand -- sometimes I watch on television

10   people debating issues, and sometimes it is important

11   to understand where they stand in the medical and

12   scientific community because not all opinions are

13   equal.

14                   I have provided in your book as tab 1 a

15   chart that we put together, and I'd just like to take

16   a moment and go through them, because I think --

17   against the backdrop of the argument you just heard,

18   I think you need to see where these experts line up.

19                   Publications on -- on acetaminophen,

20   acute liver failure, and drug-induced liver injury,

21   Dr. Lee, 152 articles; Dr. Kaplowitz, 88; Dr. Davern,

22   34, Dr. Larson, 36.

23                   Dr. Brown has had six, and Dr. Flamm has

24   had one.  And they go through each of these

25   article -- each of these on -- reports of acute liver

1    failure, acetaminophen.  These are not --

2    respectfully, while they may be -- while they may be

3    experts in the fields in which they are -- hepatitis

4    and other areas, liver transplants, they are not

5    experts in the field of drug-induced liver disease or

6    of acetaminophen-induced liver failure.

7              In fact, just to illustrate the point,

8    Dr. Flamm himself was asked to write -- author a book

9    on liver disease.  Interestingly -- and it's tabbed

10   in your book -- the person he asked to write the

11   chapter on drug-induced liver disease was Dr. Davern.

12             So now, what do these qualified experts

13   and witnesses say?  You've heard nothing from

14   Mr. Cohen about the analysis performed by any of

15   these witnesses.

16             McNeil's experts failed to consider

17   important evidence when they drafted their report,

18   including the presence of acetaminophen adducts that

19   was subsequently performed on these low-dose cases.

20   I think Your Honor cued into that in one of the

21   questions you asked Mr. Cohen.

22             If you turn to the Lee declaration,

23   page 14 and 15, he describes the importance of

24   acetaminophen adducts.  And I have a copy if Your

25   Honor needs it.  But on pages 14 or -- and 15 --

1                    THE COURT:  Hang on.

2                    MR. TISI:  -- he talks about having

3     received the expert reports of Drs. Brown and

4     Dr. Flamm and Dr. Brent (ph), and as a scientist, he

5     was concerned; did I get it wrong?

6                    And one of the things he did was go back

7     and look and see -- you know, we have this new test

8     that we had done for acetaminophen toxicity; we know

9     these patients had toxicity -- we know these patients

10    had acute liver failure; did we, in connection with

11    another study we had done -- and there were several

12    studies -- actually test these patients for

13    acetaminophen adducts?  In fact, they had.

14                    That would be the first question that

15    a -- that an expert who was looking at things in an

16    unbiased fashion would ask.  It's the question that I

17    would have expected Dr. Flamm and Dr. Brown, who were

18    members at one point of the Acute Liver Failure Study

19    Group, to have asked; by the way, McNeil, are there

20    adducts levels on these patients, and can you get

21    them for me, because I'm about to write a report that

22    says some of these patients don't even have

23    acetaminophen toxicity.

24                    Now, it's important to understand what

25    these adduct levels -- because I suspect you're going

1   to hear from Mr. Cohen about what these adduct levels

2   show and what they don't show.

3               If you go back to the chart that I

4   provided to you about the publications of the various

5   experts in this case, you will learn that plaintiffs'

6   experts and Dr. Lee and Dr. Larson have published on

7   acetaminophen adducts.  They are the primary

8   publishers of this issue -- on this issue and what

9   they mean.

10              Defendants' experts have not published a

11  single article or have ever given a talk, to my

12  knowledge, about acetaminophen -- acetaminophen

13  adducts.

14              Dr. Lee testified in his deposition --

15  and it was very clear -- that the presence of adducts

16  only shows you that there is acetaminophen toxicity.

17  It tells you nothing about how much -- how -- the

18  dose that the patient took.  I suspect you're going

19  to hear Mr. Cohen get up and say, oh, by the way,

20  these high adducts correlate with high dose.  They

21  don't.

22              The other thing, interestingly, that --

23  that these experts say -- point out is, well, why

24  didn't the defendant ask about genetic polymorphisms?

25  As you see from Dr. -- Dr. Lee's declaration, many of

1    these same patients were subject to genetic testing

2    to see whether there were common -- common genetic

3    features which would explain why patients developed

4    acute liver failure at low doses.

5                    And, lo and behold, in a patient called

6    Kort (ph), patients -- they studied 6 grams or less,

7    but -- but the 4-gram patients were in that group --

8    showed a common genetic polymorphism which would

9    explain -- which would help to explain why some

10   people get risk and the other people don't.

11                   The fact that McNeil's experts never

12   sought that data or -- and, as experts, didn't even

13   care to ask for it says a lot about the analysis

14   that's before you.

15                   They failed to consider the fact -- and

16   this is something that Dr. Flamm didn't realize until

17   Dr. Lee pointed it out to him, that one of the

18   low-dose cases was actually confirmed by his site and

19   that Dr. Flamm confirmed the dose.

20                   They failed in their reports to discuss

21   that which they had made a big deal previously, that

22   it didn't exist, that there was no patient in any

23   United States hospital that ever got acetaminophen

24   under the supervision of a doctor who got acute liver

25   failure at 4 grams or less.  There was such a case in

1    these 19.

2                 So against the backdrop, not only must

3    you consider what the acute liver failure authors

4    say, you have to consider the source of an -- not

5    only -- the quality of the expert reports that are

6    put before you to challenge that.

7                 So the court will have to decide in this

8    Daubert hearing not only whether the Daubert

9    challenge has a basis and (sic) whether, ultimately,

10   any of the data that you hear in this case goes to --

11   to the jury.

12                So with that as a background, I'm now

13   going to shift a little bit to talk about the big

14   picture, the big picture of where -- defendants'

15   analysis of the Acute Liver Failure Study Group

16   article and the article itself, what it says, and

17   whether it even makes a difference.

18                First of all, I'd like to point out that

19   under Daubert, peer review is not necessary, but when

20   it exists, it's a very important indicia of

21   reliability.  The reliability is even higher, and the

22   courts presume it's even higher, when the study is

23   done independent of and prior to litigation.  And

24   it's at its highest when regulatory authorities like

25   the FDA or the NIH rely on the study.

1              And even though I couldn't find a case

2    that says what I'm about to say, I would submit that

3    the reliability is even higher when the study is not

4    only relied on by the FDA and the federal government

5    but is funded by it and is peer-reviewed by it.

6              And I will emphasize that Dr. Robuck

7    indicated that this study was submitted to the FDA

8    prior -- was submitted to the National Institutes of

9    Health prior to it being published, and nobody said,

10   you know, I'd like to see the methodology for these

11   low-dose cases.  Nobody said, you know, this doesn't

12   make any sense; we'd like to see the -- the case

13   report forms.  Nobody said that this -- this doesn't

14   jive with the medical and scientific literature that

15   is already out there in the medical community.

16             I'd like to point out that no -- no

17   questions were ever raised until this past six months

18   on this study, not the NIH, not the FDA, not the

19   Journal of Hepatology; importantly, not Dr. Brown,

20   not Dr. Flamm, who were part of the Acute Liver

21   Failure Study Group and could have done so at any

22   time.

23             Nobody suggested that they do this

24   so-called body burden calculation that they -- that's

25   woven throughout all their reports and we'll talk

1    about in a moment.

2              Yet they claim that this process was

3    flawed, and their experts never sought to explore the

4    process.

5              Now, I really want to talk about

6    Dr. Brown, why this is so -- why what's going on in

7    this courtroom has not played out in the medical and

8    scientific community, and I'm going to give you two

9    examples.

10             In tab 3 of your binder is a series of

11   emails that were produced in Dr. Davern's deposition,

12   and they're ones that the court has not yet seen but

13   I think is telling and illustrates as to what a farce

14   this proceeding has become.

15             In your binder, Dr. Brown was asked --

16   as you recall from the papers that we filed,

17   Dr. Brown was asked to resign from the Acute Liver

18   Failure Study Group in the mid-2000s because of his

19   inattention to the group, his failure to enroll

20   cases, his failure to employ the proper paperwork.

21             Nevertheless, because he had been -- and

22   this is before any of this issue came up.  Before he

23   had been an -- because he had been an investigator in

24   the past, Dr. Lee, on behalf of the Acute Liver

25   Failure Study Group, asked Dr. Brown to participate

1    in a new study, a five-year retrospective analysis of

2    Acute Liver Failure Study Group cases.

3                    That happened in 2015, while acting as

4    McNeil's expert.  And you'll see that there are two

5    emails there.  There's one in 2016 and 2015.

6                    Importantly, this publication included a

7    subanalysis of over a hundred acetaminophen-induced

8    acute liver failure study groups in the Acute Liver

9    Failure Group registry.

10                   You will see in there a March 29, 2016

11   email from Dr. Brown, two months to the day after he

12   filed his expert report in this courtroom, saying

13   that the Acute Liver Failure Study Group doesn't know

14   how to analyze an acute -- doesn't know how to look

15   at a case of acute liver failure, doesn't know how

16   to -- you know is sloppy in its analysis of acute

17   liver failure related to acetaminophen, and he puts

18   his name on a paper that is going to be published --

19   or has been published relating to the analysis of

20   Acute Liver Failure Study Group and acetaminophen.

21   It doesn't talk about dose issues, but it talks about

22   the first two issues we talked about before.

23                   Because if you recall, Your Honor,

24   before, the initial report of Dr. Brown is, these

25   patients don't even have acute liver failure, and if

1    they have acute liver failure, it's probably not due

2    to acetaminophen.

3              Yet Dr. Brown, outside the courtroom, is

4    putting his name to an article by the Acute Liver

5    Failure Study Group as now marching into this court

6    saying that these guys don't know how to do anything,

7    and they're unreliable.

8              Now, if you take away anything from the

9    Daubert -- from the Daubert standard, it's that

10   experts are supposed to employ the very same

11   methodology in the courtroom that they apply in their

12   daily life as a scientist and as a doctor.  I

13   question whether or not Dr. Brown meets that

14   standard.

15             I'll bring another point --

16             THE COURT:  Mr. Tisi, in this tab,

17   there's a March 29, 2016 email.  It looks to be from

18   Dr. Brown.  He says, I added my comments.  Are those

19   comments then on the attached text?

20             MR. TISI:  Yes, they are -- they are --

21   they are on the attached.

22             THE COURT:  Okay.

23             MR. TISI:  In other words, he's --

24   he's -- he's giving approval to the study and not

25   saying -- you know, in that email, there's nothing

1    that says, you know, wait a second; I've just been

2    involved in a proceeding and I wrote a report two

3    months earlier where we have a real problem with --

4    with -- with the Acute Liver Failure Study Group's

5    methodology; I'd like to see the case report forms.

6              You would think -- I mean, if I was --

7    if I had a law clerk who wrote a bad memo for me

8    on -- on January 30th and I get a new memo on the

9    same topic on March -- on March 30th, I'd say, I'd

10   really like to see the data upon which you -- which

11   you rely.  Dr. Brown didn't do that.

12             I'm going to give you another example as

13   to why this is a -- a difficult argument for the

14   defendants to make.  Exhibit Number 21 to our motion

15   is case 12.  It's patient 010, which is Dr. Flamm's

16   patient.

17             In his January 29th report, Dr. Flamm

18   analyzed the 19 cases.  It included an analysis of

19   patient 12.  In his report, he said the cause should

20   not be listed as acetaminophen and that the dose is

21   unreliable.  And, further, he said it would be

22   unreliable for anyone -- anyone on -- any reasonable

23   scientist to describe this as a low-dose case.

24             But unbeknownst to Dr. Flamm when he

25   wrote his report and as described in Dr. Lee's

Page 83

1    declaration at page 10, 11 and page 34 and 37, this

2    was a report -- this was a report of a case out of

3    Dr. Flamm's -- out of Dr. Flamm's site.  His site

4    contributed the case.

5              His site, and maybe even him, said it

6    was acetaminophen-induced liver failure.  His site

7    described a biopsy as consistent with drug-induced

8    liver disease.  And as we learned, as you see as

9    attached to Exhibit 7 to his -- to Dr. Lee's

10   declaration, Dr. Flamm himself confirmed the dose as

11   less than 4 grams.

12             Now, you saw Mr. -- Mr. Cohen -- I -- I

13   thought it was interesting that Mr. Cohen brought up

14   the important parts of this form, and I -- and I wish

15   I could ask him to bring up that part.  And he said

16   there was several -- I don't know if you'll recall

17   that he said there was several important parts of the

18   form I want you to focus on.

19             I thought it was interesting that one

20   part of the form he didn't focus on -- and all of

21   these reports --

22             And if I can -- I only have one copy,

23   and if I can, I will give you my copy of Dr. Flamm's

24   report.  May I approach, Your Honor?

25             THE COURT:  Yes.

1            MR. TISI:  This is Exhibit 12 out of the

2    binder.  And if I could argue from this for a moment

3    because I only have one copy?

4            THE COURT:  Sure.

5            MR. TISI:  You will notice that there is

6    a -- it has two forms.  Each of these consist of two

7    forms.  There's an admission to the study form and an

8    outcome form.  One is filled when the patient is

9    enrolled, and the other one is admitted when -- after

10   the patient is analyzed.

11           And there is a section -- give me --

12   bear with me a moment.

13            I'll have to find it, Your Honor.  It's

14   the final diagnosis of a patient.  I have another

15   form here (indiscernible).

16           THE COURT:  Thanks.

17           MR. TISI:  It's where the medical doctor

18   indicates what the -- what the final diagnosis of the

19   patient is, and it indicates on this case that the

20   patient -- it's a little box, and they fill it in.

21   It says, acetaminophen.  It doesn't say

22   indeterminate.  It doesn't say idiopathic.  Their

23   site, Dr. Flamm's site, said this was

24   acetaminophen-related.

25           And, of course, we also know that

1    they -- that the -- that in realtime, in real

2    science, Dr. Flamm and his colleagues were correct.

3              How do we know that?  Well, we know that

4    because if you go to table 1 of Dr. Lee's

5    declaration, this patient was adduct-positive.  The

6    patient had the presence of acetaminophen adducts.

7              So Dr. Flamm -- and the reason for me

8    bringing you -- bringing this up to you is that

9    Dr. Flamm, in his litigation report, says, there's no

10   way that this could possibly be acute liver failure

11   due to acetaminophen; nobody would ever say that; the

12   dose is unreliable, and we come to learn that his

13   site made the conclusion that it was acetaminophen,

14   we know the adducts were positive, and Dr. Flamm

15   confirmed the dose.

16             So let's talk about the issues in the

17   case.  First of all, defendants filed on Friday issue

18   one; should you strike the declaration of Dr. Lee?

19   That issue wasn't raised by Mr. Cohen.  If -- do you

20   want me to find that portion of the -- of the -- of

21   that form?  Would that help?

22             Okay.  Number one, should you strike the

23   declaration of Dr. Lee?  McNeil filed a motion last

24   Friday to strike the Lee declaration.  We filed our

25   opposition yesterday.  I just want to discuss it very

1   briefly --

2                THE COURT:  Okay.

3                MR. TISI:  -- because I think it is

4   important.

5                Respectfully, it is a bizarre request.

6   The law encourages lawyers such as myself to

7   thoroughly investigate and do exactly what I did.

8   When we had the motion that was filed, we contacted

9   the lawyers for Dr. Lee.  We sent Dr. Lee, through

10  his counsel, the reports of Drs. Brown, Flamm, and

11  Brent (ph) and the -- and the -- and the motion that

12  was filed on behalf of Dr. -- on behalf of McNeil.

13               They were read by Dr. Lee before I ever

14  had a chance to meet with him.  I met with him in

15  mid-February.  He did most of the talking.  He -- he

16  gave us the information.  We took the information

17  down.  We turned around a declaration.  We sent it to

18  his lawyers.  Drafts went back and forth, and he

19  signed the -- he signed it.

20               I will point out that McNeil did exactly

21  the same thing with the declaration that it provided

22  in January.  It drafted the report.  It drafted the

23  declarations, sent it to the lawyers, had it signed,

24  and it was submitted to the court.

25               So I would argue that the motion they

1    filed on Friday is not only frivolous but is designed

2    to get the court not to look at the substance of it.

3                There are, however, two corrections that

4    Dr. Lee made in his deposition, so I -- I want to

5    call it to the court's attention.

6                In paragraph 14, he used the word

7    "median" instead of "mean" when describing the median

8    dose being 7.5 grams in the Larson study.

9                The second is paragraph 41, which was

10   left in by accident.  He testified to that.

11               As to the remainder of the 48-page,

12   single-spaced declaration, it remains his opinion as

13   of today.

14               Issue number two; does the fact that

15   there is 17 reported cases, and if there are 16 or 17

16   or 18 cases that remain after the reanalysis, based

17   upon what we now know, does it make a difference?

18               It really doesn't.  The point in

19   describing the low-dose cases was not to give a

20   conclusion as to causation but to describe the

21   low-dose phenomenon in the Acute Liver Failure Study

22   Group data.  It's a descriptive paper.  It fits into

23   all of the other articles that are out there in the

24   peer-reviewed public's literature.

25               There is a statement in the article that

1    indicates -- that they can use at trial that says

2    some of the patients can have a difficulty giving

3    medical history -- giving dosing history.  But some

4    don't.

5              But there are also reasons why some of

6    the patients in this -- in the dosing -- in this

7    group are reliable.  One would be case number 9,

8    that's described in Dr. Lee's declaration, ending in

9    also 010.

10             And -- and I just want to be clear,

11   there are -- even though we can't use the prefix for

12   these studies under the agreement with the Acute

13   Liver Failure Study Group -- they're giving patient

14   identifying information -- and -- and just

15   coincidentally, the case that Dr. Flamm has, which is

16   case number 12, ends in 010.  Case number 9 from

17   another institution ends in 010.  They're two

18   different cases, just so that -- it may be confusing,

19   but -- but you can see that there.

20             THE COURT:  I see it.

21             MR. TISI:  That case is a case -- as I

22   indicated, is a hospitalization case where the

23   patient got 12.5 grams over five days.  If the

24   patient was -- was being given acetaminophen in a

25   hospital setting, they would have gotten no more than

1    4 grams a day, which fits exactly the pattern of

2    being in the hospital for five days.

3              So what remains after this study is, if

4    you substituted the -- the -- the number 17 or 16 for

5    19 -- is, you still have a description of acute liver

6    failure with patients who took 4 grams or less.

7              It is not what the defendants came

8    marching into court with in January, which is, not a

9    single one of these patients are reliable; not a

10   single one -- most of these patients don't even have

11   acute liver failure or acetaminophen-induced liver

12   disease.  That argument is, apparently, out the

13   window because of the adducts testing.

14             So now they're focused on a handful of

15   cases, and the question is, does it make a

16   difference?  I question -- and I raise this because

17   if the study had written, for the purposes of the

18   jury and purposes of reliability -- if the jury had

19   heard that there was 17 cases or 16 cases of acute

20   liver failure at less than or equal to 4 grams,

21   the -- the -- the observation would be exactly the

22   same.

23             Now, I want to go to number three, a

24   third issue; what do the acetaminophen adducts show?

25   Now, in the reports, McNeil's experts, as -- as we

1    had indicated, indicate not only was the dose

2    unreliable, but these patients don't even have acute

3    liver failure.  I think -- as I indicated, I think

4    that's kind of out the window now.

5               Table 1 of the Lee declaration on

6    page 15 indicates that for the acetaminophen patients

7    who were tested, 18 of them, 18 of the 19, 16 were

8    adduct-positive.  One of those patients was tested

9    too long after the patient had been exposed, so the

10   adduct test would be unreliable.  So that there was

11   only one patient, which happens to be the Macrobid

12   case that Mr. Cohen talked to you about, that was --

13   should not be included.

14               While these -- while this test is not

15   commercially available, they are the smoking gun to

16   show acetaminophen was a cause of acute liver failure

17   in these patients, but this shows nothing about dose.

18               It shows that the Acute Liver Failure

19   Study Group investigators were largely right in their

20   non-litigation study, and McNeil experts were mostly

21   wrong in their litigation reports.

22               That is a really important point here,

23   Your Honor.  They came marching in here in January

24   saying -- saying that, based upon their -- their post

25   hoc analysis of these cases, that these cases weren't

1    even acute liver failure or related to acetaminophen.

2              The acute liver failure -- and it

3    indicates why there is an indicia of reliability

4    accorded to studies like this and a skepticism of

5    post-study analysis like that done by the Acute --

6    by -- by McNeil's experts.

7              THE COURT:  Let's wrap it up, Mr. Tisi.

8              MR. TISI:  Okay.  In your binder, there

9    is a -- there is a quote from Dr. Lee on page 21, and

10   I asked him, if anyone were to stand up in court and

11   say the presence of acetaminophen adducts tells you

12   anything about dose, would that be true?  The answer

13   is no.

14             Let's talk about this half life issue

15   because it involves our -- our request that these

16   experts be struck.

17             In their reports, McNeil's reports rely

18   on a formula, and the formula is basically this:

19   Measure the acetaminophen in the person's body at the

20   time that the person presents; look at their blood;

21   assume a half life of that patient; calculate

22   backwards; and through this, you can calculate and

23   demonstrate that the dosing history given by the

24   patient is incorrect .

25             The problem with that -- that -- that

1    hypothetical calculation is -- is several.  Number

2    one, it doesn't -- it doesn't describe the phenomenon

3    that as a patient is in acute liver failure, they

4    continue to -- and if they're taking acetaminophen,

5    it continues to accumulate in the liver.  It's not

6    excreted.  So it gives a high level -- an

7    inappropriately high level.

8              It is also important to note that not

9    only does the plaintiffs' experts -- not only does

10   Dr. Lee and Dr. Larson -- but defendants' own experts

11   agree that that test has never been validated in a --

12   in a situation involving acetaminophen.

13             So, for example, Dr. Flamm, as indicated

14   in his deposition on page 107 and 108 --

15             Well, we asked this of Dr. Brent (ph).

16   From your bibliography, are there any articles that

17   this estimated body burden -- the way you did it in

18   your supplemental report?  And the answer, from

19   acetaminophen?  Yes.  No.

20             We asked Dr. Flamm, there is -- question

21   on page 286:  There is no study that says --

22   question:  Is there a study that says that if we

23   combine body burden with an estimated half life, we

24   can determine whether a dose reported in a patient in

25   a chronic dosing situation is accurate; that has

1    never been proven or attempted to be proven, true?

2    Answer:  There is no such study.

3              Dr. Lee agrees.  Dr. Kaplowitz agrees.

4    Dr. Davern agrees.  Everybody agrees that this is not

5    a formula that has ever been validated in the realm

6    of science in any study that will demonstrate the --

7    that -- that dose.

8              And I would point out that Dr. Brown,

9    Dr. Flamm has never recommended that the -- that the

10   Acute Liver Failure Study Group employ such a -- such

11   a thing.

12             And I would also point out, in reality,

13   that the FDA has been struggling with the issue of

14   confirming dose for 15 years.  You would think that

15   in that time, McNeil would have come forward and

16   said, you know something; FDA, we found the Holy

17   Grail; we have a -- we have a -- a formula that all

18   you have to do is plug in a couple numbers, and we

19   can demonstrate that all this concern about low-dose

20   ingestion and margin of safety is a bunch of -- is a

21   bunch of hooey.

22             They never did that, but they march into

23   court and put a declaration before Your Honor, put

24   a -- put a -- put a -- a report before Your Honor

25   that says -- that says that they've never published

Page 94

1    on it, and we're supposed to -- we're supposed to

2    allow them to present that under the guise of

3    science.

4              So we would ask not only that that be

5    struck as unreliable and -- and -- and contravening

6    Mr. -- Dr. Lee and -- and everybody else, but their

7    experts be struck -- struck on that.

8              The truth is this, Your Honor, and --

9    and -- and -- and it is difficult, and this I agree

10   with Mr. Cohen on.  It's difficult to discuss each

11   and every one of these cases.

12             But I did ask Dr. -- I did go through

13   these -- these cases on Friday with Dr. Larson, and I

14   said, Dr. Larson, we can't go through each one of

15   these individually, but let's -- let me ask you this

16   as a -- as a --

17             And I can provide you with this

18   testimony.  And I did this with Dr. Lee as well.

19             -- let me ask you in the spectrum, are

20   there cases in the 19 in which the dosing history was

21   more challenging?  Yes.  Are there cases within the

22   19 where the dosing history was less challenging?

23   Yes.  Is that to be expected?  Yes, it's to be

24   expected because patients -- because doctors

25   sometimes find that patients can give accurate

1    histories, and sometimes they don't, but we accepted

2    the patients' history, and we described what we saw.

3    Does that mean that there's not contradictory

4    information for some of them?  Of course, there is.

5    But does that mean that the results of the study

6    is -- are wrong as reported?  Of course not.

7                   The defendant has a lot of arguments

8    that it can make at trial that dosing history is

9    sometimes difficult.  I expect that that's going to

10   be a major thrust of their -- of their argument.

11                  That has never been in dispute.  Dr. --

12   Dr. Lee and Dr. Larson include that -- admit that

13   freely.  It's in their declaration.  It's -- it's

14   throughout the medical literature.

15                  Does that mean dosing history is

16   unreliable?  Sometimes it may be; sometimes it may

17   not be.  They were reporting what they saw.  And

18   that's what this paper is about, and that's why it's

19   an important paper.  It fits in the -- in the

20   spectrum of cases out there.

21                  I'm going to wrap up now.  We've talked

22   about -- I just wanted to wrap in here that we have a

23   challenge to the defendants' experts.  I think they

24   went out way on a limb, way beyond where an expert

25   ought to be.  They became advocates in this case, and

1    I believe that they -- that they should be struck for

2    the reasons in our motion.

3                    I would point out, Your Honor, that

4    sometimes enough is enough.  We've been through this

5    for about a year and a half.  We've argued every

6    single issue that you could possibly have.  This is

7    the time to put an end to this constant wrangling

8    about what the data mean and allow the parties to put

9    their evidence, put their proofs before a jury, and

10   the Larson paper's one of them.

11                   Thank you very much.

12                   THE COURT:  Thank you, Mr. Tisi.

13                   All right.  We're going to break.

14                   Do you have something else you want to

15   argue Mr. Cohen?

16                   MR. COHEN:  I wanted to respond.  Two

17   minutes.

18                   THE COURT:  All right.  You have two

19   minutes.

20                   MR. COHEN:  Thank you, Your Honor, very

21   much.

22                   You know, there's an old -- a movie

23   about handling the truth.  Well, I'm going to say

24   that about the dose.  This is all about dose, and the

25   plaintiffs can't handle the dose.

1            The adduct data, as Mr. Tisi correctly

2    said, does not establish that these are low-dose

3    cases.  Their own experts all admitted that.  Dr. Lee

4    admitted that.  Dr. Larson admitted that.  All of

5    their experts have admitted that.  The low -- the

6    high adduct data does not establish that any of these

7    cases occurred at low dose.

8            And it gets worse, Your Honor.  Do you

9    remember the movie "A Christmas Story," where the

10   mother says, Ralphie, you're not going to get that BB

11   gun for Christmas because you're going to shoot your

12   eye out?

13           I think this gun has misfired.  If we

14   could put up (indiscernible), the 2011 study

15   published by the ALFSG with Dr. Larson as a coauthor,

16   Dr. Lee as the primary author, here's what it says:

17   1.0 nanomoles of adducts indicate a definite

18   acetaminophen overdose.

19           They didn't put that in the declarations

20   they submitted, and then they learned this at our

21   expert's depositions that, oh -- oh, my God; the gun

22   misfired.  The smoking gun we just heard about, it

23   misfired.  All their adduct levels are between 3 and

24   41 nanomoles per milliliter.

25           I invite you to look at the very table

1    Mr. Tisi just put before you.  They wrote that, and

2    they published that.  And that's the Acute Liver

3    Failure Study Group, and that is why the adduct data

4    now, we're being told, doesn't establish dose.  Oh.

5    Oops.  It establishes overdose.  They don't want you

6    to know that.

7                    THE COURT:  And do I have that article?

8                    MR. COHEN:  May I approach?

9                    THE COURT:  Thank you.  Thank you.

10                   MR. COHEN:  One last thing.  They --

11   they talked a lot about Dr. Brown.  They brought your

12   attention to Dr. Brown's emails.  They were offered

13   Dr. Brown's deposition.  They declined.  Dr. Brown's

14   not here to explain his emails.  I would ask the

15   court not to consider that evidence as -- as anything

16   other than hearsay and unrelated.

17                   Finally, Mr. Tisi talked about

18   polymorphism.  Dr. Lee testified that his papers on

19   genetic testing contain no data about 4 grams or less

20   ingestion of acetaminophen at page 322 of his

21   deposition, lines 3 through 7; we didn't discuss the

22   quantities in the papers -- two papers.

23                   Finally, Your Honor, it is a problem,

24   the methodology used for a study that the plaintiffs'

25   experts are relying on, and it's a bigger problem

1    when the authors of that paper actually excluded the

2    cases in 2009 and didn't tell the scientific

3    community and didn't tell this court.

4                    Thank you.

5                    THE COURT:  Thank you, Mr. Cohen.

6                    Mr. Tisi, you may have your case report

7    back.

8                    MR. TISI:  Okay.

9                    THE COURT:  Thank you very much --

10                   MR. TISI:  Can I make one --

11                   THE COURT:  -- for your written

12   submissions.

13                   MR. TISI:  Can I make one point about

14   this case report, Your Honor, because I think it

15   is -- it is -- Mr. -- Mr. -- with your indulgence,

16   about 30 seconds?

17                   THE COURT:  Okay.

18                   MR. TISI:  I asked -- and it's in your

19   binder -- about this adduct issue of the -- this --

20   this backfiring smoking gun issue.  Every single

21   witness said, it measures toxicity; it doesn't

22   measure dose.

23                   But to illustrate that point, I would go

24   to the case 010, which is number 12.

25                   THE COURT:  Um-hmm.

1              MR. TISI:  And that case, as we know, is

2    a 4-gram case because it was in a hospital.  That

3    patient had a -- a 9.  And if that patient had a 9

4    adduct level, it does -- it would demonstrate that

5    patient had a normal dose and had a 9.  That

6    demonstrates that -- that this measures toxicity but

7    doesn't measure dose, as Mr. Cohen just told you.

8              Thank you very much, Your Honor.

9              THE COURT:  Thank you.

10              MR. COHEN:  Your Honor, one housekeeping

11   matter?

12              THE COURT:  Yes.

13              MR. TISI:  We do have the graphics

14   printed out.

15              THE COURT:  Okay.

16              MR. COHEN:  Do you just want a set?

17              INDISCERNIBLE SPEAKER:  Could I have a

18   set?

19              MR. COHEN:  Yes.

20              INDISCERNIBLE SPEAKER:  Thank you.

21              THE COURT:  Could I see Ms. Jones and

22   Mr. Tisi for just a moment back in chambers?

23              ESR OPERATOR:  All rise.

24              (Whereupon, the proceeding was concluded

25   at 12:23 p.m.)

1          C E R T I F I C A T I O N

2

3

4          I, Judi Y. Olsen, Registered

5    Professional Reporter, do hereby certify that the

6    foregoing is a true and correct transcript from the

7    electronic sound recordings of the proceedings in the

8    above-captioned matter.

9

10

11

12

13   April 29, 2016                    _____
     Date                             Judi Y. Olsen, RPR

14

15

16

17

18

19

20

21

22

23

24

25

## A

**AASLD** 21:15 23:16
**aberration** 45:8
**ability** 7:4
**able** 4:15 8:1 22:13 23:12,21
**above-captioned** 101:8
**abstract** 13:8 36:15
**accept** 50:2 51:7
**acceptable** 44:13
**accepted** 41:17 95:1
**accident** 87:10
**accommodate** 8:1
**accorded** 91:4
**accumulate** 92:5
**accurate** 92:25 94:25
**accurately** 8:18
**acetaminophen** 1:4 12:7 13:4,14 14:1 14:5,12,24 15:2,8 15:20 17:5,20 18:2,8 19:1,4,4,17 20:6,10,24 21:6 21:22 22:1 26:6 27:1,2,6,10,11,18 29:23 30:17,18 32:11 34:21,25 36:4,6,13,17 37:6 37:18 38:1,15 39:2,8,13,24 40:2 40:4,6,10 41:23 50:13,23 51:9,11 54:9 55:20,24 56:10 57:9 59:17 59:23 61:3,17 65:16 69:20 70:1 70:13,19 71:11 72:19 73:1,18,24 74:8,13,23 75:7 75:12,12,16 76:23 80:17,20 81:2 82:20 84:21 85:6
**acetaminophen's** 61:7
**acetaminophen-i...** 54:7 62:22 63:1 65:2 71:15 73:6 80:7 83:6 89:11
**adduct-positive** 85:5 90:8
**administered** 57:9 57:11
**admission** 51:18 84:7
**admit** 42:14 95:12
**admits** 31:14 38:2 42:2
**admitted** 3:13 48:16 51:19 84:9 97:3,4,4,5
**advisory** 15:3 20:23 21:5 23:12 45:15 62:7
**advocates** 95:25
**age** 41:12
**agencies** 45:1
**agenda** 4:3
**agent** 33:12
**ago** 19:20 22:12 24:4 27:18 38:22 65:24
**agree** 17:18 92:11 94:9
**agreed** 17:1 35:12
**agreeing** 52:15
**agreement** 88:12
**agrees** 93:3,3,4,4
**Ah** 40:16
**alcohol** 26:16 34:14 35:25 36:25
**alcoholic** 70:15
**ALF** 14:13 15:7,21 17:7,16,22 18:12 19:1 39:2,12,25 43:20 50:24
**ALFSG** 12:18

**adduct** 33:17,19 74:25 75:1 90:10 97:1,6,23 98:3 99:19 100:4
**adducts** 34:4,7 73:18,24 74:13,20 75:7,13,15,20 85:6,14 89:13,24 91:11 97:17
**acetaminophen-r...** 84:24
**acknowledge** 66:7
**acknowledges** 18:6 22:2 56:20
**acquire** 64:12
**acting** 80:3
**activities** 69:20
**actual** 12:11
**acute** 6:15,19 7:7 12:4,7 14:6,11,15 18:8 33:13 51:8 54:7 56:4 57:12 59:20 60:4,7,9,22 61:4 62:5,7,13 63:1 66:22 67:2 67:11 68:8,13 69:20,23,24 70:8 70:10,12,17,18 71:8,11,18 72:2 72:20,25 74:10,18 76:4,24 77:3,15 78:20 79:17,24 80:2,8,8,13,14,15 80:16,20,25 81:1 81:4 82:4 85:10 87:21 88:12 89:5 89:11,19 90:2,16 90:18 91:1,2,5 92:3 93:10 98:2
**add** 9:22
**added** 81:18
**addition** 72:1
**additional** 8:17 24:24 27:7 52:5
**address** 4:9 15:19

**adduct** 33:17,19
**adducts** 34:4,7
13:13 14:14 15:10 15:14,16,19,22 16:6,8,12,15,19 16:21 17:3,8,15 18:17,24 19:9 23:3 24:2,8 25:13 25:13,23 26:12 42:10,12 43:6,20 44:22 45:15 46:21 47:24 48:5,25,25 49:2,4 50:24 51:6 56:9,24 97:15
**allow** 53:15 94:2 96:8
**allowed** 42:15,16
**ALT** 40:3
**altered** 26:13 35:22
**alternative** 33:24
**Alyson** 2:5 9:17
**Alyssa** 53:9
**amass** 52:19
**ambiguities** 24:25
**American** 21:14 62:5,6
**amount** 8:20 50:8
**amounts** 50:2
**analyses** 30:10
**analysis** 69:9 73:14 76:13 77:15 80:1 80:16,19 82:18 90:25 91:5
**analytical** 17:9 51:5
**analyze** 51:10 70:6 80:14
**analyzed** 82:18 84:10
**analyzing** 66:21
**Angeles** 37:6
**animal** 57:18
**Anne** 71:13
**annotated** 20:4
**annual** 21:16 23:16
**answer** 12:10 17:5 17:15,20 22:21 28:6 30:24 35:8 38:25 39:2 41:12

42:15,25 43:2,7 44:3 45:5 49:1,10 51:2,4 54:2 61:13 68:21 69:6 91:12 92:18 93:2
**answered** 18:4
**answers** 48:7
**antibacterial** 33:12
**anybody** 49:3
**apart** 65:6 68:11
**apparently** 89:12
**appear** 48:7
**APPEARANCES** 1:9 2:1
**appears** 61:24
**applies** 52:4
**apply** 81:11
**approach** 11:18 32:3 83:24 98:8
**appropriate** 44:4
**approval** 81:24
**approved** 44:22 67:1,5
**April** 1:5 101:13
**area** 72:4
**areas** 73:4
**argue** 10:12,15 11:11 70:21 84:2 86:25 96:15
**argued** 96:5
**argument** 3:3 7:8 7:22 10:23 53:5 57:24 65:12,20 69:12 72:17 82:13 89:12 95:10
**arguments** 6:23 95:7
**article** 14:10 19:9 19:24 20:5,9,15 20:18 23:6,9 31:11 58:8 62:12 62:20 63:22,22 64:13 65:13 66:1 70:24 71:14 72:25 75:11 77:16,16 81:4 87:25 98:7
**articles** 20:17 58:9

71:10,15 72:21
87:23 92:16
**ASHCRAFT** 1:17
**asked** 7:9,11,12,14
15:17 16:2,24
18:10 19:18,19,23
20:12,24 21:2,10
22:6,17 23:13
25:10 34:23 35:3
37:9,12 38:4,17
38:19 43:14 47:5
47:8,14,23 48:4
48:11 53:21 58:18
59:11 60:2 73:8
73:10,21 74:19
79:15,17,25 91:10
92:15,20 99:18
**asking** 48:3,4
**ASLD** 65:14 67:19
**assertion** 55:25
**asserts** 55:24
**assessment** 12:12
**assigned** 40:2
**assigning** 39:24
41:23
**assist** 12:12
**association** 18:7,12
21:14 62:5
**associations** 18:20
**assume** 62:18 91:21
**assumed** 27:5
**astonishing** 41:20
51:18 63:21
**Atlanta** 1:15
**attached** 81:19,21
83:9
**attack** 62:12,17
65:25
**attacks** 65:22
**attempt** 34:16 37:1
37:23
**attempted** 35:11
63:3 93:1
**attention** 87:5
98:12
**attributed** 15:7
**attributing** 40:10

**attribution** 40:6
**AUDIO** 2:8
**audio/visual** 4:22
10:24
**author** 16:1 27:23
35:9 51:15 71:9
71:14 72:6 73:8
97:16
**authored** 71:10
**authorities** 72:3
77:24
**authors** 19:15
29:13 65:7 66:6
66:10 77:3 99:1
**available** 4:14
28:19 90:15
**aware** 6:1 7:8 13:2
42:12 45:5 60:23
**a.m** 1:6 11:24,24

———————
**B**
**B** 2:5 3:12 14:25
**back** 20:14 36:11
40:21 42:21 45:22
47:15 48:3 60:19
67:22 68:8 69:13
74:6 75:3 86:18
99:7 100:22
**backdrop** 72:17
77:2
**backfiring** 99:20
**background** 31:4
62:1 77:12
**backwards** 91:22
**bad** 50:4 82:7
**balances** 69:7
**based** 19:8 38:20
49:21,22 87:16
90:24
**basically** 91:18
**basis** 20:3 30:22
33:17,25 38:18
52:16 77:9
**BB** 97:10
**bear** 46:3 84:12
**bears** 15:12 27:2
**beginning** 6:23

41:13
**behalf** 10:15 60:8
79:24 86:12,12
**behold** 76:5
**believe** 42:7 48:1
55:10 68:20 69:12
96:1
**believed** 18:23
50:13
**believes** 39:10
62:11
**belong** 44:10
**bench** 11:19
**benefit** 7:22
**Berman** 1:10,11
4:7,8,9,19,25 5:3
5:9,12 7:1 9:22
10:7
**best** 49:18 52:25
**better** 61:11 63:7
65:15
**beyond** 95:24
**bias** 41:20 42:6,6
43:4,6,7
**bibliography** 92:16
**big** 60:18,24 63:10
76:21 77:13,14
**bigger** 98:25
**billion** 14:24,25
15:1
**binder** 31:25 35:18
53:2 54:25 55:7,9
58:11,13,21,23
59:2,10 79:10,15
84:2 91:8 99:19
**biopsy** 83:7
**bit** 4:21 16:11
17:24 46:2 50:4
52:24 77:13
**bizarre** 86:5
**blame** 50:16
**blank** 27:14,14
36:3,8
**blood** 27:10 40:5
91:20
**board** 67:23,24
68:7

**body** 78:24 91:19
92:17,23
**bold** 52:21
**book** 20:1 72:14
73:8,10
**bore** 6:2
**box** 84:20
**breadth** 65:9
**break** 96:13
**Brent** 69:17 74:4
86:11 92:15
**briefing** 6:19 9:1
**briefly** 19:2 30:3
86:1
**bring** 81:15 83:15
**bringing** 85:8,8
**Broadway** 2:3
**brought** 68:8 83:13
98:11
**Brown** 69:16 72:23
74:3,17 78:19
79:6,15,17,25
80:11,24 81:3,13
81:18 82:11 86:10
93:6 93:11 10:20
**Brown's** 98:12,13
98:13
**BUENZLE** 2:8
**bullet** 22:8
**bunch** 62:20 93:20
93:21
**burden** 78:24 92:17
92:23
**BUTLER** 2:2,5

———————
**C**
**C** 101:1,1
**calculate** 91:21,22
**calculation** 78:24
92:1
**call** 4:13 7:2,2 8:8
35:5 41:6,7 87:5
**called** 16:17 26:19
27:1,6,6,9 39:3
45:23 47:1 63:11
67:23 76:5
**calls** 70:5

**capable** 15:19
**care** 76:13
**careful** 25:14
**carefully** 38:22
44:2,2
**case** 6:3,7,9 15:23
15:24 16:4,6,9,13
16:17,18 17:11,11
18:19,19,23 24:4
24:6 26:18,18
27:3 29:4,8 30:1
30:16 32:14,15,23
33:1,3,4,5,15 34:9
34:11,11,24 35:4
35:5,12,12,17
38:13,20 39:1,1
39:21,23 40:11
41:12,16 46:15,16
46:17,19,22 47:2
47:18,21,24 48:3,9,9
53:23 54:1,16
56:16,21 57:20
58:2,16 60:21,25
61:1 64:25 65:12
65:21 69:11 70:20
75:5 76:25 77:10
78:1,12 80:15
82:5,15,23 83:2,4
84:19 85:17 88:7
88:15,16,16,21,21
88:22 90:12 95:25
99:6,14,24 100:1
100:2
**cases** 12:3,22 13:20
13:23 14:3,9 15:4
15:7,11,13,14,16
15:23 16:20 18:15
20:20 22:23 23:3
26:7 27:22 28:3,5
28:7,20 29:17,18
29:20 30:7,11,11
30:20 31:1,8,15
31:16 33:21 35:2
35:7,10,15 41:16
42:4 43:11 44:8,9
44:16,19 45:4,12
47:10,25 48:13,22

48:24 49:3,7,7,21
51:12,16,16,21
53:22,22 54:6,9
57:5,8,8 61:2
62:25 63:2,12,12
63:19,25 64:20
65:9,10 67:9,17
68:11 70:6,8,17
70:18 73:19 76:18
78:11 79:20 80:2
82:18 87:15,16,19
88:18 89:15,19,19
90:25,25 94:11,13
94:20,21 95:20
97:3,7 99:2
**categorize** 39:1
**causal** 18:20,25
**causality** 18:18
38:23,24
**causation** 12:20,25
13:3,23 14:7
23:25 51:3 87:20
**cause** 33:13,24
39:24 50:13 61:3
82:19 90:16
**caused** 13:5
**causes** 12:7 14:5
15:21 17:6,16,21
**causing** 22:1 39:2
50:23
**caveats** 20:14
**center** 64:24
**certain** 50:2,8
**certainly** 5:3 22:13
23:18 50:16 64:15
**certainty** 23:24
**certify** 101:5
**challenge** 77:6,9
95:23
**challenged** 54:11
**challenging** 94:21
94:22
**chambers** 100:22
**chance** 86:14
**chapter** 20:1 60:14
73:11
**characterizations**

58:1
**characterize** 44:19
**charge** 71:18
**chart** 24:11 72:15
75:3
**checks** 69:7
**choose** 5:21
**chose** 66:3
**chosen** 5:5
**Christmas** 97:9,11
**CHRISTOPHER**
1:17
**chronic** 92:25
**cirrhosis** 70:15
**cite** 13:19 14:10,13
25:24 63:23
**cited** 54:5
**claim** 6:9 14:5 79:2
**claimed** 15:6
**claims** 6:7
**classification** 30:22
35:6
**classified** 39:12
**classifying** 34:24
**Clay** 1:13 5:24
**clean** 45:24 46:1,6
48:14,18
**clear** 71:5 75:15
88:10
**clearly** 41:20 43:11
**clerk** 82:7
**clinical** 17:9 50:11
57:3,19
**close** 56:23 58:8
71:10
**closer** 56:5
**Coast** 6:17
**coauthor** 13:22
30:2,13 97:15
**Cohen** 2:2 3:4
10:15,18,19,22
11:2 12:1,2 24:17
25:21 32:5,7,18
33:19,23 34:3,7
39:21 40:20,22
41:1 45:12 52:11
54:13,20 56:16

57:17,25 58:3
60:13 63:13,14,23
64:19 68:10 73:14
73:21 75:1,19
83:12,13 85:19
90:12 94:10 96:15
96:16,20 98:8,10
99:5 100:7,10,16
100:19
**coincidentally**
88:15
**collate** 66:16
**collateral** 53:25
**colleagues** 19:14
85:2
**collect** 51:10
**collected** 15:23
16:3 19:8,11
25:17 42:3 58:14
66:1
**collecting** 22:23
66:21
**collection** 15:22
16:17 17:11 25:19
67:4,15 68:4 69:9
**COLLOQUY** 3:2
**Colony** 2:6
**colors** 46:9,9
**column** 47:1,4
**coma** 26:10 35:21
**comatose** 35:24
**combination** 37:20
**combine** 92:23
**come** 20:14 28:5
52:18 70:2 71:23
85:12 93:15
**comes** 20:2 25:10
35:4 37:18
**comment** 8:17
27:15
**comments** 81:18,19
**commercially**
90:15
**commit** 37:25 64:1
**commitment** 11:14
**committee** 15:3
20:24 21:5 23:12

38:23,24 45:15
62:7 67:7
**committees** 67:9
**committing** 63:4
**common** 41:13,25
76:2,2,8
**commonly** 43:10
**community** 19:3
23:1 31:14 57:21
61:16,20,25 62:14
62:15,16 63:17
72:12 78:15 79:8
99:3
**company** 1:23
50:16
**company's** 50:15
**compare** 69:2
**complete** 5:17
**completed** 6:25
10:3
**completely** 22:13
36:3,8
**comprised** 15:22
**compute** 41:18
**computer** 25:5
**conceded** 17:16
44:7
**concern** 93:19
**concerned** 74:5
**concluded** 33:15
46:15,17,19
100:24
**conclusion** 50:21
85:13 87:20
**conduct** 67:11 68:5
69:1
**conducted** 33:18
67:12
**conference** 1:7 4:13
7:2 11:23
**confidentiality**
31:21,22
**confirm** 16:15
29:16
**confirmed** 16:14,21
28:1 29:5,21 65:3
76:18,19 83:10

85:15
**confirming** 93:14
**confirms** 28:23
**conform** 43:11
**confusing** 88:18
**connection** 50:11
66:24 74:10
**consensus** 61:15,19
61:21,24 62:11
**consider** 50:17,18
52:2 73:16 76:15
77:3,4 98:15
**considerable** 7:6
**considered** 28:12
57:11 72:3
**consist** 84:6
**consistent** 60:6
64:9 83:7
**constant** 96:7
**constitutional** 64:5
**consumed** 20:10
**consumers** 14:25
**contacted** 86:8
**contain** 98:19
**context** 14:22 59:7
**continue** 92:4
**continued** 2:1
**continues** 92:5
**continuing** 6:24
**contradictory** 95:3
**contravening** 94:5
**contributed** 83:4
**contribution** 69:4
**control** 16:22 17:10
**controlled** 16:23
**controversies** 22:4
**controversy** 22:5
22:10,16 23:17,17
**conversation** 49:3
**conveys** 45:25
**convinced** 57:20
**convincing** 23:5
**coordination** 9:14
**coordinators** 24:18
**copies** 5:13 9:1,7
10:4 26:1
**copy** 7:13 26:3 55:5

62:18,19 73:24
83:22,23 84:3
**core** 13:3
**coroner's** 34:19
37:3,4,5 38:17
**correct** 16:18,20,22
17:1,22 30:23,24
35:7 39:2 43:2
55:13 85:2 101:6
**corrected** 68:9
**correcting** 49:4
**corrections** 87:3
**correctly** 97:1
**correlate** 75:20
**counsel** 16:2 21:1
32:1 52:7 86:10
**counter** 26:23
**country** 6:17
**county** 37:5
**couple** 28:8 49:15
49:16 64:7 93:18
**course** 20:4,7 27:14
30:17 34:4 38:14
53:4 54:15 67:14
84:25 95:4,6
**court** 1:1,23 4:2,18
4:24 5:2,7,11,15
5:23 7:15,25 8:5
8:10,14 9:2,11,12
9:21 10:5,6,11,17
10:21 11:1,12,21
12:1,12 13:1
18:18 25:20 26:5
32:2,4,6,16 33:16
33:22 34:2,6
40:21 45:10 52:9
52:12,15 53:7,9
53:13,14,15,16
54:16 55:1,6,7,11
55:14,19,22 58:21
58:24 59:4 60:23
61:18 66:5 71:3,4
71:25 74:1 77:7
79:12 81:5,16,22
83:25 84:4,16
86:2,24 87:2
88:20 89:8 91:7

91:10 93:23 96:12
96:18 98:7,9,15
99:3,5,9,11,17,25
100:9,12,15,21
**courtesy** 5:13 10:4
**courtroom** 70:3
79:7 80:12 81:3
81:11
**courts** 8:22 77:22
**court's** 87:5
**CR** 37:10
**created** 25:13
**credibility** 30:20,22
**credit** 5:7
**CRF** 30:23 31:19
31:24 32:2 33:8
33:25 34:17 36:2
36:8 37:10 38:21
39:16,23 41:5,8
43:15 49:12,14
**CRFs** 15:25 24:17
25:3 30:5,15 39:9
44:25 45:4 66:2,7
66:13
**criteria** 32:20
39:23 40:1,6,10
41:3,22 42:4,23
42:24 43:16,24,25
**cued** 73:20
**current** 56:5
**currently** 7:18
**cut** 37:22
**cuts** 5:16
**cutting** 37:25

───────────
**D**
**D** 3:1
**daily** 56:10,20
81:12
**Dallas** 24:21 29:10
**data** 12:24 13:18
16:3,3,13 18:23
19:8,11 24:24
25:3,7,9,14,16,19
28:6,18 34:23
39:22 41:14 42:3
45:23,24 46:1,6

46:13,14 48:14,18
49:6,23,25 50:2,4
50:4,8,18,19,20
51:3,10 52:2,3
53:20 55:24 57:3
57:19 64:8 66:21
67:4,15,23 68:4,7
69:9,9 76:12
77:10 82:10 87:22
96:8 97:1,6 98:3
98:19
**database** 25:5,9,11
29:14 54:23 56:3
56:3,4,9,10,25
57:1
**databases** 56:22
**date** 26:9 36:6
101:13
**dated** 9:25
**Daubert** 10:2 12:15
53:14 77:8,8,19
81:9,9
**Davern** 13:21
29:25 72:5,21
73:11 93:4
**Davern's** 79:11
**David** 2:2 10:14
**day** 12:7 13:14 17:6
17:21 19:5,17
20:11 36:1 46:23
46:23 48:14 53:24
56:2,5,11,23 60:5
64:10 80:11 89:1
**days** 36:25 41:16
42:1 43:11 46:23
49:15,16 88:23
89:2
**day-to-day** 6:23
**deadlines** 7:4
**deal** 60:24 76:21
**deals** 59:11
**death** 34:18 38:16
38:21
**debating** 72:10
**decades** 62:11
**decide** 42:13 77:7
**decided** 42:22 48:5

49:2
**declaration** 25:1
29:1 48:19,20
66:20 67:25 73:22
75:25 83:1,10
85:5,18,23,24
86:17,21 87:12
88:8 90:5 93:23
95:13
**declarations** 44:23
71:3,25 86:23
97:19
**declined** 98:13
**defect** 6:8
**defend** 35:11
**defendant** 10:13
54:11 57:6 62:2,3
65:4 75:24 95:7
**defendants** 2:2 5:4
5:21 6:14 8:11
10:16 53:15 64:22
69:15 75:10 77:14
82:14 85:17 89:7
92:10 95:23
**defense** 6:6
**defined** 13:13
**defining** 56:20
**definite** 97:17
**delete** 47:2,3 49:2
**deleted** 48:6
**deliver** 7:16
**demonstrate** 91:23
93:6,19 100:4
**demonstrates**
100:6
**demonstrative** 4:22
**depends** 36:16
**depose** 49:17
**deposed** 49:18
**deposition** 6:6,10
7:19,19,20 13:23
16:15 17:4 19:19
20:25 22:7 28:25
29:6 30:4,9 35:3
51:18 58:19 59:3
59:9 68:21 75:14
79:11 87:4 92:14

98:13,21
**depositions** 5:17
6:16 9:6 10:2
11:4 49:13 97:21
**describe** 14:14
16:13 82:23 87:20
92:2
**described** 16:8
27:21 48:23 63:11
65:1 67:24 82:25
83:7 88:8 95:2
**describes** 27:22
45:25 73:23
**describing** 87:7,19
**description** 3:13
89:5
**descriptive** 87:22
**design** 6:8 12:18
16:15 18:5,17
50:24,25
**designations** 6:6
**designed** 16:23
17:2,4,14,19 24:7
24:8 29:16 51:2
62:20,21 87:1
**designing** 50:22
**detail** 33:2
**details** 34:10
**determine** 92:24
**determining** 56:18
**develop** 57:12 60:4
**developed** 59:21
76:3
**diagnosis** 84:14,18
**died** 34:17,21
**differed** 28:14
**difference** 77:17
87:17 89:16
**different** 5:6,6 7:23
24:9,19 27:16
33:8 50:12 56:22
88:18
**differently** 17:24
**difficult** 64:12
82:13 94:9,10
95:9
**difficulty** 56:20

64:16 88:2
**digits** 31:18
**dime** 71:12,16,20
**directed** 34:25
**directions** 7:24
**directly** 69:6
**disagree** 22:18,20
**disagreements**
22:18
**disclose** 42:5 65:7
**disclosed** 31:8,21
**discovered** 15:7
31:7
**discuss** 15:13,13
30:6 45:8 52:7
69:18 76:20 85:25
94:10 98:21
**discussed** 22:11
41:5 67:10,16,18
**discussing** 59:12,18
60:21
**discussion** 4:4 7:6
35:15 63:24
**disease** 21:15 62:6
69:5 70:15 72:5
73:5,9,11 83:8
89:12
**display** 4:22
**displayed** 5:10
**dispute** 38:18 51:9
95:11
**DISTRICT** 1:1,2,8
**divided** 17:6,21
**diving** 57:24
**doctor** 34:20 37:7
38:7 44:14 57:12
76:24 81:12 84:17
**doctors** 36:21 63:8
71:22 94:24
**document** 41:23
43:16,17 50:1
54:19 55:1
**documentation**
41:9
**documented** 41:8
42:21,25 43:2,10
**documents** 8:21

12:11
**doing** 8:24 47:20
52:22 62:9,10
68:15
**dose** 13:10,11,13
15:8 18:13 21:7
23:13 27:4 32:14
32:15,17,19,24
36:7,9 38:3 39:4,8
46:23 47:17 49:8
54:15 55:17 56:6
56:6,10,21 57:10
61:5,5,10 65:3,16
70:20 75:18,20
76:19 80:21 82:20
83:10 85:12,15
87:8 90:1,17
91:12 92:24 93:7
93:14 96:24,24,25
97:7 98:4 99:22
100:5,7
**doses** 13:4 14:12,24
17:6,16,21 19:16
28:19 29:16 30:6
37:19 50:24 56:5
56:23 76:4
**dosing** 26:7 30:21
30:23 36:17 46:22
46:24 51:11 63:18
64:11,17,21,22
88:3,6 91:23
92:25 94:20,22
95:8,15
**Dr** 13:18,21 16:1
16:14,21 17:3,16
17:19,22,23 18:6
19:13,14,18 20:5
20:12,16,22 21:4
21:8,10,13 23:5,8
23:11,15,18 24:25
25:13,21,23 27:23
27:24 28:1,4,16
28:25 29:12,25,25
30:8,8,19 31:14
32:14 33:3,14
34:23 35:3,9,11
35:12 37:2,9 39:6

39:10,10,22 40:9
40:17 42:19 43:3
43:9,12,14,15,17
43:18,19 44:7,17
44:18,24 45:4,14
46:1,5,13 47:5,8
47:14 48:5,18,19
48:23 49:13,14,14
49:25 50:10,14,25
51:17,19 52:1
58:6,10,18 59:11
60:14 64:24 65:3
66:12,13,14,19
67:8,25 68:20
69:2,16,17,17
71:17 72:2,5,21
72:21,21,22,23,23
73:8,11 74:4,4,17
74:17 75:6,6,14
75:25,25 76:16,17
76:19 78:6,19,20
79:6,11,15,17,24
79:25 80:11,24
81:3,13,18 82:11
82:15,17,24,25
83:3,3,9,10,23
84:23 85:2,4,7,9
85:14,18,23 86:9
86:9,12,13 87:4
88:8,15 91:9
92:10,10,13,15,20
93:3,3,4,8,9 94:6
94:12,13,14,18
95:11,12,12 97:3
97:4,15,16 98:11
98:12,13,13,18
**draft** 66:17
**drafted** 73:17
86:22,22
**drafts** 30:14 86:18
**drinking** 34:13
35:25
**drive** 7:15 8:3
**Drs** 18:22 22:24
74:3 86:10
**drug** 19:17,22 21:6
50:12 58:7 65:18

69:21
**drugs** 69:25
**drug-induced** 72:5
72:20 73:5,11
83:7
**due** 6:11,12,20
31:21 70:12,19
81:1 85:11
**duration** 36:8
**d-CON** 34:15,15
35:4,5,12 36:24
46:16 47:3
**D.C** 1:18

_____

**E**
**E** 3:1,12 101:1
**eager** 41:16 42:4
**earlier** 27:21 29:7
50:7 82:3
**early** 41:16 42:1
43:11 61:9 65:23
**East** 1:15 6:17
**EASTERN** 1:2
**Edition** 25:25
**editors** 31:10
**effect** 68:6
**effective** 20:10
**efficient** 11:8
**eh** 50:4
**EHRs** 56:2,9
**either** 20:3 40:2
49:20 61:4
**elected** 21:21,21
**electronic** 1:21
101:7
**elevated** 57:4
**email** 45:24 80:11
81:17,25
**emails** 79:11 80:5
98:12,14
**emphasize** 65:11
71:21 78:6
**emphasized** 25:13
**employ** 79:20 81:10
93:10
**employed** 69:8
**encephalopathy**

26:10,13
**encourages** 86:6
**ends** 88:16,17
**enroll** 24:8 79:19
**enrolled** 26:12
36:22 84:9
**enrollee** 42:15
**entered** 25:4,7
**entitled** 5:19
**entry** 25:8
**epidemiological**
17:10 51:5
**epidemiology**
57:19
**equal** 72:13 89:20
**equipment** 10:18
**errata** 49:5
**error** 39:13,14
44:12,15 51:19,20
**ESQUIRE** 1:10,13
1:17 2:2,5
**ESR** 100:23
**essentially** 11:7
15:5 16:19
**establish** 12:19
13:23 18:20 54:10
97:2,6 98:4
**established** 18:24
**establishes** 98:5
**establishing** 15:20
**estimated** 92:17,23
**ETOH** 26:16
**evaluate** 39:7
**evaluated** 15:14
30:5
**evaluation** 48:21
**event** 4:3
**eventually** 47:19
**everybody** 22:2
93:4 94:6
**evidence** 6:12 11:9
12:11,13,15,25
13:2 14:8 22:14
31:8 32:23 52:18
56:17 57:15,18
65:13 73:17 96:9
98:15

**exactly** 17:23 49:25
  86:7,20 89:1,21
**examine** 49:12,13
**examining** 51:8
**example** 8:25 35:14
  51:25 54:18,24
  82:12 92:13
**examples** 51:13
  79:9
**exclude** 34:1
**excluded** 46:10,16
  46:18,20 47:7,9
  47:13 48:21,25
  49:6,21 99:1
**excreted** 92:6
**excuse** 14:20 29:25
  60:25
**exhibit** 28:24,24
  82:14 83:9 84:1
**exhibits** 5:13 53:4
**exist** 76:22
**existing** 22:14
**exists** 77:20
**expect** 42:24 95:9
**expected** 74:17
  94:23,24
**expects** 43:3,5,12
**expedited** 7:11 8:2
  52:16
**experience** 60:6
**expert** 12:6 14:7
  30:1 74:3,15 77:5
  80:4,12 95:24
**experts** 13:7,19,21
  14:10,14 44:24
  64:23 69:16,19
  72:18 73:3,5,12
  73:16 75:5,6,10
  75:23 76:11,12
  79:3 81:10 89:25
  90:20 91:6,16
  92:9,10 94:7
  95:23 97:3,5
  98:25
**expert's** 97:21
**explain** 37:17 46:3
  76:3,9,9 98:14

**explained** 23:19
  40:9
**explanation** 49:5
**explore** 79:3
**exposed** 90:9
**extensively** 66:20
**extent** 9:8,11
**extra** 5:7
**eye** 97:12

───────────
F
**F** 1:7 56:9 67:5
  101:1
**fact** 28:25 29:21
  38:15 44:21 45:21
  54:6 57:17 58:11
  61:22 68:20 70:23
  73:7 74:13 76:11
  76:15 87:14
**factors** 26:15
**failed** 26:21 73:16
  76:15,20
**failure** 6:7,15,19
  7:7 12:4,8 13:5
  14:6,11,16 18:8
  33:13 51:8 54:7
  56:4 57:13 59:21
  59:24 60:4,7,9,22
  61:4 62:7,13,22
  63:2 65:2 66:22
  67:2,11 68:8,13
  69:20,23,24 70:8
  70:10,12,18 71:8
  71:11,16,18 72:20
  73:1,6 74:10,18
  76:4,25 77:3,15
  78:21 79:18,19,20
  79:25 80:2,8,9,13
  80:15,17,20,25
  81:1,5 82:4 83:6
  85:10 87:21 88:13
  89:6,11,20 90:3
  90:16,18 91:1,2
  92:3 93:10 98:3
**failures** 70:17
**fairly** 65:8
**falls** 30:20 48:9

**familiar** 55:1
**farce** 79:13
**fashion** 41:22
  74:16
**fast** 6:13 7:24
**father** 36:20 37:24
**faulty** 50:17
**favor** 22:14
**faxed** 24:21
**FDA** 14:1 15:3
  20:23 21:3,4,11
  31:9 44:21,25
  45:5,14,17 49:11
  51:21 53:20 54:18
  54:22,25 55:3
  56:3,15,19,19,24
  60:10 62:4,4,6
  65:13,14 77:25
  78:4,7,18 93:13
  93:16
**features** 76:3
**federal** 12:14 50:6
  78:4
**federally** 59:20
**feel** 5:18
**fell** 28:20
**female** 34:13 36:24
**Ferry** 1:15
**fewer** 70:18
**field** 39:14 73:5
**fields** 73:3
**figure** 8:8
**filed** 10:2 79:16
  80:12 85:17,23,24
  86:8,12 87:1
**filing** 60:21
**filings** 10:4
**fill** 84:20
**filled** 24:17 25:4
  84:8
**final** 31:1 84:14,18
**finally** 13:24 26:25
  27:8 38:19 50:10
  98:17,23
**find** 40:11 78:1
  84:13 85:20 94:25
**Finlay** 22:16

**first** 4:10 12:9,18
  15:18 18:19 25:24
  31:14,17,18 35:9
  37:9 41:10 52:14
  54:6 57:14 62:23
  66:17 70:25 74:14
  77:18 80:22 85:17
**FISHBEIN** 1:11
**fits** 65:20 87:22
  89:1 95:19
**five** 49:6 68:19
  88:23 89:2
**five-year** 80:1
**Flamm** 64:24 65:3
  69:17 72:23 73:8
  74:4,17 76:16,19
  78:20 82:17,24
  83:10 85:2,7,9,14
  86:10 88:15 92:13
  92:20 93:9
**Flamm's** 82:15
  83:3,3,23 84:23
**flawed** 31:1 35:16
  44:9,17 49:24
  50:2,18,19 51:12
  51:24 52:2 79:3
**flaws** 12:23 39:6
  68:23
**focus** 21:22 27:17
  66:4 70:1 83:18
  83:20
**focused** 55:2 66:3
  69:19 89:14
**follow** 5:15 42:18
**followed** 28:17
**following** 21:3
  58:18 71:3
**follows** 12:17
**follow-up** 15:11
**footnote** 56:8
**foregoing** 101:6
**forget** 70:4
**form** 24:4 26:19
  27:3,14,16 30:18
  35:17 37:5,8
  83:14,18,20 84:7
  84:8,15 85:21

**format** 5:6
**forms** 15:23,25
  16:4,9,11 24:6,22
  25:4 29:4,8 38:13
  68:25 78:13 82:5
  84:6,7
**formula** 91:18,18
  93:5,17
**forth** 60:1 86:18
**forthcoming** 15:16
**forum** 60:10
**forward** 40:24,25
  40:25 58:9 71:23
  93:15
**found** 40:16 41:19
  45:21 93:16
**Foundation** 62:6
**four** 26:11,11 33:9
  33:11 37:7 38:15
  44:8,16,18,18
  70:3,4
**fourth** 55:10
**frame** 11:4
**frankly** 41:19 59:6
  59:7 63:20
**freely** 95:13
**Friday** 85:17,24
  87:1 94:13
**friendly** 22:18
**frivolous** 87:1
**front** 18:1
**fulfill** 39:23
**full** 6:2
**fund** 71:17
**funded** 59:20 78:5
**furnished** 9:9
**further** 70:21 82:21

───────────
G
**GA** 1:15
**garbage** 25:15,15
**gatekeeping** 12:14
**general** 19:21,22
**generally** 9:20
**generic** 36:5 60:24
  61:13
**genetic** 75:24 76:1

76:2,8 98:19
**GEREL** 1:17
**getting** 25:14 64:16
**give** 4:12,15 8:23
  21:18 26:2 62:19
  79:8 82:12 83:23
  84:11 87:19 94:25
**given** 5:1 9:19
  34:23 36:20 41:11
  75:11 88:24 91:23
**gives** 92:6
**giving** 61:11 64:16
  81:24 88:2,3,13
**global** 59:19
**go** 17:24 33:1 34:10
  40:21 42:21 47:15
  48:3 53:25 56:14
  56:14 58:11,13
  59:10 60:10,18
  63:22 69:13 72:8
  72:16,24 74:6
  75:3 85:4 89:23
  94:12,14 99:23
**God** 97:21
**goes** 25:15 57:12
  64:6 77:10
**going** 5:10 6:2,13
  7:23 8:18 10:12
  10:15 15:24 20:14
  24:4 27:5 30:2
  31:23 32:7 34:9
  34:10 40:14 45:10
  45:15 46:12 47:11
  48:10 52:25 53:21
  58:12 74:25 75:18
  77:13 79:6,8
  80:18 82:12 95:9
  95:21 96:13,23
  97:10,11
**good** 5:22,23 8:14
  8:15 25:14,16
  41:15
**gotten** 88:25
**government** 78:4
**grades** 26:11
**Grail** 93:17
**grams** 12:6 13:14

14:5 17:6,21 18:9
  19:5,16 20:11
  23:6,10 28:9,21
  32:20,20,21 35:25
  36:1,11 40:3
  48:14 56:1,5,11
  56:23 57:3,23
  58:8,10,18,23
  59:24,25,25 60:5
  61:4 64:10 76:6
  76:25 83:11 87:8
  88:23 89:1,6,20
  98:19
**grant** 43:5 67:1
  71:9,19
**graphics** 100:13
**gray** 46:10,10,17
  46:18
**graying** 47:6
**great** 33:2
**green** 46:19 47:18
**grotesque** 45:7
**group** 6:16,20 7:7
  12:4 14:1 15:5
  16:22 17:10 47:25
  54:19,25 55:4,12
  56:4,15,19 57:8
  59:21 60:9,22
  62:4,8,13 65:14
  66:23 67:2,11
  68:8,13 69:23,24
  71:8,18 74:19
  76:7 77:15 78:21
  79:18,19,25 80:2
  80:9,13,20 81:5
  87:22 88:7,13
  90:19 93:10 98:3
**groups** 80:8
**Group's** 82:4
**guess** 21:8
**guilty** 10:19,22
**guise** 94:2
**gun** 90:15 97:11,13
  97:21,22 99:20
**guys** 81:6

---
**H**
---

**H** 3:12
**half** 60:20 63:3,6
  91:14,21 92:23
  96:5
**hand** 32:2 53:8
**handful** 32:12,13
  89:14
**handle** 96:25
**handling** 96:23
**hands** 7:20
**handy** 40:8
**hand-up** 5:14
**Hang** 39:17 74:1
**happen** 68:24
**happened** 29:3
  65:24 69:11 80:3
**happens** 22:2 90:11
**hard** 26:3
**harm** 63:4
**Hayes** 61:1
**hazardous** 64:10
**head-down** 25:7
**Health** 53:19 66:25
  67:6 68:17 69:10
  78:9
**hear** 52:15 53:19
  75:1,19 77:10
**heard** 21:16 31:13
  72:17 73:13 89:19
  97:22
**hearing** 7:3,8,11,16
  77:8
**hearsay** 98:16
**heavily** 61:14
**heavy** 36:25
**help** 29:16 76:9
  85:21
**helped** 33:20
**helpful** 9:16
**HENRY** 1:14
**hepatic** 26:10,13
  56:2
**hepatitic** 35:21
**hepatitis** 70:14
  73:3
**hepatologist** 13:17
**Hepatology** 31:11

51:22 53:18 78:19
**hepatotoxicity** 20:6
  57:4
**herbs** 26:22
**hey** 49:5
**high** 75:20,20 92:6
  92:7 97:6
**higher** 77:21,22
  78:3
**highest** 77:24
**highlight** 26:20
**highlighted** 28:10
**highlights** 39:6
**highly** 51:12
**histories** 26:7 30:21
  63:15 95:1
**history** 30:23 36:20
  37:24 63:18 64:17
  64:21,22 88:3,3
  91:23 94:20,22
  95:2,8,15
**hoc** 90:25
**holder** 71:9
**Holy** 93:16
**honor** 4:8 5:18,22
  6:1,20 7:8 8:13,23
  9:8,18,23 10:14
  10:20 11:3 12:2
  13:12,24 20:22
  21:18 25:24 30:1
  31:5 32:22 33:2
  36:3 39:5 41:19
  42:5 45:7 48:17
  50:21 52:5 53:2
  55:21 63:20 66:9
  66:19 69:7 73:20
  73:25 80:23 83:24
  84:13 90:23 93:23
  93:24 94:8 96:3
  96:20 97:8 98:23
  99:14 100:8,10
**HONORABLE** 1:7
**Honor's** 5:12 9:15
**hooey** 93:21
**hope** 12:12
**hospital** 27:12 40:5
  57:9 76:23 88:25

89:2 100:2
**hospitalization**
  41:15 88:22
**hour** 11:15
**housekeeping**
  100:10
**human** 60:3
**hundred** 80:7
**hurry** 47:11 48:10
**Hy** 21:18
**hypothesis** 50:22
**hypothetical** 92:1

---
**I**
---

**idea** 5:10
**identical** 54:22
**identified** 15:14
  16:4 28:5 68:6
**identify** 12:22 23:3
**identifying** 88:14
**idiopathic** 84:22
**ignored** 34:3
**ignores** 60:15
**illustrate** 58:2,4
  62:13 73:7 99:23
**illustrates** 79:13
**immediately** 35:11
**importance** 73:23
**important** 14:15
  18:17 25:6 26:17
  29:2 43:1 48:12
  48:16 49:24 52:16
  52:19 57:16 61:13
  63:5,10 66:18
  72:10 73:17 74:24
  77:20 83:14,17
  86:4 90:22 92:8
  95:19
**importantly** 54:13
  69:17 78:19 80:6
**inappropriately**
  92:7
**inattention** 79:19
**include** 95:12
**included** 43:21
  44:5 80:6 82:18
  90:13

**including** 26:22
57:6 61:10 64:21
67:3,4,4 73:18
**incorrect** 38:2
91:24
**increase** 55:17
61:12
**independent** 77:23
**indeterminate**
84:22
**indicate** 47:6,16
90:1 97:17
**indicated** 52:23
54:13,20 56:24
57:6 58:5,6,10
78:7 88:22 90:1,3
92:13
**indicates** 56:9 57:3
84:18,19 88:1
90:6 91:3
**indicating** 34:20
**indicia** 77:20 91:3
**indiscernible** 5:8
7:19 8:4,4 9:16
24:15 40:18,19,24
47:3 84:15 97:14
100:17,20
**individual** 42:22
57:5 68:11
**individually** 42:17
94:15
**individuals** 56:7
**induced** 59:23
**indulgence** 99:15
**inevitably** 68:24
**information** 4:16
8:21 9:10 15:15
15:17 27:7 30:16
30:18 31:20 37:11
37:14 39:8 48:12
64:11 66:14 68:3
86:16,16 88:14
95:4
**informed** 41:24
**ingestion** 14:12
15:8,20 17:6,21
18:2,9,13,25 19:4

**ingestions** 22:4,8
**ingredient** 15:1
**initial** 80:24
**initially** 38:10
**injury** 13:5 22:2
33:13 50:14 56:2
64:8 72:20
**Institute** 53:19
**Institutes** 66:25
67:6 68:16 69:10
78:8
**institution** 34:19
36:16 65:1 88:17
**instructions** 61:11
65:15
**intend** 59:6
**intended** 59:6
**intent** 5:4
**interesting** 83:13
83:19
**interestingly** 73:9
75:22
**internal** 67:24
**investigate** 86:7
**investigator** 36:21
36:22 41:7 51:14
71:7,7,13 72:6
79:23
**investigators** 24:19
30:8 32:13 33:7
67:14 68:1 90:19
**invite** 97:25
**invited** 20:23 21:17
21:18
**involved** 11:4 54:16
66:12 68:14 82:2
**involves** 6:7 34:12
91:15
**involving** 50:12
92:12
**IN-PERSON** 1:7
**issue** 6:20 7:20
42:11 53:25 58:17
60:25 65:22 75:8

75:8 79:22 85:17
85:19 87:14 89:24
91:14 93:13 96:6
99:19,20
**issues** 6:2,24 52:6
53:25 54:5 58:16
63:17 67:10,15
72:10 80:21,22
85:16

――――――――――

### J

**Jackson** 6:8 13:15
**January** 9:25 29:1
69:14 70:3 82:8
82:17 86:22 89:8
90:23
**Jersey** 4:6,11,16
6:20,22 8:19,24
13:16
**jive** 78:14
**job** 66:14
**Johnson** 4:14 7:3
7:17 8:25 9:3,14
9:18 10:23 52:20
61:18,23
**Johnson's** 8:6 9:24
**Jones** 2:5 8:12,13
8:15,15 10:14
11:19 100:21
**Journal** 31:10
41:25 53:18 78:19
**Judge** 1:8 4:13 7:2
7:3,16 8:6,25 9:3
9:14,18,23 10:23
11:18 52:14,20
61:18,23
**Judi** 2:9 101:4,13
**jump** 53:1
**jumping** 40:22
**June** 45:14,18
**jury** 6:11,25 77:11
89:18,18 96:9

――――――――――

### K

**K** 1:18
**Kaplowitz** 13:18
72:2,21 93:3

**keep** 9:18 29:2
**keeps** 40:22
**Kemp** 10:1,24
**key** 26:4
**kind** 90:4
**kinds** 68:25
**knew** 20:20 37:14
38:14
**know** 5:16,19 7:10
19:21 23:5,8,15
23:15 34:4 36:6,7
36:7 38:8,10,11
43:17,18 45:1
51:21,22,23,23
63:17 74:7,8,9
78:10,11 80:13,14
80:15,16 81:6,25
82:1 83:16 84:25
85:3,3,14 87:17
93:16 96:22 98:6
100:1
**knowledge** 61:7
75:12
**known** 5:4 16:8
17:11 21:15,19
33:12
**knows** 54:17
**Kort** 76:6

――――――――――

### L

**labs** 41:18
**lack** 23:23,24 43:4
43:6,7
**largely** 90:19
**larger** 57:18,18
**largest** 60:6
**Larson** 12:5,19,22
13:8,19 14:2 15:4
15:10 16:1,14,21
17:3,14,19,19,23
18:22,24 19:7
20:5,7,8,12,16
22:25 23:4,8 24:3
24:20 27:17,23
28:1,4,16 30:8
33:18 35:9,11
37:2,9 39:6,10

43:14,17,19 44:7
44:18 45:16,18,19
45:22 46:5,7,14
47:5,8,14,24 48:6
48:18,23 49:4,14
50:25 51:1,19
52:1 54:21 59:13
59:18 62:17 66:2
66:14 71:10,13,14
72:6,22 75:6 87:8
92:10 94:13,14
95:12 96:10 97:4
97:15
**Lastly** 9:13
**late** 6:4
**LAURA** 2:8
**Laurence** 1:10 4:8
**law** 1:10 82:7 86:6
**LAWRENCE** 1:7
**lawyers** 86:6,9,18
86:23
**lead** 7:18 16:1
51:14,14 71:14
**learn** 75:5 85:12
**learned** 25:8 48:24
49:19 83:8 97:20
**Lee** 17:16,22 18:6
18:22 19:13,18
20:22 21:4,8,10
21:13 22:24 23:5
23:11,15,18 24:25
25:13,21,23 27:24
28:25 29:12 30:8
30:19 31:14 32:14
33:3,15 34:23
35:3,12 39:10,22
40:7,9,17 43:15
43:18 44:17,24
45:4,14 46:1 48:5
48:19 49:14 50:10
50:14,25 58:6,10
58:18 59:11 60:14
66:12 67:25 69:2
71:6 72:21 73:22
75:6,14 76:17
79:24 85:18,23,24
86:9,9,13 87:4

90:5 91:9 92:10
93:3 94:6,18
95:12 97:3,16
98:18
**Lee's** 43:9 46:13
51:17 75:25 82:25
83:9 85:4 88:8
**left** 87:10
**let's** 17:13,24 19:2
35:17 39:16 40:11
42:21 48:2 52:9
85:16 91:7,14
94:15
**level** 27:10,10
36:13,14,16,18
40:4 92:6,7 100:4
**levels** 74:20,25 75:1
97:23
**LEVIN** 1:10
**LIABILITY** 1:5
**life** 81:12 91:14,21
92:23
**limb** 95:24
**limine** 9:15
**limit** 28:13
**limited** 4:2
**line** 30:9,10 59:12
60:3 72:18
**lines** 30:12 65:13
98:21
**lining** 6:10
**list** 6:12 36:2
**listed** 36:4 70:22
82:20
**literature** 57:7
59:22 60:15 78:14
87:24 95:14
**litigation** 1:6 9:20
14:4 31:7 69:19
77:23 85:9 90:21
**little** 16:11 17:24
46:2 50:4 52:24
64:10 65:6 77:13
84:20
**liver** 6:15,19 7:7
12:4,7 13:5,5 14:6
14:11,15 18:8

21:15 22:1 33:13
33:13 50:13 51:8
54:7 56:4 57:13
59:21,23 60:4,7,9
60:22 61:4 62:6,6
62:7,13,22 63:1
64:8 65:2 66:22
67:2,11 68:8,13
69:20,23,24 70:8
70:10,12,15,17,18
71:8,11,16,18
72:5,20,20,25
73:4,5,6,9,11
74:10,18 76:4,24
77:3,15 78:20
79:17,24 80:2,8,8
80:13,15,17,20,25
81:1,4 82:4 83:6,8
85:10 87:21 88:13
89:5,11,11,20
90:3,16,18 91:1,2
92:3,5 93:10 98:2
**LLP** 1:14,17 2:2,5
**lo** 76:5
**location** 38:9
**long** 54:16 65:24
90:9
**look** 8:3 16:10 19:2
24:4 28:13 34:9
35:17,18 39:16
55:15 56:8 62:20
62:21 66:7,9 69:1
74:7 80:14 87:2
91:20 97:25
**looked** 28:6,17,18
29:3 41:15 54:19
**looking** 28:22
45:22 46:13 52:21
66:12 74:15
**looks** 21:11 81:17
**loop** 9:19
**Lortab** 36:5
**Los** 37:6
**lot** 7:23 15:24
21:16 44:20 49:17
63:14 65:4 68:10
69:25 76:13 95:7

98:11
**low** 13:10,11,13
14:12 17:16 18:13
27:4 29:16 30:21
32:14,17 47:17
49:8 50:24 54:15
65:3 70:20 76:4
97:5,7
**lowered** 55:17
65:16
**lowering** 61:10
**low-dose** 12:3,22
12:24 13:20 14:3
15:4,20 18:2,15
18:25 20:20 22:4
22:8,23 29:20,22
30:5,7,16 31:16
33:4 39:1,12 44:9
44:19 48:13,24
49:7 51:9,16 54:7
63:12 67:17 73:19
76:18 78:11 82:23
87:19,21 93:19
97:2
**L.A** 34:19 38:17

## M

**M** 2:2
**Macrobid** 33:8,11
90:11
**main** 4:3 29:9,19
38:8
**major** 95:10
**making** 12:12
37:23
**manner** 5:6,20
**Manual** 16:8 18:3
25:12,22,23 29:19
29:22
**Manuals** 67:3
**manufacturer**
55:24
**manuscript** 30:14
**march** 80:10 81:17
82:9,9 93:22
**marching** 70:2 81:5
89:8 90:23

**margin** 54:8,10
55:18 57:22 61:8
61:12 64:9 65:17
93:20
**mark** 22:5,9
**marked** 3:13,14
28:24
**Market** 1:24
**MARKETING** 1:4
**math** 37:21
**Matt** 40:7
**matter** 52:17 68:12
100:11 101:8
**maximum** 19:16
32:19 36:18 56:6
**McNeil** 15:16 56:16
57:21 61:6,20,25
62:11 66:1 74:19
85:23 86:12,20
90:20 93:15
**McNeil's** 65:22
73:16 76:11 80:4
89:25 91:6,17
**MDL** 9:2 13:3,22
30:2
**mean** 47:20 75:9
82:6 87:7 95:3,5
95:15 96:8
**means** 22:17 25:8
26:13 40:1 46:10
**meant** 26:20 47:15
**measure** 91:19
99:22 100:7
**measures** 61:9
99:21 100:6
**median** 56:10,11
87:7,7
**medical** 13:3 22:25
34:19 46:12 57:7
57:21 59:22 60:14
61:16,19,24 62:14
63:15,16 64:24
72:11 78:14,15
79:7 84:17 88:3
95:14
**medication** 33:10
36:2 64:4

**medications** 26:19
26:21 32:10
**medicine** 18:21
22:17 39:15 44:13
44:15
**meds** 26:23
**meet** 7:4 43:25
86:14
**meeting** 21:16
23:16 67:13
**meetings** 67:8
**meets** 81:13
**member** 38:24
**members** 69:23
74:18
**memo** 82:7,8
**mental** 26:13 35:22
**mention** 29:23 30:3
48:18,19,20
**mentioned** 7:1 9:17
24:3 27:18 70:13
70:14
**met** 86:14
**methodologically**
35:15
**methodology** 12:21
12:24 23:2 24:2
31:2 39:7 41:21
44:9,22 66:6,19
68:12 69:8 70:5
78:10 81:11 82:5
98:24
**methods** 49:22,22
51:9
**meticulously** 68:22
**midpoint** 56:12
**MID-ATLANTIC**
1:23
**mid-February**
86:15
**mid-2000s** 61:9
79:18
**milligrams** 36:11
37:14,16 38:1
**milliliter** 97:24
**Milling** 1:13,14
4:12 5:22,23,24

5:24 8:1,6,17 9:13
  52:20
**mind** 29:2 32:1
**minimum** 49:20
**minute** 60:19
**minutes** 34:11 52:6
  96:17,19
**misfired** 97:13,22
  97:23
**missing** 24:24
  68:25
**moment** 11:20
  22:12 24:4 26:2
  27:18 69:18 72:16
  79:1 84:2,12
  100:22
**monitoring** 67:23
  68:7
**monthly** 20:3 67:7
**months** 26:22
  41:10 71:2 78:17
  80:11 82:3
**morning** 5:22,23
  8:14,15
**mother** 97:10
**motion** 6:15 10:24
  82:14 85:23 86:8
  86:11,25 96:2
**motions** 7:21 9:15
  10:1 60:21
**mountain** 11:8
**movie** 96:22 97:9
**moving** 18:15
**multiple** 6:2 58:9
**multiply** 37:19
**mushrooms** 26:22

**N**

**N** 3:1 101:1
**name** 80:18 81:4
**nanomoles** 97:17
  97:24
**narrow** 54:8 57:22
  61:7 64:9
**National** 1:23
  53:19 66:25 67:6
  68:16 69:10 78:8

**nation's** 72:3
**NE** 1:15
**near** 57:23 61:4
**necessary** 77:19
**need** 26:2 45:8 72:9
  72:18
**needs** 73:25
**never** 27:3,4 29:3,5
  30:5,5 31:8,13
  38:7 41:24 43:10
  44:25 45:3,4,6
  49:9,10,11 76:11
  79:3 92:11 93:1,9
  93:22,25 95:11
**Nevertheless** 79:21
**new** 2:3 4:6,11,16
  6:20,22 8:19,24
  13:16 74:7 80:1
  82:8
**NH** 71:18
**NIH** 31:9 42:10
  43:3,4,12 44:21
  45:1,6 49:11 50:1
  50:1,3,5,6 51:22
  67:20,25 71:9,17
  77:25 78:18
**NIH-funded** 62:23
**nitrofurantoin**
  33:10
**non-litigation**
  90:20
**non-party** 42:9
  49:16
**normal** 100:5
**note** 34:18 37:4
  60:16 71:21 92:8
**noted** 28:6 34:16
  61:19
**notice** 5:1,19 71:24
  84:5
**noting** 27:3
**number** 3:13 21:23
  31:19,24 36:14
  55:3,3 58:23 61:3
  61:6 70:7,11,16
  82:14 85:22 87:14
  88:7,16,16 89:4

89:23 92:1 99:24
**numbers** 31:24
  93:18
**numerous** 61:23
**NW** 1:18
**NY** 2:3

**O**

**O** 101:1
**objection** 5:20
  10:25 18:4
**objections** 31:6
**observation** 89:21
**observations** 14:18
  18:16 57:19
**obviously** 32:13
  44:17 51:12 52:16
**occur** 56:22 59:24
  59:25,25
**occurred** 97:7
**October** 13:16
**odds** 16:25
**offer** 18:16
**offered** 98:12
**office** 10:15 34:19
  37:4,5 38:17
**officer** 42:10
**OFFICES** 1:10
**official** 71:17
**oh** 37:3 40:20 41:5
  75:19 97:21,21
  98:4
**okay** 4:18 7:25 8:5
  9:12 10:6,11,21
  11:1 37:12 45:3
  45:20 50:4,8
  55:23 81:22 85:22
  86:2 91:8 99:8,17
  100:15
**old** 96:22
**Olsen** 2:9 101:4,13
**Once** 25:2
**once-a-year** 67:13
**ones** 79:12
**onset** 26:9 64:7
**on-goings** 4:17
**Oops** 98:5

**Operation** 67:3
**Operations** 16:9
  18:3 25:12,22,23
  29:19,22
**OPERATOR** 2:8
  100:23
**opine** 21:6
**opinion** 12:6,6 14:7
  59:22 87:12
**opinions** 60:8
  72:12
**opportunities**
  60:11
**opposition** 85:25
**oral** 7:22
**order** 5:12 7:5 9:24
  9:24,25 26:12
**OTC** 26:23
**ought** 60:16 70:24
  95:25
**outcome** 84:8
**outside** 28:20 61:21
  81:3
**outstanding** 35:14
**overdose** 21:25,25
  27:2,5,6,19 32:11
  34:14,21 36:10,24
  37:6 38:5,8,15
  46:22 47:17,22
  64:3 97:18 98:5
**overdoses** 22:1
  27:20
**over-the-counter**
  15:2

**P**

**PA** 1:4,12,24
**Paces** 1:15
**packed** 4:3
**page** 3:1 24:7 25:25
  27:21 30:9,12
  55:3,14,15,16
  56:14 58:19,22
  59:11 63:23,24
  73:23 83:1,1 90:6
  91:9 92:14,21
  98:20

**pages** 73:25
**paid** 71:12,16,19
**pain** 63:8 64:4
**paper** 12:5,19 13:8
  13:13,20,22 14:2
  16:2,4 17:14,14
  18:6 19:7,15
  20:19 24:20 27:19
  27:24 28:1 29:4,8
  30:2 31:3 33:18
  35:10,10,14 38:12
  43:22 44:5,5,11
  45:20 51:15 59:13
  59:19 63:24 65:6
  66:9,9,11 72:7
  80:18 87:22 95:18
  95:19 99:1
**papers** 44:23 61:22
  79:16 98:18,22,22
**paperwork** 79:20
**paper's** 96:10
**paragraph** 13:7,9
  15:10,12 23:4
  27:20 31:3 32:21
  54:21 55:2,3 87:6
  87:9
**parcel** 13:2
**Park** 2:6
**part** 12:14 13:2
  24:10 30:15 37:3
  41:8 42:17 45:23
  47:25 57:17 61:25
  63:5,9 66:11 68:1
  78:20 83:15,20
**participant** 70:22
**participate** 4:15
  79:25
**participated** 70:23
**particular** 55:2
  62:17
**parties** 6:2,22
  52:17 96:8
**parts** 27:16 65:6
  83:14,17
**party** 10:19
**passed** 53:17 68:19
**passeded** 53:17

patient 24:11 35:21 36:3,23 43:19,20 43:21 44:3,4,4 64:25 68:4 75:18 76:5,22 82:15,16 82:19 84:8,10,14 84:19,20 85:5,6 88:13,23,24 90:9 90:11 91:21,24 92:3,24 100:3,3,5
patients 24:8 27:11 27:19 28:14 43:24 59:23 63:6 64:3 64:12,14,16 65:8 67:21,22 68:2 71:22 74:9,9,12 74:20,22 76:1,3,6 76:7 80:25 88:2,6 89:6,9,10 90:2,6,8 90:17 94:24,25 95:2
patient's 39:24
Patricia 42:8
pattern 89:1
Pause 10:9 39:19
peer 31:10 41:24 51:24 53:17 65:25 68:17 77:19
peer-reviewed 78:5 87:24
PENNSYLVANIA 1:2
people 21:7 22:17 37:8 51:23 56:23 57:9 63:3,25 71:4 72:10 76:10,10
percent 32:18 39:13 44:13,15 49:21 51:19,20
performed 42:20 73:14,19
period 6:22 11:10 11:10 19:10 36:1
permission 53:5
permitted 52:7
person 34:20 41:21 57:12 73:10 91:20

personally 65:3
person's 91:19
perspective 8:12
ph 6:3,7 22:16 53:9 60:25 61:1 69:17 74:4 76:6 86:11 92:15
phenomenon 87:21 92:2
Philadelphia 1:4,12 1:24
Phone 24:13
phrased 30:24
physician 24:22,23
physicians 22:20
picking 65:6
picture 60:18,24 63:11 77:14,14
pieces 59:8
pills 37:22,25
pinned 21:9 23:14
place 71:1
places 33:9,11 38:16
plaintiff 5:25 13:19 14:7
plaintiffs 1:10 4:9 4:21 7:10 9:4 13:1,5,6,17,25 14:10 16:2 21:1 30:1 31:6,25 42:8 44:20 52:8 61:14 75:5 92:9 96:25 98:24
plan 7:19 45:19
played 79:7
please 39:17
plug 93:18
point 4:19 16:11 21:4,5 22:8 48:17 50:1,3,5,9 54:24 56:15 57:2 58:2,3 73:7 74:18 75:23 77:18 78:16 81:15 86:20 87:18 90:22 93:8,12 96:3 99:13,23

pointed 52:20 76:17
pointing 19:7
points 4:10
poison 34:16
poisoning 47:3
polymorphism 76:8 98:18
polymorphisms 75:24
poor 25:19
portion 85:20
portions 33:6
pose 12:16
posing 12:9
positive 85:14
possibly 85:10 96:6
post 90:24
post-study 91:5
potentially 39:3
PowerPoint 5:8 52:24
practical 52:17
practice 41:13 42:1 44:15
practices 1:5 67:3
precise 32:14 64:11
predetermined 42:3
preface 19:6 21:21 59:14
prefix 88:11
preliminarily 16:12
preliminary 14:17
prepare 32:25 33:1 53:2
prepared 5:14 32:1
presence 73:18 75:15 85:6 91:11
present 32:23 38:20 94:2
presentation 4:23 5:20 11:7 21:14 21:18,19,20,22,24 21:24 52:25
presentations 5:5

presented 10:23 34:22 53:20 67:10
presently 18:18
presents 52:8 56:2 56:6 91:20
prespecified 40:10
presumably 46:7
presume 77:22
pretrials 6:24
pretty 8:6 32:16 53:13
previous 41:15
previously 9:23 76:21
primary 27:23 75:7 97:16
principal 13:17 51:14 71:7
principle 18:21 52:3
printed 100:14
prior 23:19 36:25 77:23 78:8,9
private 71:6
probably 49:10 81:1
problem 21:25 40:15 46:22 65:7 65:18 66:5 82:3 91:25 98:23,25
problems 50:8 68:3
procedurally 66:1
procedures 66:21 68:17,18
proceeded 35:22
proceeding 23:20 31:5 79:14 82:2 100:24
proceedings 1:21 101:7
process 48:21 66:16 79:2,4
produced 1:22 11:9 51:18 69:15 79:11
product 36:4 61:11
products 1:5 15:2
Professional 101:5

program 42:10
project 25:18 45:24 46:1 48:18
proof 23:23
proofs 96:9
proper 79:20
properly 43:20,21
proposition 54:4 63:21
protocol 16:8 17:25 29:15,17,19,23,24 42:17,18 50:3,5
prove 13:6 22:13 23:21
proven 93:1,1
provide 5:13 41:9 71:24 94:17
provided 9:4,15,23 10:1,3 27:15 44:25 64:22,25 66:15 67:20 68:3 69:10 71:3 72:1 72:14 75:4 86:21
providing 9:5
public 49:9 59:15 60:10
publically 31:14
publication 33:4 80:6
publications 72:19 75:4
public's 87:24
publish 19:10 45:16 49:23
published 12:4 14:13,23 15:10,11 16:24 19:3,8,13 20:7,8,15,17,19 22:25 23:6,9,10 30:12 31:11 33:14 59:16 60:15 70:25 71:15 72:4 75:6 75:10 78:9 80:18 80:19 93:25 97:15 98:2
publishers 75:8
pulled 51:3 58:25

purchased 14:25
purpose 11:3,5,6
59:1
purposes 89:17,18
put 25:11 46:25
60:11 72:15 77:6
93:23,23,24,24
96:7,8,9 97:14,19
98:1
puts 32:24 60:13
80:17
putting 81:4
p.m 100:25

**Q**
qualification 42:14
qualified 73:12
qualify 70:20
qualifying 42:23,23
quality 77:5
quantities 34:14
98:22
quarterly 20:3
queried 24:23 38:7
38:11,22,25 44:1
query 25:2 39:8,8
question 15:18 17:5
17:15,18,20 18:10
18:18 21:3,4 22:5
22:9 24:2 26:6
30:24 31:1 32:25
35:4,7 42:21 43:1
44:2 45:5 48:12
49:1 51:3,4 53:12
54:19 59:12,14,19
60:2 68:21 69:6
70:5 74:14,16
81:13 89:15,16
92:20,22
questionnaire 6:11
questions 12:10,16
20:25 25:10,11
29:12,13 54:2
58:19 60:24 61:14
73:21 78:17
quick 8:7 31:4
quickly 26:8 35:23

35:24 46:4
quite 4:20 41:18
quote 13:10 25:17
29:17 41:25 64:2
91:9
quoted 61:22

**R**
R 1:13 101:1
raise 89:16
raised 78:17 85:19
Ralphie 97:10
range 66:10
ranges 36:18
rat 34:16
rate 39:13,14 44:12
44:15 51:19,20
ratios 16:25,25
18:11
read 7:17 40:14
86:13
readers 41:24
51:22 64:13
reading 7:18
real 82:3 85:1
reality 93:12
realize 76:16
really 33:16 65:11
79:5 82:10 87:18
90:22
realm 93:5
realtime 9:5 85:1
reanalysis 87:16
reanalyzed 49:6
reapproved 67:1,1
reason 33:1 43:24
45:1 46:11 85:7
reasonable 21:7
82:22
reasons 88:5 96:2
rebuffed 15:17
recall 13:24 25:6
41:11 58:5 79:16
80:23 83:16
received 31:12 74:3
recipients 43:5
reclassified 47:17

47:21
recommend 65:15
recommendation
55:17
recommended 13:4
19:16 20:11 36:17
93:9
record 34:15 37:4
40:14 42:25 71:4
recorded 1:21
37:24
recording 1:21
recordings 101:7
redesigning 61:11
reduction 61:9
reevaluating 47:24
47:24
reevaluation 48:15
refer 13:11 31:23
53:4
reference 12:11
13:25 18:1 33:9
36:9 38:6,6,7
referenced 38:5
references 14:2
referred 54:20
referring 13:12
reflected 8:18
REGION 1:23
Registered 101:4
registry 16:19 24:9
46:21 60:7 62:23
80:9
regulation 50:6,6
regulatory 61:16
62:16 77:24
reiterates 56:15
related 67:10,15
69:21 80:17 91:1
relates 6:3,15
relating 27:1 30:17
80:19
relationship 18:25
relative 17:1
relevance 36:15
relevant 26:5 30:16
33:6

reliability 12:13
23:25 26:6 77:21
77:21 78:3 89:18
91:3
reliable 23:4 48:13
54:3 56:25 57:11
64:21 88:7 89:9
reliably 12:5
reliance 13:1
relied 65:14 78:4
relies 14:6,8
relitigate 53:14,15
rely 13:7 61:14
77:25 82:11 91:17
relying 56:21 98:25
remain 87:16
remainder 87:11
remaining 22:4,5
23:17
remains 87:12 89:3
remarkable 69:3
remember 47:20,20
69:24 97:9
remind 35:5
reminder 15:12
24:10
Renaissance 2:6
renewal 68:18
repeated 55:25
replicated 56:25
reply 6:21,21
report 4:11 14:1,2
15:23,24 16:4,9
16:13 18:7,23
24:4,6 26:18 27:3
29:4,8 35:17
38:13,16 64:23
66:6 69:15 73:17
74:21 78:13 80:12
80:24 82:2,5,17
82:19,25 83:2,2
83:24 85:9 86:22
92:18 93:24 99:6
99:14
reported 16:7 28:8
28:10,11 54:21,22
59:22 60:9 63:2

63:18 64:3 87:15
92:24 95:6
reporter 7:15 101:5
reporting 1:23
18:11 42:6 43:4,7
95:17
reports 4:4 10:12
13:20 14:12 16:7
16:18 17:11 18:19
56:17,21 57:20
70:3 72:1,25 74:3
76:20 77:5 78:25
83:21 86:10 89:25
90:21 91:17,17
report's 69:16
represents 19:24
request 8:2,3 46:13
86:5 91:15
require 53:14
requirements
42:14
requires 31:20
50:22
research 42:6 43:4
50:12 69:19
researcher 42:2
researchers 15:6
43:13
researching 43:8
reserve 5:20 52:6
resign 79:17
resistance 49:17
resolution 24:24
respect 4:11 45:9
51:11 63:18
respectfully 73:2
86:5
respond 96:16
responded 16:3
17:22 21:8 28:18
responses 25:2
responsible 10:17
rest 54:11 60:15
62:14,14,15
result 31:2 66:16
results 54:21 95:5
retained 71:12,19

**retracted** 70:24
**retrospective** 80:1
**returned** 25:2
**returning** 69:12
**review** 37:11 51:24
53:17 68:17 77:19
**reviewed** 24:22
30:13 44:21 66:1
**reviewers** 31:10
41:24
**reviewing** 37:10,13
**re-categorized**
46:20,21
**Ridgeland** 2:7
**right** 5:2,11 6:2 8:5
8:10,11 9:21 12:1
14:18 22:9,9,19
22:20 33:17,22
34:2,6 35:4,8
38:23 40:20 45:16
52:3 55:19 58:24
90:19 96:13,18
**ringing** 24:13
**rise** 100:23
**rises** 30:20
**risk** 16:24 18:11
26:15 54:15 56:2
56:6,18 57:4,22
58:7,10,17,23
61:8 65:18 76:10
**risks** 17:1
**Road** 1:15
**Robuck** 42:8,19
43:3 49:25 66:19
67:8 68:20 71:17
78:6
**Robuck's** 43:12
**role** 12:14
**RPR** 2:9 101:13
**rule** 7:9 12:14
**ruling** 7:11
**rulings** 9:15
**running** 60:6

———————
**S**
———————
**S** 1:10 3:12
**safe** 19:17,22 20:10

21:6,7 23:7,10,13
56:20 58:6
**safety** 54:8,11
55:18 61:12 65:17
67:23 68:4,7
93:20
**SALES** 1:5
**sat** 67:8
**savvy** 8:7
**saw** 28:19 30:5
37:11 38:6 83:12
95:2,17
**saying** 25:15 80:12
81:6,25 90:24,24
**says** 25:18 33:19
38:15 48:3,7 50:1
55:11,23 56:19
74:22 76:13 77:16
78:2 81:18 82:1
84:21 85:9 88:1
92:21,22 93:25,25
97:10,16
**schedule** 11:13
**scheduled** 11:13
**scheduling** 7:5 9:24
**Schiodt** 19:14
**science** 18:21 22:21
39:15 44:14 45:8
50:21 61:15 85:2
93:6 94:3
**scientific** 19:3
23:25 31:13 57:21
61:16,20,25 62:15
63:16 72:12 78:14
79:8 99:2
**scientist** 42:22 74:4
81:12 82:23
**scientists** 22:20
42:13 54:18
**screen** 32:8 35:19
**Screens** 27:9
**scrupulously** 68:16
**sealed** 31:20
**second** 4:19 12:21
15:4 18:22 22:8
24:1 33:5 34:20
47:25 82:1 87:9

**seconds** 99:16
**section** 26:9,19,25
27:2,4,6,8 32:11
33:10 35:20 36:10
38:5 58:13,14
63:24 84:11
**sections** 26:4 27:15
**SEDRAN** 1:11
**see** 22:7 26:20
28:14 30:10 32:10
35:20 37:6 39:16
40:11 45:18 47:2
52:9 55:21 57:7
60:19 72:18 74:7
75:25 76:2 78:10
78:12 80:4,10
82:5,10 83:8
88:19,20 100:21
**seeing** 46:14
**seen** 7:21 51:13
62:22 68:22 79:12
**selection** 6:25
**senator** 50:11,14
**sending** 49:5
**senior** 71:9
**sense** 78:12
**sent** 29:5 34:18
45:3,4,6 86:9,17
86:23
**sentences** 64:7
**sentencing** 11:13
**sepsis** 70:9
**September** 10:23
13:16 52:19
**series** 16:6,17,19
17:12 18:19 20:2
79:10
**serious** 35:23
**service** 1:22
**set** 4:23 6:4 65:19
66:22,24 100:16
100:18
**setting** 50:22 57:10
88:25
**seven-day** 6:21
**severe** 64:8
**shared** 9:10

**shift** 77:13
**shock** 70:9
**shoot** 97:11
**short** 11:9,10 51:17
71:24
**shortly** 4:5 45:11
**show** 32:8 35:13
40:7 56:4 64:15
75:2,2 89:24
90:16
**showed** 21:23
27:21 45:19 47:18
76:8
**showing** 48:15
**shown** 44:16
**shows** 39:6 41:20
56:10 75:16 90:17
90:18
**sic** 69:2 77:9
**side** 11:15
**sidebar** 11:23
**signed** 34:20 37:8
86:19,19,23
**significant** 8:20
18:7,12
**similar** 10:1
**simple** 37:21
**simply** 17:11 34:24
41:22
**single** 13:7,9 15:1
18:1 36:4 41:21
49:12,14 53:23
62:12 68:19 70:19
75:11 89:9,10
96:6 99:20
**single-spaced**
87:12
**sink** 25:18
**sinks** 14:4
**sir** 7:24
**site** 29:9,13 30:7
33:7 36:22 38:9
41:6,7 71:13 72:6
76:18 83:3,3,5,6
84:23,23 85:13
**sites** 24:9,19,23
**situation** 34:12

57:10 92:12,25
**six** 26:22 41:10
72:23 78:17
**six-years** 62:23
**skepticism** 91:4
**skipping** 64:6
**slash** 7:3
**slide** 21:23 22:3
45:19
**sloppy** 80:16
**small** 65:17
**smoking** 90:15
97:22 99:20
**snippets** 58:3 59:2
**SNOW** 2:2,5
**somebody** 25:9
34:24 36:10 37:23
41:14
**sorry** 24:15 40:13
**sought** 76:12 79:3
**sound** 1:21 101:7
**source** 77:4
**so-called** 12:3
78:24
**SPEAKER** 8:4
24:15 40:18,24
100:17,20
**specific** 15:13 16:5
18:10 25:24 38:6
**specifically** 17:13
17:15 18:24 24:3
27:1 28:3 29:18
39:15 53:21 59:13
59:19 64:4 67:18
**spectrum** 57:18
62:21 63:9 65:21
94:19 95:20
**spend** 64:19
**spent** 63:14 65:4
68:10
**SPIEGEL** 1:14
**sponsored** 42:9
**sponsorship** 50:15
**spreadsheet** 27:25
28:2,23 37:15
46:8 47:1,6,7,8,16
66:15

**spreadsheets** 45:25 48:15
**squarely** 61:21 62:4
**stand** 15:5 19:21,23 20:13 51:16 57:16 72:11 91:10
**standard** 81:9,14
**standing** 5:12 62:3
**stands** 61:20
**start** 12:9 57:15 58:2
**started** 41:10 45:22 60:20
**startling** 57:25
**state** 6:18 29:11 35:23
**statement** 19:18 20:16 45:17 50:7 87:25
**statements** 23:19 59:15
**States** 1:1,8 14:16 76:23
**stating** 23:6
**statistically** 18:7,12
**status** 1:7 26:14 35:22
**steering** 67:7,9
**STENGEL** 1:7
**stop** 22:1
**Story** 97:9
**straightforward** 53:13
**Street** 1:11,18,24
**strenuous** 31:5
**stretched** 6:16
**strike** 85:18,22,24
**struck** 91:16 94:5,7 94:7 96:1
**struggling** 93:13
**student** 46:12
**studied** 63:1 76:6
**studies** 15:11 51:24 74:12 88:12 91:4
**study** 6:20 7:7 12:4 14:11,15,19,23

15:12 16:23 17:10 18:5 21:15 24:9 24:18,18 32:12 33:7 36:21,22 40:1 41:10 42:12 42:20 43:24 44:1 44:3,4 46:10 50:12,15,17,18,19 50:22 51:2,3,5 52:2 53:16 54:3 54:10,12,14 56:4 59:21 60:9,22 62:5,8,13,18,25 63:2,3,5 66:2,22 67:2,11 68:5,8,13 68:14,22 69:1,3,8 69:23,24,25 70:22 70:23 71:8,10,18 74:11,18 77:15,22 77:25 78:3,7,18 78:21 79:18,25 80:1,2,8,13,20 81:5,24 82:4 84:7 87:8,21 88:13 89:3,17 90:19,20 92:21,22 93:2,6 93:10 95:5 97:14 98:3,24
**studying** 70:1
**study's** 40:9
**subanalysis** 80:7
**subject** 42:14 68:17 68:18 76:1
**submissions** 99:12
**submit** 23:2,24 32:22 42:5 54:3 78:2
**submitted** 37:8 78:7,8 86:24 97:20
**subsequently** 73:19
**substance** 87:2
**substantial** 32:24 34:13
**substituted** 89:4
**sudden** 64:7
**suggest** 56:22

**suggested** 47:7 53:16 78:23
**suggests** 54:14 57:17 64:8
**suicide** 34:16 37:1 37:23,25 63:4 64:1
**Suite** 1:11,14,18,24 2:6
**summaries** 67:20 68:2
**supervised** 68:16
**supervision** 76:24
**supplement** 4:12
**supplemental** 4:4 10:12 92:18
**support** 12:6 55:25 65:25
**supports** 50:6
**supposed** 81:10 94:1,1
**supratherapeutic** 56:1
**sure** 4:20 8:22 9:9 11:21 32:4,19 53:7 84:4
**surprise** 5:18
**surprised** 4:21
**surprising** 64:18
**suspect** 74:25 75:18
**swims** 14:4
**symptoms** 64:5
**S-c-h-i-o-d-t** 19:14

**T**

**T** 3:12 101:1,1
**tab** 32:2 35:18 39:22 55:10 72:14 79:10 81:16
**tabbed** 73:9
**table** 85:4 90:5 97:25
**tablets** 37:20
**take** 11:15 21:8 37:16 40:2 53:9 60:16,18 66:14 72:15 81:8

**taken** 9:6 19:16 28:15 36:6 49:15 52:23 61:8
**takes** 46:2
**talk** 10:11 14:18 15:24 27:9 34:7 59:15 63:10,25 65:8,8 75:11 77:13 78:25 79:5 80:21 85:16 91:14
**talked** 47:11 63:13 80:22 90:12 95:21 98:11,17
**talking** 63:15 64:19 65:5,23 86:15
**talks** 55:16 74:2 80:21
**Taylor** 6:3,7 60:25
**technologically** 8:7
**technology** 40:15
**telephone** 1:7 41:6 41:7
**television** 72:9
**tell** 23:12 28:4 99:2 99:3
**telling** 79:13
**tells** 44:24 75:17 91:11
**term** 16:13
**terms** 4:6 9:13 11:12
**test** 33:17,19 50:23 74:7,12 90:10,14 92:11
**tested** 90:7,8
**testified** 13:18,22 17:4 30:4,14,19 33:23 39:22 40:17 42:11 43:9,19 46:5 51:1,15 58:15 66:13,19 67:17 75:14 87:10 98:18
**testify** 14:15 20:23
**testimony** 14:7 17:2 21:2 31:12 35:13 39:5 41:20

43:12 45:17 50:7 51:17 58:14 59:9 94:18
**testing** 50:23 76:1 89:13 98:19
**Texas** 31:7
**text** 81:19
**textbook** 72:4
**thank** 7:24,25 10:6 10:7 11:12 12:2 14:21 32:5,6 52:11,12,15 96:11 96:12,20 98:9,9 99:4,5,9 100:8,9 100:20
**Thanks** 53:11 84:16
**theory** 13:3,6
**therapeutic** 28:13 32:19 57:22 61:7 64:9
**thin** 6:16
**thing** 17:23 26:18 27:13 57:14 66:18 75:22 86:21 93:11 98:10
**things** 9:3 16:5,16 52:21 59:15 61:10 62:20 68:25,25 69:25 70:4,4,9,9 70:13,14,14 74:6 74:15
**think** 4:3 6:1 8:7,17 9:24 19:24 21:7 26:5 28:7 39:6 40:18 48:11 49:5 52:20 58:12 60:16 66:10 69:13 72:8 72:16,18 73:20 79:13 82:6 86:3 90:3,3 93:14 95:23 97:13 99:14
**thinking** 19:24
**third** 12:23 15:9 30:25 89:24
**thoroughly** 86:7
**thought** 7:9 24:16

83:13,19
**thousand** 40:3
**three** 31:15,24 33:8
35:2,7 39:11
44:17 49:8 54:5,9
68:19 69:16,18
70:16 89:23
**throws** 50:19 52:3
**thrust** 95:10
**thumb** 7:15 8:3
**time** 6:14 10:25
11:4,10,10 20:19
24:20 28:12 31:15
49:17 52:7,10
54:16 63:14 64:19
65:5,24 68:11,19
71:24 78:22 91:20
93:15 96:7
**times** 37:7 61:23
**Tisi** 1:17 3:4 11:17
11:18 52:13,14
53:8,12 55:8,9,13
55:15,20,23 58:22
58:25 59:5 66:8
74:2 81:16,20,23
84:1,5,17 86:3
88:21 91:7,8
96:12 97:1 98:1
98:17 99:6,8,10
99:13,18 100:1,13
100:22
**today** 4:13 7:8,13
7:22 11:11 13:11
15:24 29:7 32:23
32:25 38:20,22
39:1 41:9 44:2,10
44:19 49:9,12
51:16 87:13
**today's** 4:23 7:16
**told** 19:3 21:11
23:16 42:19 45:14
49:10,11 64:13
98:4 100:7
**topic** 82:9
**total** 36:7 47:25
**tough** 21:9
**Tox** 27:9

**toxicity** 56:22
71:11 74:8,9,23
75:16 99:21 100:6
**toxicologists** 72:7
**toxins** 26:22
**track** 16:5
**tracked** 26:15,16
**tragic** 34:12
**tragically** 34:17
**TRANSCRIBER**
2:9
**transcript** 1:7,22
7:13,16 8:2 101:6
**transcription** 1:22
**transcripts** 9:5
**transferred** 8:21
**transplants** 73:4
**treat** 63:7,8
**treaters** 6:10
**treating** 36:21 38:7
**tremendous** 71:24
**trial** 6:4 13:15 17:9
52:17,19 53:23
57:3 61:14 88:1
95:8
**trials** 57:19
**tried** 37:21
**true** 43:6 48:1
49:10 54:17 63:21
91:12 93:1 101:6
**truth** 68:11 94:8
96:23
**try** 47:11
**trying** 7:20 9:18
12:10 62:2,10
63:6,7,8 64:1
**turn** 14:6,8 17:13
24:1 30:25 65:21
73:22
**turned** 86:17
**two** 4:9 6:7 18:16
19:10,15 20:7,18
23:9 27:15,15
31:7,18 35:10
37:8 49:2,7 54:8
56:21 60:23 61:6
61:13 69:22 70:11

71:2 72:7 79:8
80:4,11,22 82:2
84:6,6 87:3,14
88:17 96:16,18
98:22
**Tylenol** 1:4 32:13
34:14 36:5,24
37:18 38:5,8
**types** 25:9
**typical** 36:15
**typically** 53:3

---
**U**

**ultimately** 53:24
77:9
**Um-hmm** 99:25
**unacceptable** 39:14
**unbeknownst**
82:24
**unbiased** 74:16
**unblinded** 41:22
**uncertain** 22:11
**uncertainty** 22:22
23:22
**underlying** 12:13
**understand** 24:5
26:5 33:20 62:2
72:9,11 74:24
**understanding**
69:4
**understands** 71:4
**undo** 62:10
**unfolded** 65:22
**unfortunate** 34:12
**unilaterally** 42:13
43:15
**unintentional** 64:3
**unique** 68:13
**United** 1:1,8 14:16
76:23
**unknown** 36:1 39:3
64:23
**unquote** 13:10
**unrelated** 98:16
**unreliable** 12:24
56:17 63:15 65:5
81:7 82:21,22

85:12 90:2,10
94:5 95:16
**update** 7:4
**updated** 20:4
**up-to-date** 4:16
**use** 11:3 36:25 59:6
59:7 64:9 88:1,11
**uses** 16:13
**usually** 41:5
**UTSMC30059** 46:9
**UTSW** 24:21,22
31:20
**U.S** 14:25 50:10,14

---
**V**

**V** 1:17
**vacuum** 66:23
**valid** 51:8
**validated** 92:11
93:5
**validity** 53:16
**various** 58:15,16
59:3,9 60:21
68:23 75:4
**verified** 27:24 29:1
**verify** 30:6
**VERITEXT** 1:23
**vetted** 38:10
**Vicodin** 36:5
**video** 5:17 11:3
**videotapes** 11:6
**view** 12:5
**violation** 42:3
**virtually** 13:18
21:24
**visual** 11:5,7
**vital** 25:18
**vitamins** 26:24
**votes** 62:7

---
**W**

**wait** 82:1
**waive** 42:13,14,22
**waived** 40:11 41:2
41:3,3,11,22
43:16
**waiver** 41:4,23

42:20,21,24 43:18
**waivers** 43:9
**walk** 26:8
**Walnut** 1:11
**want** 8:22,22 9:8,8
9:9,22 16:11 19:6
59:14 65:11,21
79:5 83:18 85:20
85:25 87:4 88:10
89:23 96:14 98:5
100:16
**wanted** 4:19 7:3
16:5 28:13 32:8
46:6 95:22 96:16
**wants** 8:23 9:11
44:14
**warn** 6:7
**Washington** 1:18
6:18 29:11,11
**wasn't** 37:10 61:25
85:19
**watch** 72:9
**way** 13:12 25:16
26:2 51:8 74:19
75:19 85:10 92:17
95:24,24
**week** 6:17
**well-accepted**
18:21
**went** 22:15 24:5
29:12 48:21 49:8
67:22 86:18 95:24
**weren't** 70:1 90:25
**we'll** 4:5 11:15,15
27:9 34:7 78:25
**we're** 5:14 6:9,12
7:23 8:24 11:6
15:24 20:14 24:4
31:23 34:9 52:22
60:20 65:23 94:1
94:1 96:13 98:4
**we've** 21:15 31:17
35:7 49:6 95:21
96:4,5
**widely** 72:2
**William** 71:6
**willing** 71:22,23

**window** 89:13 90:4
**wish** 83:14
**withdraw** 35:13
**withdrawn** 19:25
  20:16 31:15 33:3
  33:15 35:7
**withdrew** 32:14
  33:5 35:6,10
**witness** 42:9 99:21
**witnesses** 49:16
  58:1,15 59:9
  73:13,15
**word** 87:6
**words** 23:20 28:22
  81:23
**work** 7:14 37:22
  59:20
**working** 6:5 14:1
  54:19,25 55:4,11
  56:15,19 62:4
  65:14
**world** 15:6 60:7
**worries** 8:9
**worse** 97:8
**worth** 27:2
**wouldn't** 42:25
**woven** 78:25
**wrangling** 96:7
**wrap** 45:10 53:22
  91:7 95:21,22
**write** 19:10 20:13
  22:9 29:8 31:2
  66:17 73:8,10
  74:21
**writings** 23:19
**written** 20:18 24:20
  27:24 28:2 30:10
  32:12 33:8 34:15
  37:7 44:24 89:17
  99:11
**wrong** 22:19 24:5
  62:16 74:5 90:21
  95:6
**wrote** 19:15,20
  20:5,9 22:7 25:15
  29:4 35:10 36:10
  36:23 38:12 50:10

  50:14 52:1 60:14
  64:23 82:2,7,25
  98:1

**X**

**X** 3:1,12
**X'd** 31:18

**Y**

**Y** 2:9 101:4,13
**Yeah** 40:22 41:1
**year** 6:9 13:17
  60:20 96:5
**years** 19:10,20 20:7
  20:18 23:9 31:7
  36:1 38:22 59:16
  60:16 68:5,14,19
  68:24 71:8 93:14
**yesterday** 4:14 7:2
  85:25
**York** 2:3

**Z**

**Zimmerman** 21:19
  21:19

**0**

**008** 39:21
**010** 64:25 82:15
  88:9,16,17 99:24
**026** 31:25 32:2
**035** 33:5
**042** 35:12,17 46:16
  47:2 48:3
**051** 46:17

**1**

**1** 20:11 24:7 72:14
  85:4 90:5
**1,200** 36:10,11
  37:14,16,20,22
  38:1
**1.0** 97:17
**1.2** 36:11
**10** 30:9 32:19 55:16
  56:1 58:8,18,23
  59:16 60:5 83:1
**10:11** 1:6

**10:19** 11:24
**10:21** 11:24
**10019** 2:3
**107** 92:14
**108** 92:14
**11** 53:22 55:3,15
  60:3 66:10 83:1
**116** 46:20 47:18
  48:9,9
**12** 3:4 25:25 82:15
  82:19 84:1 88:16
  99:24
**12.5** 88:23
**12:23** 100:25
**12:30** 11:14
**120** 36:14,19
**13** 19:20 26:9 35:20
**1368** 27:21
**1370** 63:24
**14** 35:18 38:22
  73:23,25 87:6
**1400** 2:6
**15** 59:16 60:16
  73:23,25 90:6
  93:14
**150** 71:10
**152** 72:21
**16** 39:13 49:20
  51:19 87:15 89:4
  89:19 90:7
**16th** 6:12,23
**17** 53:22 59:12
  87:15,15 89:4,19
**1700** 2:3
**18** 26:25 87:16 90:7
  90:7
**1800** 1:24
**1801** 1:24
**1825** 1:18
**19** 12:3 13:23 14:3
  14:8 15:16 20:20
  22:23 23:3 26:7
  27:22 28:3,5,7
  29:17,18 30:11,20
  31:15 32:2 33:14
  35:15 39:11 45:4
  51:11 54:10 57:8

  62:25 63:12 64:20
  65:9 66:4 77:1
  82:18 89:5 90:7
  94:20,22
**19103** 1:24
**19106** 1:12
**1997** 25:25
**1998** 19:9,11 22:24
  41:11 62:24

**2**

**2** 30:10 45:16,18,19
  46:7 48:6
**2:00** 11:14
**2:13-md-02436-LS**
  1:4
**20** 36:18 68:5,24
  71:7
**20-year** 59:20
**20006** 1:18
**2002** 38:11
**2003** 19:9,12,13,25
  22:24 23:6 58:8,9
  60:13 62:24
**2005** 12:5,19,22
  13:19 14:2,23
  15:4,9,15 17:14
  17:19 18:24 19:8
  20:8,19 23:4 24:3
  27:17 33:25 34:5
  38:12 45:22 46:14
  47:25 49:4 50:25
  65:12
**2006** 50:11 52:1
**2007** 20:5 23:10
**2009** 20:22 23:12
  45:14,18,23 47:14
  48:1,4,8,20 49:2
  99:2
**2011** 97:14
**2013** 21:13 23:16
**2015** 80:3,5
**2016** 1:5 29:1 65:23
  80:5,10 81:17
  101:13
**202** 1:19
**21** 21:23 30:13

  44:12,15 49:20
  51:20 82:14 91:9
**215** 1:12
**23rd** 6:25
**2450** 1:14
**256** 27:19
**27** 1:5
**275** 27:19 63:1
**28** 14:24,25
**286** 92:21
**29** 80:10 81:17
  101:13
**29th** 9:25 82:17
**299** 40:7

**3**

**3** 30:12 46:8 58:23
  79:10 97:23 98:21
**30** 29:1 36:18 71:15
  99:16
**30th** 82:8,9
**30326** 1:15
**322** 98:20
**325** 37:18
**34** 72:22 83:1
**35-year-old** 34:13
  36:23
**36** 72:22
**37** 83:1
**39158** 2:7

**4**

**4** 3:2 12:6 13:14
  14:5 17:6,21 18:9
  19:5,16 20:11
  23:6,10 28:9,21
  32:20,21 40:3
  48:14 56:5,23
  57:3,23 58:10
  59:24 61:4 76:25
  83:11 89:1,6,20
  98:19
**4-gram** 76:7 100:2
**404** 1:16
**41** 30:9 87:9 97:24
**42** 30:9,12
**48-page** 87:11

Page 118

Page 118

**5**
**5** 56:11 59:25
**50** 32:18
**500** 1:11
**500-milligram**
  37:19
**510** 1:11
**52** 3:4
**592-1500** 1:12

**6**
**6** 32:16 59:25 76:6
**6-gram** 32:24
**601** 2:7
**606-2995** 2:4
**646** 2:4

**7**
**7** 83:9 98:21
**7.5** 56:11 64:10
  87:8
**700** 1:18
**702** 12:15
**777-6690** 1:25
**783-6400** 1:19

**8**
**8** 15:1
**80** 35:25 36:1
**832-8000** 1:16
**86** 58:19 59:11
**88** 72:21
**888** 1:25

**9**
**9** 39:22 88:7,16
  100:3,3,5
**9th** 6:12,21
**950** 1:15
**96** 3:4
**985-4427** 2:7
**99** 3:4

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 302-571-0510 ~ 610-434-8588 ~ 888-777-6690

**5**
**5** 56:11 59:25
**50** 32:18
**500** 1:11
**500-milligram**
  37:19
**510** 1:11
**52** 3:4
**592-1500** 1:12

**6**
**6** 32:16 59:25 76:6
**6-gram** 32:24
**601** 2:7
**606-2995** 2:4
**646** 2:4

**7**
**7** 83:9 98:21
**7.5** 56:11 64:10
  87:8
**700** 1:18
**702** 12:15
**777-6690** 1:25
**783-6400** 1:19

**8**
**8** 15:1
**80** 35:25 36:1
**832-8000** 1:16
**86** 58:19 59:11
**88** 72:21
**888** 1:25

**9**
**9** 39:22 88:7,16
  100:3,3,5
**9th** 6:12,21
**950** 1:15
**96** 3:4
**985-4427** 2:7
**99** 3:4